No. 23-7090

# UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

———————

PERRY CLINE, on behalf of himself and all others similarly situated,

*Plaintiff-Appellee*,

v.

SUNOCO, INC. (R&M); SUNOCO PARTNERS MARKETING & TERMINALS L.P.,

*Defendants-Appellants*.

———————

On Appeal from the United States District Court for the
Eastern District of Oklahoma,
No. 17-cv-00313

———————

## BRIEF FOR APPELLANTS

———————

R. PAUL YETTER
ROBERT D. WOODS
YETTER COLEMAN LLP
811 Main Street, Suite 4100
Houston, TX 77002

DANIEL M. MCCLURE
NORTON ROSE
 FULBRIGHT US LLP
1301 McKinney, Suite 5100
Houston, TX 77010

PAUL D. CLEMENT
ERIN E. MURPHY
MATTHEW D. ROWEN*
ZACHARY J. LUSTBADER*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

* Supervised by principals of the firm who are
members of the Virginia bar

*Counsel for Appellants*

ORAL ARGUMENT REQUESTED

March 14, 2024

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

STATEMENT OF PRIOR OR RELATED APPEALS ............................................. ix

GLOSSARY ..................................................................................................... x

INTRODUCTION ............................................................................................. 1

JURISDICTIONAL STATEMENT ....................................................................... 4

STATEMENT OF THE ISSUES ......................................................................... 4

STATEMENT OF THE CASE.............................................................................. 5

    A.    Factual and Legal Background............................................................. 5

    B.    Procedural Background .......................................................................11

SUMMARY OF ARGUMENT............................................................................. 18

STANDARD OF REVIEW ................................................................................. 20

ARGUMENT .................................................................................................... 20

I.     The Classwide Judgment Violates Rule 23 And The Rules Enabling Act........................................................................................................... 20

    A.    Cline Came Nowhere Close to Satisfying Rule 23 ............................ 21

    B.    The District Court's Efforts to Wish Away the Glaring Rule 23 Problems Only Created Additional Reversible Errors ................. 28

II.    At A Minimum, The Class Could Not Include, And No Damages Could Be Awarded To, The Unidentified Class Members .......................... 34

III.   The Damages Awards Far Exceed What Oklahoma Law Permits .............. 39

    A.    PRSA Interest Stops Accruing When Proceeds Are Paid ................. 39

    B.    The Punitive-Damages Award Violates Oklahoma Law Many Times Over ...................................................................................... 44

1.  Under Oklahoma law, punitive damages are not available in actions for late-payment interest under the PRSA ........................................................................... 44

2.  The Reform Act confirms that punitive damages are unavailable ............................................................ 46

3.  The punitive-damages award fails on its own terms ............... 49

CONCLUSION ................................................................ 52

STATEMENT OF COUNSEL AS TO ORAL ARGUMENT ................................ 52

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF DIGITAL SUBMISSION

CERTIFICATE OF SERVICE

ADDENDUM

Opinion re Class Certification (Oct. 3, 2019) (Dkt.126) ................................... A1

Order re Class Certification (Oct. 3, 2019) (Dkt.127) .................................... A18

Memorandum Order re Motion to Clarify (Nov. 26, 2019) (Dkt.186) ........................................................................... A20

Opinion re Partial Summary Judgment (Dec. 10, 2019) (Dkt.231) ................. A26

Opinion (Aug. 17, 2020) (Dkt.298) ................................................ A39

Opinion re Motion for a New Trial and to Alter Judgment (Dec. 9, 2020) (Dkt.349) ........................................................... A87

Amended Plan of Allocation Order (Oct. 17, 2023) (Dkt.643) ..................... A101

Amended Award of Actual Damages (Oct. 19, 2023) (Dkt.645) ................. A107

Judgment Order (Oct. 19, 2023) (Dkt.646) .................................... A109

Order re Motions to Alter or Amend Judgment and for a New Trial (Nov. 20, 2023) (Dkt.655) ............................................................. A110

ii

# TABLE OF AUTHORITIES

## Cases

*Abraham v. WPX Prods., LLC*,
317 F.R.D. 169 (D.N.M. 2016) ........................................................................ 25

*Adashunas v. Negley*,
626 F.2d 600 (7th Cir. 1980) ........................................................................... 25

*Albertson's, Inc. v. Amalgamated Sugar Co.*,
503 F.2d 459 (10th Cir. 1974) ......................................................................... 27

*AmChem Prods. v. Windsor*,
521 U.S. 591 (1997) ........................................................................ 20, 32, 38

*Base v. Devon Energy Prod. Co., L.P.*,
2024 WL 445613 (Okla. Feb. 6, 2024) ............................................... 30, 44, 45

*BMW of N.A., Inc. v. Gore*,
517 U.S. 559 (1996) ........................................................................................ 49

*Brecher v. Republic of Argentina*,
802 F.3d 303 (2d Cir. 2015) ............................................................................ 25

*Carrera v. Bayer Corp.*,
727 F.3d 300 (3d Cir. 2013) ............................................................................ 25

*CGC Holding Co. v. Broad & Cassel*,
773 F.3d 1076 (10th Cir. 2014) ....................................................................... 20

*Chieftain Royalty Co. v. XTO Energy, Inc.*,
528 F.App'x 938 (10th Cir. 2013) ............................................................ 23, 33

*Cline v. Sunoco, Inc. (R&M)*,
2023 WL 4946312 (10th Cir. Aug. 3, 2023) .................................................... 17

*Cline v. Sunoco Partners Mktg. & Terminals L.P.*,
2021 WL 5858399 (10th Cir. Nov. 1, 2021) .................................................... 17

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) .......................................................................................... 22

*Cook v. Rockwell Int'l Corp.*,
618 F.3d 1127 (10th Cir. 2010) ............................................................16

*Cowart v. Piper Aircraft Corp.*,
665 P.2d 315 (Okla. 1983) .....................................................................49

*EQT Prod. Co. v. Adair*,
764 F.3d 347 (4th Cir. 2014) ...................................................... 22, 25

*Evans v. Brigham Young Univ.*,
2023 WL 3262012 (10th Cir. May 5, 2023) .........................................24

*Faulhaber v. Petzl Am., Inc.*,
656 F.Supp.3d 1257 (D. Colo. 2023) ....................................................25

*Gen. Tel. Co. of N.W. v. EEOC*,
446 U.S. 318 (1980) ...............................................................................32

*Gorss Motels, Inc. v. Brigadoon Fitness, Inc.*,
29 F.4th 839 (7th Cir. 2022) ..................................................................31

*Green v. Johnson*,
977 F.2d 1383 (10th Cir. 1992) .............................................................49

*H.B. Krug v. Helmerich & Payne, Inc.*,
362 P.3d 205 (Okla. 2015) .......................................................... 41, 43

*Hayes v. Wal-Mart Stores, Inc.*,
725 F.3d 349 (3d Cir. 2013) ..................................................................33

*Hebble v. Shell Western E & P, Inc.*,
238 P.3d 939 (Okla. Civ. App. 2009) ...................................................46

*Hull v. Sun Refining & Mktg. Co.*,
789 P.2d 1272 (Okla. 1989) .......................................................... 7, 30

*In re Assessments for Tax Year 2012*,
481 P.3d 883 (Okla. 2021) .....................................................................43

*In re Bridgestone/Firestone, Inc.*,
288 F.3d 1012 (7th Cir. 2002) ..................................................................4

*In re Tulsa Energy, Inc.*,
    111 F.3d 88 (10th Cir. 1997) ........................................................................ *passim*

*Karhu v. Vital Pharm., Inc.*,
    2015 WL 3560722 (11th Cir. June 9, 2015) ......................................25

*Liberty Mut. Fire Ins. Co. v. Woolman*,
    913 F.3d 977 (10th Cir. 2019).............................................................20

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)................................................................... 36, 37

*Marcus v. BMW of N. Am., LLC*,
    687 F.3d 583 (3d Cir. 2012) ..............................................................25

*Martinez v. FedEx Ground Package Sys., Inc.*,
    2023 WL 7114678 (D.N.M. Oct. 27, 2023).......................................25

*Maxwell v. Samson Res. Co.*,
    848 P.2d 1166 (Okla. 1993) ........................................................ 13, 22

*McClintock v. ExxonMobil Oil Corp.*,
    2018 WL 1547373 (E.D. Okla. Mar. 29, 2018)..................................47

*McCook v. Bryan*,
    46 P. 506 (Okla. 1896) .......................................................................30

*McKnight v. Linn Operating, Inc.*,
    2016 WL 756541 (W.D. Okla. Feb. 25, 2016)...................................22

*Michigan v. Bay Mills Indian Cmty.*,
    572 U.S. 782 (2014)...........................................................................49

*Okland Oil Co. v. Conoco, Inc.*,
    144 F.3d 1308 (10th Cir. 1998)..........................................................47

*Parsons v. Dist. Ct.*,
    408 P.3d 586 (Okla. 2017) .................................................................29

*Purcell v. Santa Fe Minerals, Inc.*,
    961 P.2d 188 (Okla. 1998) .......................................................... *passim*

*Quinlan v. Koch Oil Co.*,
    25 F.3d 936 (10th Cir. 1994) ...............................................................30

*Rural Water Dist. No. 2 v. City of Glenpool*,
    698 F.3d 1270 (10th Cir. 2012) ............................................................38

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
    559 U.S. 393 (2010) .............................................................................38

*Sides v. John Cordes, Inc.*,
    981 P.2d 301 (Okla. 1999) ...................................................................44

*Slocum v. Phillips Petroleum Co.*,
    678 P.2d 716 (Okla. 1983) ............................................................. 43, 51

*Smith v. LifeVantage Corp.*,
    341 F.R.D. 82 (D. Utah 2022) ..............................................................25

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) .............................................................................35

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
    538 U.S. 408 (2003) .............................................................................51

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998) ...............................................................................38

*Strey v. Hunt Int'l Res. Corp.*,
    696 F.2d 87 (10th Cir. 1982) ...............................................................16

*Sunoco, Inc. (R&M) v. Cline*, No. 19-608
    (10th Cir. Nov. 13, 2019) .....................................................................13

*Thornton v. Kroger Co.*,
    2023 WL 6378417 (D.N.M. Sept. 29, 2023) ........................................25

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ....................................................................... 34, 36

*Wagner v. Case Corp.*,
    33 F.3d 1253 (10th Cir. 1994) ..............................................................45

*Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc.*,
    725 F.3d 1213 (10th Cir. 2013) ............................................................20

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ................................................................... 26, 33

**Statutes**

15 Okla. Stat. §266 ...............................................................................44

20 Okla. Stat. §1602 .............................................................................49

23 Okla. Stat. §9.1(A) ............................................................ 44, 45, 46, 51

23 Okla. Stat. §9.1(B) ...........................................................................51

28 U.S.C. §292(d) ................................................................................12

28 U.S.C. §2072(b) ..............................................................................32

28 U.S.C. §5072(b) ..............................................................................38

52 Okla. Stat. §570.10 ..........................................................................13

52 Okla. Stat. §570.10(B) .......................................................................6

52 Okla. Stat. §570.10(B)(1) ...............................................................6, 27

52 Okla. Stat. §570.10(B)(3) ................................................................6, 9

52 Okla. Stat. §570.10(D)(1)-(2) .................................................7, 11, 21, 23

52 Okla. Stat. §570.10(D)(1) ....................................................19, 39, 41, 49

52 Okla. Stat. §570.10(D)(2) .......................................................... 21, 49

52 Okla. Stat. §570.10(E)(1) ............................................................ *passim*

52 Okla. Stat. §570.10(E)(2) ..................................................................49

52 Okla. Stat. §570.10(F) ......................................................................49

52 Okla. Stat. §570.14(A) ......................................................................29

52 Okla. Stat. §§901-903 .......................................................................42

52 Okla. Stat. §902(2) ........................................................................46

52 Okla. Stat. §903 ................................................................... *passim*

60 Okla. Stat. §658 ............................................................................10

Okla. Admin. Code §735:80-7-2(8) ..................................................37

**Rules**

10th Cir. R. 27.4 ...............................................................................49

Fed. R. Civ. P. 23(a)-(b) ..................................................................20

Fed. R. Civ. P. 23(a)(3)-(4).............................................................27

Fed. R. Civ. P. 23(a)(4)....................................................................32

Fed. R. Civ. P. 82 ............................................................................ 38

**Other Authorities**

Ellen P. Aprill, *Inadvertence and the Internal Revenue Code: Federal Tax Consequences of State Unclaimed Property Laws*, 62 U. Pitt. L. Rev. 123 (2000) ............................................................................37

Jonathan D. Baughman, *The Prudent Operator Standard in the 21st Century*, 58 Rocky Mountain Mineral Law Inst. 12-1 (2012).................... 42, 46

*Black's Law Dictionary* (11th ed. 2019) ................................................ 44

Katherine Crowley Jimenez, Note, *Class-Actions Threaten the Energy Industry: Class-Action Lawsuits and Royalty Litigation in Light of Cline v. Sunoco*, 46 Okla. City U. L. Rev. 87 (2021) ........................................11

Newberg & Rubenstein on Class Actions (6th ed. Nov. 2023 Update)...................31

Okla. H.B. 1759 (2005).....................................................................41

Unif. Unclaimed Prop. Act §102(2) ....................................................... 10

## STATEMENT OF PRIOR OR RELATED APPEALS

- Sunoco, Inc. (R&M), et al., v. Cline, No. 19-608

- Cline v. Sunoco Partners Marketing & Terminals L.P., No. 20-7055

- Cline v. Sunoco Partners Marketing & Terminals L.P., No. 20-7064

- Cline v. Sunoco Partners Marketing & Terminals L.P., No. 20-7072

- In re: Sunoco, Inc. (R&M), et al., No. 21-7063

- Cline v. Sunoco, Inc. (R&M), et al., No. 22-7017

- Cline v. Sunoco, Inc. (R&M), et al., No. 22-7018

- Cline v. Sunoco, Inc. (R&M), et al., No. 22-7030

# GLOSSARY

PRSA          Production Revenue Standards Act, 52 Okla. Stat. §§570.1-15

Reform Act    Energy Litigation Reform Act, 52 Okla. Stat. §§901-903

## INTRODUCTION

It is bedrock law that a court must hold each class member to her burden of proof on each element of every claim and ensure that the defendant has a meaningful opportunity to present all of its defenses as to all class members. The district court failed to abide by those rules here, instead short-circuiting the proceedings at every turn to try to make a sprawling case involving individualized issues and unidentified plaintiffs work as a class action when it plainly could not. The result was a $180 million judgment—most of which will escheat to various states (and class-action lawyers) rather than being distributed to class members—that violates Rule 23, the Rules Enabling Act, Article III, the Due Process Clause, and Oklahoma law.

Sunoco[1] purchases crude oil from wells in Oklahoma and pays proceeds to the wells' various interest owners. That is more difficult than it sounds because ownership interests are highly fractionalized, and some are unidentifiable. Despite those difficulties, Sunoco paid on time in an industry-leading percentage of cases. But in the less than 1% of cases in which Sunoco could not make timely payment, the Production Revenue Standards Act entitles rightful owners to interest at a rate set by the statute. Whether Sunoco is liable for interest and, if so, in what amount, depends on highly individualized factors, including whether and when the owner

---

[1] "Sunoco" refers collectively to Defendants-Appellants Sunoco Partners Marketing & Terminals L.P. and Sunoco, Inc. (R&M).

had marketable title during the delay, whether oil from the well had previously been sold to another purchaser, whether the sale agreement at issue indemnified the purchaser, and more.

The district court nonetheless certified a class of 53,000 "oil-well interest owners" who were not paid interest on a late proceeds payment *without even requiring the class representative to identify who all those owners purportedly are.* The court instead proceeded on the assumption that an expert could sort it all out and resolve any potential individualized issues at trial. And when that assumption inevitably proved false, the court faulted Sunoco for not having at the ready records sufficient to prove the plaintiffs' case for them, held all possible defenses invalid or unproven after a four-day trial, and awarded a judgment at the maximum statutory 12% interest rate for every class member despite the complete absence of evidence that the individualized and specific prerequisites for that maximum rate were met for any (let alone every) class member—which, of course, would have been impossible to determine given that no one is sure to this day who many of the class members are. The very factors that prevented timely proceeds payment in the first place—namely, the difficulty of identifying and locating the actual owner legally entitled to some of the fractional interests—thus mean that roughly two-thirds of the judgment amount will likely never be seen by actual oil-well interest owners, but instead will end up in state-run unclaimed-property funds.

Given that this case is at bottom about payments that were not made because it was often difficult (if not impossible) to ascertain who is legally entitled to each fractional interest, the district court should have been especially skeptical of any claim that the case could be tried on a classwide basis without even knowing who the class members are. After all, every plaintiff—whether in an individual or class action—has a non-negotiable obligation to establish that they suffered a redressable injury-in-fact traceable to the defendant, and that cannot be assessed without knowing who it is that claims to have been injured. But rather than grapple with those difficulties, the district court made the classic mistake of certifying first and confronting obstacles later (or not at all). Making matters worse, the court propelled the case forward at breakneck speed shortly after inheriting it, allowing just *15 days* between certification of a 53,000-member class and the close of discovery, and setting trial a mere two months later. The court thus set a schedule that assumed that the highly individualized liability and damages issues at the heart of this case would not be presented—and, in so doing, ensured that none could.

Not content to order Sunoco to pay all class members interest at the statutory maximum, the court added to the $48.7 million in unpaid-interest damages another $55 million in extra-statutory prejudgment interest at the PRSA's maximum rate for measuring damages, plus $75 million more in *punitive* damages. Those awards are plainly verboten under Oklahoma law and due process; indeed, the Oklahoma

legislature enacted reforms a decade ago precisely to prevent freewheeling awards like this one.

Class actions do not license rough justice. "Tempting as it is to alter doctrine in order to facilitate class treatment, judges must resist so that all parties' legal rights may be respected." *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1020 (7th Cir. 2002). A court cannot assume away any plaintiff's burden, or preclude a defendant from litigating defenses, just because that is the only way to make a class action work. The judgment should be vacated, and this Court should remand with instructions to decertify the class, or at least throw out the great majority of the damages.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §1332(d)(2). It entered final judgment on October 19, 2023. App.489. Sunoco timely moved to alter or amend the judgment and for a new trial on November 15, 2023; the district court denied Sunoco's post-trial motions on November 20, 2023. App.550; *see* App.490-549. Sunoco filed a timely notice of appeal on December 15, 2023. App.551-52. This Court has jurisdiction under 28 U.S.C. §1291.

## STATEMENT OF THE ISSUES

1. Whether the classwide adjudication and the judgment it produced violated Rule 23 and the Rules Enabling Act.

2. Whether the district court violated Article III and Rule 23 by awarding $120 million to unidentified class members whose standing was never proven.

3. Whether the district court violated Oklahoma law and/or due process in awarding extra-statutory prejudgment interest and punitive damages.

## STATEMENT OF THE CASE

### A.     Factual and Legal Background

1. Sunoco is a "first purchaser" of crude oil.  While some well operators sell oil and remit the proceeds directly to the owners in their wells, others (especially small operators) sell to first purchasers like Sunoco, which then pay the proceeds to the well's owners.  That process is more challenging than it sounds.  Oil and gas ownership interests are varied, fractured, and frequently changing hands—so much so that literally thousands of people can own shares of the proceeds generated by the sale of oil from a single well or unit.

First, there are the owners of the mineral rights, typically royalty owners, who enter leases with producer-operators and keep a percentage of the proceeds derived from oil produced from the land.  App.343.  That share is often spread among multiple people.  Since mineral rights were first granted in Oklahoma in the late 19th century, they have been subdivided among multiple heirs across multiple generations, App.342, and various entities across the country have bought (and sold) these interests from fourth- and fifth-generation owners, App.347-48.  Next, there

are the exploration and production companies—well operators who lease mineral rights from owners and do the drilling—along with non-operating "working interest" owners who invest capital and pay expenses in return for a share of the proceeds. App.343-44.  Finally, there are assignees, to whom working-interest owners may have assigned all or part of their interests.  App.359-60; *see* App.387-90.  In all, "it is not unusual for Sunoco to pay anywhere from tens to thousands of interest owners for oil produced" from one well.  App.412 n.6.

While those payment obligations are contractually grounded, *see Purcell v. Santa Fe Minerals, Inc.*, 961 P.2d 188, 191-92 (Okla. 1998), eventually the Oklahoma legislature "codified" them in the PRSA, providing that "[p]roceeds from the sale of oil or gas production from an oil or gas well shall be paid to persons legally entitled thereto" within certain deadlines that vary by sale type.  52 Okla. Stat. §570.10(B).  For a "first sale" from a well, proceeds must be paid within six months.  *Id.* §570.10(B)(1).  For subsequent sales, proceeds must be paid before "the last day of the second succeeding month after the end of the month within which such production is sold."  *Id.* §570.10(B)(1)(b).  There are multiple exceptions, including for payments under $100.  *See id.* §570.10(B)(3).  The PRSA also provides for interest as a form of damages when someone breaches the obligation to pay proceeds to someone legally entitled to them in whole and on time.  *See id.* §570.10(E)(1) ("a first purchaser … who fails to remit proceeds" on time "to owners

legally entitled thereto … shall be liable to such owners for interest as provided in subsection D … on that portion of the proceeds not timely paid); *Purcell*, 961 P.2d at 191-92.

Unsurprisingly, it is not always clear who the rightful owner of a well interest is.  To account for the risk of confusion on that score, a person is not legally entitled to proceeds under the PRSA unless she has "marketable title," *In re Tulsa Energy, Inc.*, 111 F.3d 88, 90 (10th Cir. 1997), a concept Oklahoma courts define as "perfect title or clear title of record … free from apparent defects, grave doubts and litigious uncertainty," *Hull v. Sun Refining & Mktg. Co.*, 789 P.2d 1272, 1277 (Okla. 1989). Given the inherent information asymmetry (owners tend to know best about what they own) and the difficulty of determining title, Oklahoma assigns to each owner the burden to "establish marketable title so that he can receive proceeds." *Tulsa Energy*, 111 F.3d at 90.  The PRSA also accounts for the possibility that a first purchaser may be unable to timely pay because it cannot determine who has marketable title.  To that end, while the statute provides a rate of 12% interest for other kinds of untimely payments, it reduces the rate to 6% "[w]here such proceeds are not paid because the title thereto is not marketable."  52 Okla. Stat. §570.10(D)(1)-(2).  If title was not marketable when proceeds came due, then whoever is legally entitled to proceeds may claim them once she has cured whatever

defect or cloud on her title existed, but she is entitled to only 6% interest for the period during which payment was delayed because she lacked marketable title.

In effect, then, the PRSA not only acknowledges the practical challenges facing first purchasers, but "recognizes the operator's *right* to withhold proceeds in the absence of marketable title," *Tulsa Energy*, 111 F.3d at 90, rather than pay proceeds to what could end being the wrong person. And it compensates the ultimate rightful owner for delay attributable to a cloud on title, but at a much lower rate than if the delay was not attributable to such uncertainty. All of that creates a scheme in which first purchasers are strongly incentivized to promptly determine who has marketable title (lest they be saddled with 12% interest for untimely proceeds payments), but are not penalized for the relatively rare instances when they cannot.

2. Between 2007 and 2019, Sunoco purchased oil from 23,172 wells in Oklahoma. App.216. To facilitate on-time payments to the many fractional owners, Sunoco worked hard to ascertain who held marketable title to which interests. Because Sunoco is not an exploration and production company with personal relationships with royalty owners, it generally relied on information provided by well operators regarding the many interests down the chain. App.346-47, 360, 398-99. Well operators typically provided Sunoco with title opinions demarcating royalty-interest owners, working-interest owners, and other payees on each well and identifying how much each owns. *See* App.341. These opinions were often more

8

than 100 pages long, App.389-90, as title over fractional interests is often muddied by decades' worth of poorly recorded transactions, stray deeds, deaths without a probated estate, unrecorded lease terminations, and more, App.351-58.

Most of the time, these efforts succeeded in identifying and locating the rightful owner with marketable title, enabling Sunoco to make timely proceeds payments. In fact, Sunoco almost always paid on time and in full; over the relevant period, it had an industry-leading 98.7% 60-day payment rate.[2] App.362. While Sunoco occasionally simply made a mistake, most of the time, payments were late for one (or more) of three reasons: (1) Sunoco was awaiting further information, without which the title attorneys could not confirm who had marketable title, App.361; (2) Sunoco received inaccurate or incomplete information from a well operator about the location or identity of an owner, App.372; or (3) Sunoco simply had no idea who was legally entitled to proceeds, App.373. *See* App.400 (late payment absent a title defect "doesn't occur very often").

Starting with the first category, sometimes a title examination revealed who likely owned a well interest, but more information was needed to confirm that they held marketable title. In that case, a title attorney would issue an opinion noting

---

[2] That is not to say that the remaining 1.3% of payments were all late. As discussed, the PRSA contains several exceptions—for example, the less-than-$100-payment exception, 52 Okla. Stat. §570.10(B)(3). *See* App.362.

what additional documents ("title requirements") were needed.  App.360.  Second, sometimes Sunoco thought it knew who the owner was but got no response to correspondence, including requests for confirmation.  *E.g.*, App.338-40.  Sunoco sometimes ran into this problem even when there were (at least thought to be) no issues with marketable title; occasionally it would send letters and proceeds checks to what it believed was the owner's address only to have them go unanswered and uncashed.  App.365-66.  Finally, sometimes a title examination was so inconclusive that Sunoco could not identify any owner at all.  App.373.

When it ran into these complications, Sunoco did not just keep the proceeds for itself; it segregated them for the presumed rightful owner.  And if the difficulties locating or identifying that person persisted long enough for the proceeds to be deemed "presumed abandoned" under the law of the state where the presumed owner appeared to live, Sunoco would escheat them to that state's unclaimed-property fund, listing the name of any "apparent owner."  App.368; *e.g.*, 60 Okla. Stat. §658 (five years); Unif. Unclaimed Prop. Act §102(2).  When Sunoco had no idea who the owner might be, it would escheat the proceeds into "undivided" accounts with no associated name(s) or address(es) in the unclaimed-property fund in Texas, where Sunoco is headquartered.  App.368, 369, 373.

The situation was even more complicated when it came to calculating interest.  As explained, the PRSA sets two different interest rates as compensation for delayed

proceeds payments:  12% for periods during which the owner had marketable title, and 6% for periods when the owner did not.  52 Okla. Stat. §570.10(D)(1)-(2). Sunoco thus could not accurately determine the applicable interest rate without first ascertaining both the actual owner and when their title became marketable.  Yet when Sunoco failed to make timely proceeds payments, it was often due to uncertainty about one or both of those things.  Accordingly, rather than guess what interest may be owed, Sunoco typically waited to pay interest until someone came forward and asked for it.  App.337.  Sunoco was not alone in this practice; that was how the entire industry operated.[3]  App.400.

### B.    Procedural Background

1. In 2017, Perry Cline filed a putative class-action lawsuit against Sunoco under the PRSA, which Sunoco timely removed to federal court.  App.65-112.  Cline sought to represent a class of virtually anyone who had "received" a late proceeds payment from Sunoco and had not been paid interest.  App.83.  Thus, the only compensatory damages Cline sought was interest that had not been paid on late

---

[3] In the aftermath of the district court's ruling, Sunoco made the difficult decision to exit the proceeds-payment business in Oklahoma.  App.371.  Unfortunately, losing Sunoco's payment infrastructure—which led the industry with on-time payments nearly 99% of the time—will disproportionately burden "small oil and gas operators who do not have the ability to manage the payments on their own."   Katherine Crowley Jimenez, Note, *Class-Actions Threaten the Energy Industry: Class-Action Lawsuits and Royalty Litigation in Light of* Cline v. Sunoco, 46 Okla. City U. L. Rev. 87, 103 (2021).

proceeds payments, as the class was confined to people who had already received proceeds.

The case was initially assigned to Judge James H. Payne, who set deadlines for class-certification discovery to conclude in late 2018 and class-certification briefing to be completed by March 2019.  App.113-14.  Judge Payne's scheduling order sensibly specified that "[a] deadline for all merits discovery" would be set later, after a "decision on class certification."  App.113.  Cline filed four extension requests, App.115-34, 137-42, 145-50, 153-59, which pushed the class-certification-briefing deadline to October 7, 2019, App.135-36, 143-44, 151-52, 160-61.

2. While class-certification briefing was underway, the case was reassigned to Judge John A. Gibney of the Eastern District of Virginia under 28 U.S.C. §292(d) (allowing out-of-circuits judges to be "assign[ed] temporarily" to a district "wherein the need arises").  App.18-19.  Judge Gibney quickly brought the Rocket Docket to the Sooner State.   On August 5, 2019, he *sua sponte* pushed up the class-certification-briefing deadline; ordered "all discovery"—including merits discovery—to conclude by October 18, 2019 (even though no class had yet been certified); and set a bench trial to begin on December 16, 2019.  App.162.

Sunoco vigorously resisted certification, explaining (among other things) that individualized issues would overwhelm common ones at trial.  *See* App.168-212.  Chief among those individualized issues was whether a putative class member had

marketable title for none, all, or some of the period during which payment was delayed, as how much interest a rightful owner is entitled to (6% versus 12%) depends on whether they had marketable title *when payment was withheld*. That question, moreover, may not have a binary answer for each owner. It could be 6% for part of the delay but 12% for the remainder if, e.g., a cloud on title cleared up midway through. *See, e.g.*, App.337; *Maxwell v. Samson Res. Co.*, 848 P.2d 1166, 1169 (Okla. 1993). Yet determining marketable tile consistent with the "current title examination standards," 52 Okla. Stat. §570.10, would require individually examining—and applying a set of book-length title rules to—mineral-rights records, leases, assignments, and more for every putative owner. App.367, 385-86, 401-03.

Notwithstanding those central individualized issues, the district court granted class certification on October 3, 2019, a mere two weeks before it had set "all discovery" to close.[4] Sunoco strenuously objected to that absurdly compressed schedule, explaining that it would be impossible to complete merits discovery—let alone develop a full defense—for tens of thousands of class members in such a short time, but the court would not budge. App.318-19.

Making matters worse, the court accepted Cline's invitation to vastly expand the class. While the definition Cline proposed covered only those who had

---

[4] This Court denied leave to immediately appeal the class-certification decision. Order, *Sunoco, Inc. (R&M) v. Cline*, No. 19-608 (10th Cir. Nov. 13, 2019).

"received" untimely proceeds payments (thus limiting the class to those eventually identified as rightful owners), Cline insisted that it also included well interests for whom no owner had ever received or even claimed any proceeds payments, leaving those payments sitting in unclaimed-property funds in the name of an "apparent owner" who may not be the real one. Sunoco sought clarification that the class could not possibly include tens of thousands of abstract "interest owners" whose identities Cline had not sought to ascertain or supply. App.274-305. But 20 days before trial, the district court agreed with Cline. App.306-11. Indeed, the court even included well interests as to whom there is not even any "apparent owner," effectively certifying a class of account numbers associated with well interests rather than actual people claiming entitlement to the money sitting in them.

Two weeks later, the court granted summary judgment to the class on whether the PRSA required Sunoco to pay interest immediately along with a late principal payment, holding that it did.[5] App.321-33. The case then proceeded to a bench trial "on the remaining issues." App.406.

3. The most obvious "remaining issue" was whether each class member had marketable title and, if so, as of when. But as Sunoco had explained in opposing

---

[5] That question is irrelevant to liability. The class sued for unpaid interest on late-paid proceeds, and Sunoco agrees that any liability for interest is not extinguished because an owner failed to demand it. *See* App.263-64.

certification, there was no way to make that determination on a classwide basis. In point of fact, the district court never even tried. On August 17, 2020, it issued an opinion holding Sunoco liable to all class members, without making any findings about who actually owns any of the well interests at issue, let alone whether or when that owner had marketable title. App.405-52.

The court accomplished that remarkable feat in three steps. First, it shifted the burden from the plaintiffs to prove that each class member had marketable title, instead holding that Sunoco must *dis*prove that fact for each member—itself an impossible task when the class consists of account numbers instead of actual plaintiffs. App.432-35. Next, it refused to give Sunoco a meaningful opportunity to try to carry that misplaced and impossible burden on a classwide basis, striking Sunoco's damages expert because he could not produce full results regarding Sunoco's beliefs about the ownership of all 53,000 well interests within the extraordinarily truncated discovery window. App.423-29. Finally, the court accepted all the calculations of Cline's damages expert, who simply assigned a 12% rate to every late proceeds payment for the entire period of delayed payment, without regard to whether anyone ever established the marketable title necessary to claim that payment, let alone did so in time to claim 12% interest. App.421-22, 443-44.

The result was a nearly $75 million damages award—nearly two-thirds of which is attributable not to actual people or entities who have collected proceeds

15

payments, but simply to accounts sitting in state unclaimed-property funds. *See* App.377-78, 452. Indeed, the award even included the maximum 12% interest on proceeds from well interests so far removed from marketable title that no one has even a guess as to ownership; those proceeds sit in undivided unclaimed-property funds associated with no one. App.443 n.27. The court then added another $75 million in *punitive* damages, rejecting Sunoco's argument that they are unavailable under Oklahoma law. App.446-51.

4. Difficulties over how to distribute that windfall to as-yet-unidentified owners engendered years of litigation over finality. On August 27, 2020, the district court issued an order that was designated a Rule 58 judgment but did not allocate damages among class members or provide a plan to dispose of damages that go unclaimed (as most here likely will). App.453. The court subsequently entered an allocation plan, but it provided no plan for unclaimed funds and failed to address how to distribute proceeds owed to class members represented by the undivided accounts should anyone ever figure out who they are. App.454-58. Although that was insufficient under this Court's cases, *see Cook v. Rockwell Int'l Corp.*, 618 F.3d 1127, 1137-38 (10th Cir. 2010); *Strey v. Hunt Int'l Res. Corp.*, 696 F.2d 87, 88 (10th Cir. 1982), the district court believed its work was done, so Sunoco filed a notice of appeal. App.459-62. The court rejected Sunoco's post-trial arguments as to finality in a subsequent order, App.475 n.10, so Sunoco filed another protective notice of

appeal, App.477-80.  This Court dismissed both appeals on the ground that Sunoco itself maintained there was no final judgment.  *Cline v. Sunoco Partners Mktg. & Terminals L.P.*, 2021 WL 5858399 (10th Cir. Nov. 1, 2021).

"Undeterred, Sunoco returned to the district court and filed [a Rule] 60(b)(6) motion" asking for minor modifications that would render the allocation plan final; when the court refused, Sunoco again appealed, and this time this Court reversed. *Cline v. Sunoco, Inc. (R&M)*, 2023 WL 4946312, at *3 (10th Cir. Aug. 3, 2023).  The Court agreed with Sunoco that "the allocation plan fails both requirements for a final and appealable class-action judgment under *Strey* and *Cook*" and "urge[d] the district court to promptly take whatever steps it deems necessary to cure the allocation plan's defects and produce a final judgment."  *Id.* at *7.

5. On remand, the district court entered a revised allocation plan that finally created a final judgment.  App.481-86, 489.  This time, the court directed that all unclaimed funds "be sent to the appropriate state account for unclaimed property" (including the undivided accounts).  App.484-86.  It also revised its interest calculation upward, adding $23 million more in prejudgment interest at the PRSA's 12% damages rate to cover the time it took Sunoco to get the court to issue a final judgment (on top of $6 million added before the earlier purported judgment).  That brought the total compensatory-damages award to $104 million, plus $75 million in punitive damages.  App.489.  Sunoco now appeals that final judgment.

## SUMMARY OF ARGUMENT

This $180 million judgment is the product of a class action proceeding that violated Rule 23, the Rules Enabling Act, Article III, the Due Process Clause, and Oklahoma law.  At its core, the claim Cline sought to press on behalf of a 53,000-member class turns on an inherently individualized issue:  whether each class member had the marketable title necessary to make them legally entitled to proceeds for all, part, or none of the period when proceeds were not timely paid.  That alone should have precluded class certification, as marketable title cannot be determined in gross; it requires close examination of each purported owner's title documents.  But the problem with certification here was even more fundamental, as Cline sought to press that highly individualized claim on behalf of 53,000 class members *without even identifying who they are*.  He essentially sought to represent a class of "whoever is entitled to interest," and insisted that a judgment administrator could sort out later who (if anyone) that is.  That novel approach would not satisfy the strictures of Rule 23 in any context, but its impracticability leaps off the page here.  After all, it is literally impossible to determine whether or when someone obtained marketable title when that "someone" has not been identified.

This class thus never should have been certified at all, but it certainly should not have been expanded to include tens of thousands of unidentified "owners" represented by only the number on an account sitting in an unclaimed-property fund.

After all, wholly apart from where the PRSA places the burden of proof (and the district court got that wrong too), Article III demands proof that a plaintiff actually suffered the injury a defendant is accused of having caused before that plaintiff can be awarded money damages.  Yet in its haste to punish Sunoco for failing to pay interest to *somebody*, the district court awarded damages without determining to whom, if anyone, it was awarding them.  That runs afoul of first principles.  Simply put, Article III courts cannot award damages first and decide whether anyone is entitled to them later.

At a bare minimum, this Court should vacate the prejudgment interest and punitive-damages awards.  Because the "interest" a defendant owes under the PRSA is a measure of damages for "proceeds not timely paid," it sensibly stops accruing on "the day" late "proceeds" are "paid."  52 Okla. Stat. §570.10(D)(1), (E)(1).  Yet the district court converted that measure of *damages* into a misplaced measure of *prejudgment interest*, awarding 12% PSRA interest that kept accruing (and compounding) all the way until the court issued a final judgment (which took years longer than it should have), accounting for an additional *$55 million*.  Worse still, the court awarded $75 million in *punitive* damages in violation of Oklahoma law and due process.  Thus, the $180 million judgment should be vacated in its entirety or at the very least massively reduced.

## STANDARD OF REVIEW

This Court reviews legal questions de novo and factual findings for clear error. *Liberty Mut. Fire Ins. Co. v. Woolman*, 913 F.3d 977, 994 (10th Cir. 2019). Class certification is reviewed for abuse of discretion, which includes "[m]aterial misapplication of the Rule 23 factors"; the "standard the district court used in making its Rule 23 determination" is reviewed de novo. *Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc.*, 725 F.3d 1213, 1217 (10th Cir. 2013).

## ARGUMENT

## I.     The Classwide Judgment Violates Rule 23 And The Rules Enabling Act.

Those seeking to certify a damages class face a "demanding" burden. *AmChem Prods. v. Windsor*, 521 U.S. 591, 623-24 (1997). They must show, *inter alia*, that their own claims or defenses are "typical of the claims or defenses of the class," that they "will fairly and adequately protect the interests of the class," "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(a)-(b). "Predominance regularly presents the greatest obstacle to class certification[.]" *CGC Holding Co. v. Broad & Cassel*, 773 F.3d 1076, 1087 (10th Cir. 2014). Cline failed to overcome that (and many other obstacles to certification) here, as his class was riddled with individualized issues that could not practically be resolved on a classwide basis—especially when Cline never even identified many of

the persons or entities whose claims he sought to press.  Simply put, this class should never have been certified, and the district court's efforts to make this case "work" as a class action only made matters worse.

### A.    Cline Came Nowhere Close to Satisfying Rule 23.

Cline sought to represent a class consisting of anyone who received a late proceeds payment from Sunoco and was not paid interest.  App.83.  He claimed that he could adjudicate on a classwide basis whether every one of his fellow class members was entitled to interest and, if so, how much.  But litigating that claim on a classwide basis suffered from an insurmountable threshold obstacle:  The PRSA does not entitle every late-paid well-interest owner to the same uniform measure of interest.  If the reason for delay was "because the title thereto is not marketable," then a 6% rate applies; otherwise, a 12% rate applies.  52 Okla. Stat. §570.10(D)(1)-(2).  Resolving Cline's claim—for example, that he had marketable title at all times and was thus entitled to the maximum 12% interest rate throughout—does nothing to resolve any other class member's claim, as there is no way to determine whether and when other class members had marketable title without examining their own unique circumstances.

Answering that individualized question is no mean feat.  "Marketability of title shall be determined in accordance with the then current title examination standards of the Oklahoma Bar Association," *id.* §570.10(D)(2)(a), under which

21

examiners must presume *un*marketability and examine hundred-page title opinions, complicated deeds, death records, and more before they may conclude otherwise. App.391; *see* App.351-58, 360, 389-90.  Adding to the complexity, the applicable rate is not necessarily uniform for each owner; it can be 6% for some of the delay but 12% for the rest, depending on *when* the owner had marketable title.  App.337; *Maxwell*, 848 P.2d at 1169.  Determining the applicable rate(s) thus requires a fact-intensive inquiry into the integrity of each owner's claim to title during each owner's period of delay—which means going not just "well by well," but "month by month," as to each owner.  *McKnight v. Linn Operating, Inc.*, 2016 WL 756541, at *8 (W.D. Okla. Feb. 25, 2016).

Trying to answer that fact-intensive question for 53,000 distinct owners would "inevitably overwhelm questions common to the class."  *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013).  Indeed, other courts have recognized that problem as inherent in trying just this sort of case on a classwide basis.  *See, e.g.*, *EQT Prod. Co. v. Adair*, 764 F.3d 347, 359-60, 366-70 (4th Cir. 2014) (abuse of discretion to certify class alleging royalty underpayment where "verifying ownership will be necessary for the class members to receive royalties" because "resolving ownership based on land records can be a complicated and individualized process").  And this Court has recognized the same problem even in circumstances less complicated than these.  *See Chieftain Royalty Co. v. XTO Energy, Inc.*, 528 F.App'x 938, 942-44 (10th

Cir. 2013) (vacating certification of royalty-owners class where claims depended on terms of each member's lease). There is simply no way to adjudicate on a classwide basis claims dependent on the individualized land-ownership details of each plaintiff.

That alone should have sufficed to foreclose certification. But the nature of the class Cline ultimately represented compounded the problems. Cline originally proposed a class of all owners who "received" a late proceeds payment. App.83. Such owners were actually identifiable, and by virtue of having "received" a late proceeds payment, were at least people who Sunoco at some point determined possessed the marketable title that rendered them legally entitled to proceeds payments. Even so, individualized issues would have pervaded as to that group, as the fact that Sunoco satisfied itself at *some* point that it had identified a rightful owner does not mean that the owner necessarily had marketable title during the period of delay. In many of those cases, Sunoco likely withheld proceeds payments because it was *not* confident that the apparent owner had marketable title, and tendered payment only once the apparent owner either confirmed that it did or cleared whatever cloud Sunoco brought to its attention. And, again, whether the former or the latter ultimately triggered payment makes all the difference when determining the applicable interest rate. *See* 52 Okla. Stat. §570.10(D)(1)-(2).

But the district court vastly expanded the class, and in doing vastly magnified the predominance difficulties.  Rather than limiting the class to actual identified individuals who received a late-proceeds check, it expanded the class to include every well interest for which proceeds were not timely paid to an owner—even if proceeds were *never* paid to an owner, but were instead escheated to a state unclaimed-property fund because the owner could not be located, confirmed, or identified.  In effect, the court certified a class of account numbers associated with well interests, deeming it sufficient that *someone* out there must be entitled to the proceeds escheated by Sunoco to the 50 states and any interest on them.  These unidentified (and perhaps unidentifiable) "class members" were not some rounding error or miniscule tail on a large dog; roughly two-thirds of the damages award is attributable to well interests for which no one has claimed, let alone received, a proceeds payment.

That vast expansion multiplied the problems with certification.  For one thing, it created an insurmountable ascertainability obstacle.  As this Court has recognized, it is exceedingly difficult to determine whether the prerequisites of Rule 23 are satisfied without knowing who is in the proposed class.  *See Evans v. Brigham Young Univ.*, 2023 WL 3262012 (10th Cir. May 5, 2023).  Moreover, "insisting on the easy identification of class members" serves both to "eliminate[] 'serious administrative burdens that are incongruous with the efficiencies expected in a class action'" and

24

to "protect defendants[']" substantive rights. *Abraham v. WPX Prods., LLC*, 317 F.R.D. 169, 254 (D.N.M. 2016) (quoting *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 593 (3d Cir. 2012)). After all, a defendant cannot meaningfully defend itself if it is left with the conundrum of trying to "identify class members consisting of persons not identified." *Adashunas v. Negley*, 626 F.2d 600, 603 (7th Cir. 1980).

Circuits across the country have held that the proponent of class certification must show that membership in the proposed class is, or will be, ascertainable by objective criteria. *See Smith v. LifeVantage Corp.*, 341 F.R.D. 82, 91-93 (D. Utah 2022) (collecting cases); *see also, e.g.*, *Brecher v. Republic of Argentina*, 802 F.3d 303, 304-06 (2d Cir. 2015); *Carrera v. Bayer Corp.*, 727 F.3d 300, 307-08 (3d Cir. 2013); *EQT Prod. Co.*, 764 F.3d at 358-60; *Karhu v. Vital Pharm., Inc.*, 2015 WL 3560722, at *2-4 (11th Cir. June 9, 2015). And many district courts within the Tenth Circuit have refused to certify classes where even the process of ascertaining class membership would necessitate delving into individualized or subjective determinations. *See, e.g.*, *Martinez v. FedEx Ground Package Sys., Inc.*, 2023 WL 7114678, at *1 (D.N.M. Oct. 27, 2023); *Thornton v. Kroger Co.*, 2023 WL 6378417, at *43 (D.N.M. Sept. 29, 2023); *Faulhaber v. Petzl Am., Inc.*, 656 F.Supp.3d 1257, 1272 (D. Colo. 2023).

This case proves the wisdom of demanding ascertainability. By effectively certifying a class of "well-interest owners" without requiring Cline to identify who

they are, the district court deprived Sunoco of any ability to litigate an issue that was "central to the validity of each one of the claims," let alone to do so "in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). After all, it is impossible to determine whether or when someone had marketable title without knowing who that someone is. It is difficult to imagine a more fundamental ascertainability (and Rule 23(b)(3)) problem than forcing a defendant to defend itself against highly individualized damages claims brought on behalf of claimants whose identity is literally unknown. Indeed, this defect goes beyond ascertainability to standing, as Article III courts do not exist to determine whether the defendant violated some duty in the abstract; they exist to adjudicate whether the defendant violated the legal rights of an actual injured plaintiff. *See infra* Part II.

And marketable title was not even the only individualized issue. For example, Sunoco entered into indemnity agreements with many class members (generally the very well operators who gave Sunoco faulty information in the first place) that should have foreclosed any PRSA claim. *See* App.349, 404. In fact, one putative class member whose representative testified at trial opted out because the company believed it had no right to payment in light of an indemnity agreement. App.392-97. But Sunoco could not even try to determine whether such agreements might exist without knowing who purported to be entitled to interest.

The individualized issues do not end there. The PRSA also sets a longer (six-month) deadline for payments for the first sale from a well, so whether a payment was late depends on whether it was for a first sale. *See* 52 Okla. Stat. §570.10(B)(1); p.6, *supra*. While that question could be answered for Cline's specific wells, it could not be answered on a classwide basis for a class covering all 23,172 wells from which Sunoco purchased.

That not only illustrated that Cline's claims (and Sunoco's defenses) were not "typical … of the class," but also raised grave doubts that Cline could "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(3)-(4). In fact, on at least the first-sale issue, he plainly did not. Cline's expert could not always determine whether a payment was for a first sale, so she simply assumed that the date of first purchase *by Sunoco* was the date of first sale *of the well*. App.375-76. That necessarily prejudiced owners who received late payments that were falsely deemed timely on that assumption, as they fall within the terms of the class but have now had their claims extinguished by its representative. *See Albertson's, Inc. v. Amalgamated Sugar Co.*, 503 F.2d 459, 463 (10th Cir. 1974) ("It is axiomatic that a plaintiff cannot maintain a class action when his interests are antagonistic to, or in conflict with, the interests of the persons he would seek to represent."). In short, this class should never have been certified, and this case falls far short of the demanding requirements of Rule 23.

27

**B.    The District Court's Efforts to Wish Away the Glaring Rule 23 Problems Only Created Additional Reversible Errors.**

Rather than confront these glaring problems, the district court tried to wish them away.  The court did not purport to identify how marketable title (or any other individualized issues) could be proven on a classwide basis before granting certification—let alone be proven without even knowing who purports to own each of the 53,000 well interests at stake.  It just certified on the *assumption* that all these problems would work themselves out.    App.247-48.    But subsequent events underscored the impossibility of trying individualized issues on a classwide basis for a class whose members remain unidentified.  Cline declined to present any evidence about who his fellow class members are, let alone whether any of them ever had marketable title.  Yet rather than treat that omission as fatal, the court faulted Sunoco for failing to prove Cline's case for him—even as it refused to consider the only evidence Sunoco could muster in the two-and-a-half months it was given between certification and trial, on the incredulous reasoning that it would be unfair to "allow [Sunoco] to undercut [plaintiffs'] theory of the case with information [it] produced six weeks before trial."  App.384.  The factual question that should have been central to every class member's claim thus remains unanswered.

The district court tried to excuse that omission by declaring in its post-trial opinion that "[u]nmarketability" was actually "an affirmative defense" on which Sunoco had unwittingly borne the burden of proof in the four-day trial that had

concluded many months ago.  App.434.  It then faulted Sunoco for not keeping sufficient internal records to be able to satisfy that belatedly imposed burden for all 53,000 well interests (without knowing who purports to have marketable title, no less) in a matter of weeks.  App.467.  The court thus simply awarded every class member 12% interest across the board, without regard to whether whoever may own each well interest ever had marketable title at all, let alone had it during the period when a proceeds payment was delayed.  That effort to paper over the Rule 23 problems was flawed at every turn.

At the outset, the burden to prove marketable title rests firmly with the plaintiff.  The Oklahoma Supreme Court "has repeatedly imposed the burden of proof on the party who asserts an entitlement to the judicial relief sought," *Parsons v. Dist. Ct.*, 408 P.3d 586, 596 (Okla. 2017), and Oklahoma law allows "any owner in a well" to sue to have a court "determine the[ir] entitlement" to, *inter alia*, "proceeds from production" and "interest," 52 Okla. Stat. §570.14(A).  A PRSA plaintiff therefore bears the burden to prove entitlement to both.  *Id.* §570.10(E)(1).  To be sure, a plaintiff who proves marketable title is entitled to be compensated for any delay in proceeds payments by the appropriate measure of interest, which creates a strong incentive to pay promptly when title does not appear to be in dispute.  But it still remains the plaintiff's burden to prove that it is the rightful owner.  Any other conclusion would make nonsense of the Oklahoma Supreme Court's consistent

29

holding—including as recently as this past month—that an owner's "'right to payment' under the PRSA 'rests upon a showing of marketable title.'" *Base v. Devon Energy Prod. Co., L.P.*, 2024 WL 445613, at *16 (Okla. Feb. 6, 2024) (quoting *Hull*, 789 P.2d at 1279); *see also Tulsa Energy*, 111 F.3d at 90 ("[T]he party responsible for payment … is not[] required to pay until the other party has cleared up his title.").

The district court read this Court's decision in *Quinlan v. Koch Oil Co.*, 25 F.3d 936 (10th Cir. 1994), to compel the opposite result. App.434-35. But *Quinlan* did not purport to alter the black-letter state-law rule that, like all other elements of a claim, entitlement to payment is the plaintiff's burden to prove in court. *See McCook v. Bryan*, 46 P. 506, 508 (Okla. 1896) ("[C]onditions precedent … must be pleaded and proven affirmatively by the plaintiff."). *Quinlan* simply held that an undisputed owner does not need to "make an affirmative showing of marketable title" *to the first purchaser when payment is due* "to be deemed 'legally entitled to the proceeds' from his oil lease." 25 F.3d at 940. In other words, a first purchaser cannot justify withholding payment to an owner whose title was never in "legitimate question" by faulting the owner for failing to proactively supply proof of title outside of court before demanding payment. *Id.* That has nothing to do with what a plaintiff must prove *in court* to succeed on a claim for payment under the PRSA.

In all events, for purposes of class certification, it does not matter whether marketable title is the plaintiff's burden to prove or the defendant's burden to

30

disprove. All that matters is that it is an inherently individualized question—and one that is impossible to answer without knowing who the plaintiff is. That alone should have foreclosed certification, as "Rule 23(b)(3) predominance … analysis applies not only to the elements that plaintiffs must prove but also to affirmative defenses." *Gorss Motels, Inc. v. Brigadoon Fitness, Inc.*, 29 F.4th 839, 845 (7th Cir. 2022); *see also* 2 Newberg & Rubenstein on Class Actions §4:55 (6th ed. Nov. 2023 Update). Here, marketable-title issues were pervasive—which is unsurprising, as Sunoco generally paid on time unless it could not locate or determine who had marketable title, so the class consisted almost entirely of well interests with some uncertainties about ownership.[6] Thus, even assuming marketable title were an affirmative defense, the district court still could not deprive Sunoco of the ability to contest it as to every class member without enlarging their substantive rights and diminishing Sunoco's, in violation of the Rules Enabling Act's "instruct[ion] that rules of

---

[6] At one point, the district court suggested that because "Sunoco has already paid owners their proceeds" (which is not even true as to the two-thirds), marketable title must not have been in doubt. App.434. That reflects a fundamental misunderstanding of how PRSA interest works. Of course Sunoco sent checks once it thought it had identified someone with marketable title (though that belief sometimes proved mistaken, *see* pp.9-10, *supra*). But the appropriate interest rate turns not just on whether an owner *eventually* had marketable title, but *when* marketable title was obtained during the period when payment was delayed.

procedure 'shall not abridge, enlarge or modify any substantive right.'" *AmChem*, 521 U.S. at 612-13 (quoting 28 U.S.C. §2072(b)).[7]

That the court faulted *Sunoco* for being unable to disprove marketable title on a classwide basis (for class members whose identity it did not even know) added insult to injury. After all, Sunoco opposed class certification on the ground that it would be impossible to do so. It was then given just 15 days after its certification arguments were rejected to conduct merits discovery and less than three months before it was forced to go to trial against tens of thousands of unidentified class members. That was nowhere near enough. The court never even purported to explain how Sunoco was supposed to disprove marketable title without knowing who claimed to have it. But that aside, it took a team of three analysts three weeks to determine what caused payment delay *for fewer than 60 identified owners*. App.363-64. Even if Sunoco had a team of *300* experts working round the clock on just this issue, reaching marketable-title determinations for 53,000 distinct owners would have taken more than ten times as long as the court's breakneck pace demanded.

---

[7] Nor could Cline concede away the problem by accepting a 6% interest for any class member whose marketable title was in doubt; that would have created an adequacy problem since those class members would each have every right to try to prove entitlement to 12%. *See* Fed. R. Civ. P. 23(a)(4); *Gen. Tel. Co. of N.W. v. EEOC*, 446 U.S. 318, 331 (1980).

The court insisted that Sunoco should not have needed any discovery or time to disprove marketable title because it should already have had all the information necessary to do so in its own "records." App.467.  But "the nature or thoroughness of a defendant's recordkeeping does not alter the plaintiff's burden to fulfill Rule 23's requirements." *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 356 (3d Cir. 2013).  And nothing in the PRSA renders liability for 6% versus 12% interest dependent on whether a defendant keeps adequate records of why it believed title to be in dispute, let alone entitles someone who has not even proven that they are legally entitled to *proceeds* to demand 12% interest on an uncollected proceeds payment just because a defendant does not have documentation on hand *dis*proving the plaintiff's ownership claim.

The district court's effort to eliminate the individualized issue of indemnity agreements fared no better.  Class members with such agreements plainly would be barred from suing had they filed individually.  Indeed, not even the district court denied that indemnity agreements would require individualized adjudication.  *See Chieftain Royalty*, 528 F.App'x at 942-44.  But rather than follow that conclusion to its logical end and decline to certify, *see Wal-Mart*, 564 U.S. at 367 (a class-action defendant is "entitled to litigate its statutory defenses to individual claims"), the court disposed of the indemnity agreements in a footnote deeming all of them invalid because 12% interest is a non-waivable "penalty."  App.444 n.28.  That conclusion

was both entirely dependent on the court's independently flawed decision to impose 12% interest across the board and entirely wrong on its own. The court purported to derive it from language in *Tulsa Energy*, *see* 111 F.3d at 90-91, but the Oklahoma legislature abrogated that language by removing the phrase "as a penalty" from the statute, *see Purcell*, 961 P.2d at 193. Once again, then, the court's effort to excise individual issues in its post-trial rulings failed as a matter of law.

In short, this case never should have been litigated on a classwide basis, as the trial and post-trial proceedings made all too clear. The district court's desire to do rough justice on the fast-track is no match for Rule 23 and the Rules Enabling Act. This Court should vacate and remand with instructions to decertify.

## II.    At A Minimum, The Class Could Not Include, And No Damages Could Be Awarded To, The Unidentified Class Members.

"Every class member must have Article III standing in order to recover individual damages," and standing is always "the plaintiff[']s … burden" to prove. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 430-31 (2021). That bedrock principle likewise should have doomed any effort to certify this class. But at the very least, it compels a massive reduction in the $180 million judgment, as fully *two-thirds* of that award is attributable to unidentified class members associated with accounts in unclaimed-property funds whose standing was never proven.

To satisfy Article III, a plaintiff must have suffered an injury-in-fact that is "fairly traceable to the [defendant's] challenged conduct" and "likely to be redressed

by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

In this context, that means pleading and ultimately proving that each class member

had marketable title, which is the *sine qua non* of legal entitlement to both proceeds

and interest. Thus, even a true owner without marketable title was not injured by

Sunoco's failure to make PRSA payments. After all, a plaintiff cannot be injured by

the failure to pay interest on proceeds to which it has no legal entitlement.

Yet for tens of thousands of class members, Cline never proved the basic

prerequisite for Article III standing. The majority of the damages award

($120 million) is attributable to well interests whose purported owner Cline has

never identified; the "class member" is essentially just a well interest standing in for

whoever may be entitled to the proceeds sitting in state unclaimed-property funds (if

anyone). App.377-78. Those funds may have ended up there because Sunoco could

not locate that person, or because someone Sunoco thought was the owner did not

respond to Sunoco's correspondence, or because associating the well interest with a

living person has become impossible. App.338-40, 372. But whatever the reason,

Cline never established that any actual, identifiable person or entity *ever* had

marketable title to those well interests, which (as explained) is essential to

establishing that they were injured by the failure to pay interest. Indeed, Cline never

even identified who those purported class members are, so he could not have proven

that they had standing even if he had tried.

In rejecting Sunoco's Article III objections, the court fixated on the notion that "Sunoco has kept someone else's money," i.e., interest that has not been paid on proceeds no one has claimed. App.436. But Article III is not satisfied by pointing out that the defendant injured someone. To the contrary, plaintiffs must show that the defendant injured them in particular. While a government enforcement agency may take action against a defendant who injured others without identifying the specific individuals injured, plaintiffs do not have that luxury. Each and every plaintiff—whether in an individual or a class action—must allege that they suffered a concrete and particularized injury traceable to the defendant and redressable by the court. Simply asserting—or even proving—that the defendant injured well-interest owners, or shareholders, or users of national parks, without alleging and then proving that the plaintiffs are in fact the well-interest owners, shareholders, or actual users of the national parks, does not cut it. It was Cline's burden to prove that all of his class members met that Article III requirement. *See TransUnion*, 594 U.S. at 430-31, 439. He could not just claim that the defendants violated a duty and demand damages, while leaving it to be sorted out later who, if anyone, is entitled to them.

Cline likewise failed to prove that any harm the unidentified class members may have suffered is redressable. To satisfy Article III's redressability requirement, it must be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Yet

it is sheer speculation that *anyone* will ever come forward and try to claim the funds

Sunoco has been ordered to pay into state unclaimed-property funds, let alone that

anyone would succeed.   Only 4% of unclaimed property nationwide is ever

successfully claimed.  *See* Ellen P. Aprill, *Inadvertence and the Internal Revenue*

*Code: Federal Tax Consequences of State Unclaimed Property Laws*, 62 U. Pitt. L.

Rev. 123, 148 (2000).  And the rate would almost certainly be lower here.  After all,

the proceeds at issue have sat unclaimed for years throughout the whole of this very

public litigation.   Even if someone were to come forward now, moreover, an

"apparent owner" of abandoned oil-sale proceeds (or true owner not listed as the

apparent one) typically cannot just show up with identification and walk out with

the money.  One must supply things like land records, leases, etc., *see, e.g.*, Okla.

Admin. Code §735:80-7-2(8)—i.e., the very things Sunoco was unable to obtain for

some well interests and the very things Cline never tried to prove anyone has.

Whether anyone (beyond class counsel) will ever benefit from the district court's

award of damages to tens of thousands of unidentified class members thus remains

utterly "conjectural" and "hypothetical."  *Lujan*, 504 U.S. at 560.  The most likely

beneficiaries are the state governments, who are decidedly not class members.  The

fact that the remedy here will end looking more like civil penalties "payable to" a

state just underscores that, while proving that a defendant violated a legal duty may

be enough for government enforcement actions, it is not enough for a plaintiff in an

Article III court.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 106 (1998).[8]

That this is a class action changes nothing.  "Rule 23's requirements must be interpreted in keeping with Article III constraints," *AmChem*, 521 U.S. at 613, and the Federal Rules themselves declare that they "shall not be construed to extend … the jurisdiction of the district courts," Fed. R. Civ. P. 82.  Relieving plaintiffs of their obligation to prove standing just because they are part of a class action would plainly violate Article III and extend the jurisdiction of the district court.  It would also enlarge class members' (and abridge defendants') substantive rights in violation of the Rules Enabling Act.  To comply with the Rules Enabling Act, Rule 23 must do no more than "merely enable[] a federal court to adjudicate claims of multiple parties at once, instead of in separate suits."  *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 408 (2010); *see* 28 U.S.C. §5072(b).  To be sure, that may leave room for a court to certify a class when peculiar standing concerns arise

---

[8] For similar reasons, any claim to interest on proceeds sitting in unclaimed-property funds is not prudentially ripe.  Whether anyone is entitled to interest (and, if so, how much) cannot be determined when no one has claimed entitlement to the proceeds.  And no hardship would result from holding off on adjudicating those claims until someone does, as a plaintiff cannot complain about losing out on the use of funds that she has not tried to claim.  *See Rural Water Dist. No. 2 v. City of Glenpool*, 698 F.3d 1270, 1275 (10th Cir. 2012) (prudential ripeness focuses on "the *fitness* of the issue for judicial resolution" and "the *hardship* to the parties of withholding judicial consideration").

only at the margins and easily can be resolved on the back end. But it does not begin to justify certifying a class full of members who have not even been identified when the identity of the claimant is central to determining liability and entitlement to damages, let alone ordering a defendant to pay $120 million in damages without first determining whether any real, live plaintiff is entitled them.

## III.  The Damages Awards Far Exceed What Oklahoma Law Permits.

Even assuming Cline had identified a viable class with identifiable members who all had standing, the damages award would still be unsustainable, as it included both prejudgment interest and punitive damages that Oklahoma law (and the Due Process Clause) forecloses.

### A.  PRSA Interest Stops Accruing When Proceeds Are Paid.

1. The PRSA sets forth a measure of damages for untimely proceeds payments: "[A] first purchaser … who fails to remit proceeds" on time "shall be liable to [late-paid] owners for interest as provided in [§570.10(D)] on that portion of the proceeds not timely paid." 52 Okla. Stat. §570.10(E)(1). Section 570.10(D) in turn provides that the "portion of such proceeds … not paid [on time] … shall earn interest at the [applicable rate] compounded annually, calculated from the end of the month in which such production is sold *until the day paid*." *Id.* §570.10(D)(1) (emphasis added). So, under the plain text of the statute, the only thing a defendant may owe PRSA "interest" on is "proceeds not timely paid." And while there is a

statutory formula for compounding PRSA interest until the proceeds are paid, that calculation definitively ends "the day" those "proceeds" are "paid." In short, whatever prejudgment interest may apply in litigated cases, the accrual of *PRSA interest* ends once the proceeds are paid.

Despite this clear statutory direction, the district court awarded 12% PRSA interest as a form of prejudgment interest long after the proceeds were paid—indeed, all the way up until it issued final judgment—without regard to when Sunoco satisfied its obligation to pay proceeds. App.440-41. The court even ordered Sunoco to continue paying 12% PRSA interest for all the time Sunoco spent trying to fix *the court's own mistake* in failing to enter a final, appealable judgment, all of which followed the payment of proceeds by years. App.487-89. That was error, and an enormously costly one. Even assuming *arguendo* that there is some actual class member who is entitled to 12% interest for every period during which each proceeds payment was not timely made, that would total (at most) $48.7 million. App.377-78. The court nonetheless ballooned that (already-inflated) figure three times, first to $75 million, App.452, then to $81 million, App.453, and then finally to a whopping $104 million, App.487.

The court tried to justify its atextual approach based on a further misreading of the statute. According to the court, if the phrase "'until the day paid'" in §570.10(D) really "mean[s] 'until the day [a defendant] pa[ys] the proceeds,'" then

40

defendants would never "owe compound interest." App.440. That is wrong and conflates compounding and accrual. The PRSA specifically provides for compound interest, based on a specific statutory formula, on unpaid proceeds that go unpaid for significant periods of time. 52 Okla. Stat. §570.10(D)(1). But the PRSA just as plainly provides that interest-damages cease accruing (and hence cease compounding) the day proceeds are paid. *Id.*

That conclusion is not just textually compelled, but reinforced by the PRSA's purpose and structure. "The obvious overriding purpose of the Act is to ensure that royalty owners are timely paid their share of the *proceeds*." *H.B. Krug v. Helmerich & Payne, Inc.*, 362 P.3d 205, 214 (Okla. 2015) (emphasis added). The PRSA accordingly compensates owners for delays in receiving the *proceeds* to which they are entitled (12% or 6% depending on the cause for the delay). But the statute does not show any specific concern about the timing of *interest* payments; their role, after all, is to incentivize the payment of proceeds. Once those proceeds are paid, there is no further role for PRSA interest to play.

Text, structure, and purpose thus all refute the district court's approach. History does too. In 2005, an amendment was proposed that *would* have required "[i]nterest" to "be paid … at the time the production proceeds are paid" and *would* have allowed interest to continue to accrue "from the date the production payment was made until the date *the interest* is paid." Okla. H.B. 1759 (2005) sec. 3,

§570.4(B),    (D)(5),    sec.    5,    §570.10(D)(1)    (emphasis    added),

http://tinyurl.com/3ybyamn4.  But that amendment failed.  It is little wonder, then,

that the evidence at trial showed that the Oklahoma Commissioners of the Land

Office—the agency charged with managing royalties on state-owned mineral

interests—sought PRSA interest only for delays in paying proceeds, not for

subsequent delays in paying interest.  App.380-83.  In short, the PRSA is clear that

PRSA interest stops accruing once proceeds are paid.

2. While PRSA interest stops with the payment of proceeds, the normal default

rules providing for prejudgment interest (at a rate well below 12%) would apply

absent specific legislation to the contrary.  But here, there is such legislation:  the

Energy Litigation Reform Act, 52 Okla. Stat. §§901-903.

Oklahoma enacted the Reform Act in 2012 "in response to an increase in

lawsuits filed against Oklahoma energy companies and a perceived threat to drilling

operations and the jobs they offer within the state."  Jonathan D. Baughman, *The

Prudent Operator Standard in the 21st Century*, 58 Rocky Mountain Mineral Law

Inst. 12-1, 12-34 (2012).  As relevant here, the Reform Act declares that the PRSA

"shall provide the exclusive remedy to a person entitled to proceeds from production

for failure of a holder to pay the proceeds [on] time."  52 Okla. Stat. §903.  That

explicit language bars the recovery of remedies predicated upon some other

Oklahoma statute—including prejudgment interest under 23 Okla. Stat. §6.  *See*

*Krug*, 362 P.3d at 214-15 (it is "well settled that … recovery of prejudgment interest must be predicated on statute").

The Reform Act also "limit[s]" the scope of "'actual damages'" available in PRSA actions "to the proceeds due and the interest as provided [§570.10(D)]" and explicitly "deem[s]" that sum (proceeds plus PRSA interest) "to be adequate remedies for failure to pay proceeds within the time periods required for payment." 52 Okla. Stat. §903.  That further confirms that extra-statutory prejudgment interest is off the table.  Under Oklahoma law, a plaintiff's "recovery is whole and complete with actual damages." *Slocum v. Phillips Petroleum Co.*, 678 P.2d 716, 719 (Okla. 1983).  And while that often includes prejudgment interest, which serves to provide "complete compensation for a loss," *In re Assessments for Tax Year 2012*, 481 P.3d 883, 896 (Okla. 2021), the Reform Act declares the PRSA's compensation scheme to be "adequate," 52 Okla. Stat. §903.  So no interest beyond what the PRSA awards as damages—which stops accruing once proceeds are paid—may be awarded.  The district court thus awarded $55 million more in interest-damages than Oklahoma law allows.  But at the very least, the class should not have been awarded 12% prejudgment interest, as PRSA interest stops upon the payment of proceeds, and the

default standard rate of prejudgment interest is a healthy 6%, *see* 15 Okla. Stat. §266, but still only half the PRSA maximum rate applied by the district court.[9]

### B. The Punitive-Damages Award Violates Oklahoma Law Many Times Over.

#### 1. Under Oklahoma law, punitive damages are not available in actions for late-payment interest under the PRSA.

At a bare minimum, the $75 million punitive-damages award cannot stand. Under Oklahoma law, no punitive damages may be awarded in "an action for the breach of an obligation … arising from contract." 23 Okla. Stat. §9.1(A).[10] The Oklahoma Supreme Court has repeatedly held that the obligation to pay interest under the PRSA "is based upon a breach of the obligation to pay the royalty arising *ex contractu*." *Purcell*, 961 P.2d at 193; *see* Ex Contractu, *Black's Law Dictionary* (11th ed. 2019) ("Arising from a contract"). In other words, "a PRSA claim is a contractual claim" as a matter of Oklahoma law. *Base*, 2024 WL 445613, at *15.

While it might seem counterintuitive to characterize an action grounded in a state statute as "a contractual cause of action," the PRSA "did not create" *either* the "duty on the part of [purchasers] to pay [owners] a royalty upon production" *or* "the duty to pay interest on production payments" in certain circumstances. *Purcell*, 961

---

[9] Of course, that default rate can be altered by contract. Whether any class members agreed to a different rate is another individualized issue—and one on which Cline may not have been an adequate representative of all members' interests.

[10] Although §9.1 by its terms applies to "awards by jury," it applies equally in bench trials too. *Sides v. John Cordes, Inc.*, 981 P.2d 301, 305 n.7 (Okla. 1999).

P.2d at 192-93.  Long before the PRSA, Oklahoma courts recognized "interest" as a form of contract damages for late or "underpayment" of oil-sale proceeds.  *Id.*  The statute "provides a measure of damages in the form of 12% interest for when the contract is breached," but those interest-damages remain a "contractual liability." *Id.* at 193.  Thus, an action to recover them (like this one) depends upon "the breach of an obligation … arising from contract"—making punitive damages categorically unavailable as a matter of Oklahoma law.  23 Okla. Stat. §9.1(A).

The district court rejected this argument in a cursory footnote, casting Oklahoma law aside because no opinion says *in haec verba* that "punitive damages are [un]available for the type of claim at issue here."  App.448 n.31.  But federal courts "are bound by a state's highest court's interpretations of state law." *Wagner v. Case Corp.*, 33 F.3d 1253, 1256 (10th Cir. 1994).  That means they must apply not just those courts' explicit "holding[s]," but their necessary "logic" as well.  *Id.*  The Oklahoma Supreme Court not only has explicitly "disagree[d]" with the argument that a "contractual cause of action and a statutory liability both arise separately, one from the breach of a contract and the other from non-payment in accordance with [the PRSA]," but has explicitly held that "12% interest" under the PRSA is "part of the contractual claim."  *Purcell*, 961 P.2d at 193.  Indeed, the court reiterated just a few weeks ago that its "holding [in *Purcell*] confirmed that a PRSA claim is a contractual claim."  *Base*, 2024 WL 445613, at *15.

Because punitive damages are categorically unavailable in "an action for the breach of an obligation … arising from contract," 23 Okla. Stat. §9.1(A), and any action a class member may have here arises from contract as a matter of settled Oklahoma law, the $75 million punitive-damages award cannot stand.

### 2. The Reform Act confirms that punitive damages are unavailable.

The district court seemed to think the Reform Act compels a different conclusion. App.448 n.31. In reality, the Reform Act's text and history reinforce that punitive damages are not available here.

The last time a rogue court tried to award punitive damages in a PRSA case, the response was swift and decisive. In 2009, an intermediate appellate court held that well operators may sometimes owe a "fiduciary duty" to royalty owners, and that, if they do, an action to recover interest under the PRSA sounds in tort, not contract. *Hebble v. Shell Western E & P, Inc.*, 238 P.3d 939 (Okla. Civ. App. 2009). *Hebble* was quite the cause célèbre in Oklahoma; based on $750,000 in unpaid principal, the court approved a jaw-dropping judgment of more than $13.2 million in "actual damages," plus $53.6 million more in punitive damages. *Id.* at 942. But *Hebble* was not long for this world. The Oklahoma legislature overruled it via the Reform Act, which not only "expressly rejected the decision of the *Hebble* court" and any notion that operators may owe a "fiduciary duty" above and beyond their contractual obligations, Baughman, *supra*, at 12-34; *see* 52 Okla. Stat. §902(2), but

46

also narrowed the scope of remedies available in PRSA cases, *see id.* §903.   In particular, the Reform Act "deem[s]" "the proceeds due and the interest … provided in [§570.10(D)] … to be adequate … for failure to pay proceeds" on time and declares that "no other penalty or damages shall be recoverable in any litigation involving a claim for unpaid or underpaid proceeds," "including, without limitation, punitive or exemplary damages." *Id.*

To be sure, the Reform Act contains an exception for cases in which there is "a determination by the finder of fact upon clear and convincing evidence that the holder who failed to pay such proceeds did so with the actual, knowing and willful intent: (a) to deceive the person to whom the proceeds were due, or (b) to deprive proceeds from the person the holder knows, or is aware, is legally entitled thereto." *Id.*  But that narrow exception does not abrogate *Purcell* or all the other cases holding that PRSA claims are contract claims in which punitive damages are unavailable as a matter of Oklahoma law.  *See* pp.44-46, *supra*.  It simply recognizes that "litigation *involving* a claim for unpaid or underpaid proceeds from production," 52 Okla. Stat. §903 (emphasis added), may include something other than a PRSA claim, such as a claim for fraud, which the Reform Act does not eliminate.  *See, e.g.*, *McClintock v. ExxonMobil Oil Corp.*, 2018 WL 1547373 (E.D. Okla. Mar. 29, 2018); *see also Okland Oil Co. v. Conoco, Inc.*, 144 F.3d 1308, 1314 (10th Cir. 1998) ("[T]he torts of fraud and deceit … may support an award of punitive damages under Oklahoma

law … [even] where the parties' relationship basically is contractual."). In other words, the exception ensures that punitive damages will *remain* available for claims on which they were *always* available (but only upon the "clear and convincing" showing that the Reform Act newly requires), even if those claims are brought in "litigation involving a [PRSA] claim." 52 Okla. Stat. §903. It does not *create* a punitive-damages remedy for PRSA claims that was never before available. Any other reading would make nonsense of a statute that was patently designed to limit the remedies in this context, not expand them.

In all events, even if the Reform Act somehow allowed for punitive damages on PRSA claims, they still would not be available for *these* claims. Punitive damages are available under the Reform Act only if the defendant "failed to pay … *proceeds*" on time with the requisite intent. *Id.* (emphasis added). The claim here, however, is that Sunoco failed to pay *interest* on proceeds, not that Sunoco deceptively or knowingly withheld *proceeds*. The district court brushed that critical distinction aside, observing that "it is the failure to timely pay 'proceeds' that leads to the recovery of 'interest.'" App.447. That is undoubtedly true; no one denies that there is a relationship between proceeds and interest. But that hardly makes those related terms mean the same thing. There is a critical difference between proceeds and interest, and the legislature consciously chose to confine punitive damages to instances in which "proceeds" were deceptively or knowingly withheld from their

rightful owner. That cannot be chalked up to an accident; the PRSA repeatedly distinguishes "proceeds" from "interest,"[11] and so does the Reform Act, *see* 52 Okla. Stat. §903. *Cf. Cowart v. Piper Aircraft Corp.*, 665 P.2d 315, 317 (Okla. 1983) (statutes "should be construed together with other statutes on the same subject").

In short, Oklahoma "wrote the statute it wrote—meaning, a statute going so far and no further." *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 794 (2014). And that statute does not allow for the punitive damages sought here.[12]

### 3.     The punitive-damages award fails on its own terms.

Even putting the state-law bar on punitive damages aside, the grossly excessive $75 million punitive-damages award was factually unfounded, an abuse of discretion, *see Green v. Johnson*, 977 F.2d 1383, 1389 (10th Cir. 1992), and a violation of due process, *see BMW of N.A., Inc. v. Gore*, 517 U.S. 559, 568 (1996).

---

[11] *See, e.g.*, 52 Okla. Stat. §570.10(D)(1) ("proceeds … shall earn interest"); *id.* §570.10(D)(2) (same); *id.* §570.10(D)(2)(b) ("interplead the proceeds and all accrued interest" to relieve liability for "payment of such proceeds and interest thereon"); *id.* §570.10(E)(1) ("fail[ure] to remit proceeds" makes one "liable to such owners for interest"); *id.* §570.10(E)(2)(a), (b), (c) (if "causes such proceeds to be received" then "not liable for interest on such proceeds"); *id.* §570.10(F) ("proceeds to be paid … shall not commence to earn interest").

[12] While the text speaks for itself, to the extent the Court has any doubt about the correct interpretation of the PRSA or the Reform Act, it can and should certify those questions to the Oklahoma Supreme Court. *See* 10th Cir. R. 27.4; 20 Okla. Stat. §1602.

Punitive damages are available under the Reform Act only if a plaintiff shows by "clear and convincing evidence" that the defendant "failed to pay … proceeds" on time "with the actual, knowing and willful intent … to deprive proceeds from the person the holder knows, or is aware, is legally entitled thereto." 52 Okla. Stat. §903. Setting aside the district court's proceeds/interest conflation, the court did not even purport to explain how Cline could have made that mens rea showing for every class member. Nor could he have, as it is literally impossible for Sunoco to have willfully withheld payments from "the person" it knew was "legally entitled" to them when no one has determined who that "person" is for a vast portion of the class. Even for class members whose identities are known, moreover, that is an inherently individualized issue that the court never purported to resolve.

Instead, the court deemed it sufficient that "Sunoco knew it owed interest payments and intentionally withheld that interest until—and unless—the owner finally asked for the interest." App.447. But the Reform Act does not permit punitive damages simply because a first purchaser knowingly and intentionally withholds payments owed to *someone*. Nor could it, as the PRSA "recognizes the operator's *right* to withhold proceeds in the absence of marketable title." *Tulsa Energy*, 111 F.3d at 90. Yet by the district court's logic, every first purchaser who did so would subject itself not only to interest-damages, but to punitive damages. That is plainly not what the Reform Act meant by demanding "clear and convincing"

evidence of failure to timely pay proceeds "with the actual, knowing and willful intent … to deprive proceeds *from the person the holder knows, or is aware, is legally entitled thereto*."  52 Okla. Stat. §903 (emphasis added).

On top of that, the court awarded what it believed to be the maximum punitive damages allowed by state law:   $75 million, roughly equal to its original compensatory-damages award.  *See* 23 Okla. Stat. §9.1(B).  That means the court effectively balanced *all* the state-law statutory factors 100% against Sunoco.  *See id.* §9.1(A).  But the evidence came nowhere near justifying such a radically one-sided judgment.  *See Slocum*, 678 P.2d at 719 ("Exemplary damages are highly penal and punishment thereof should not be lightly imposed.").

The award violates due process for similar reasons.  The test set forth in *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408 (2003), looks to: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases."  *Id.* at 418.  All three factors point in the same direction here.  First, purely "economic" injuries are low on the reprehensibility totem pole, and there is no evidence that Sunoco's adherence to an industry-wide practice was "intentional malice, trickery, or deceit."  *Id.* at 419.  Indeed, even the district court rejected Cline's fraud claim.

App.441-42.  Second, although the court nominally adhered to a 1:1 ratio of punitive to compensatory damages, the "actual damages" figure turned on an elevated statutory interest rate that far exceeded actual economic harm.  *See* App.331.  Third, no comparable civil penalties exist for a PRSA action—which makes sense since it is a remedy for breach of contract.  *See Purcell*, 961 P.2d at 193.  Thus, while there should not have been any punitive-damages award at all, the $75 million award is grossly and unconstitutionally excessive.[13]

## CONCLUSION

For the reasons above, this Court should vacate and remand with instructions to decertify the class.  If any portion of the class-certification ruling survives, at the very least the Court should vacate the judgment as to class members who were never identified, and as to post-payment interest and punitive damages.

## STATEMENT OF COUNSEL AS TO ORAL ARGUMENT

Counsel believes that oral argument may be helpful to the Court in light of the importance and complexity of the issues this class-action case presents.

---

[13] If this Court does not vacate the punitive-damages award in total, but does vacate some part of the compensatory-damages award, it should reduce the punitive-damages award commensurately or remand with instructions to do so.

Respectfully submitted,

s/Paul D. Clement

R. PAUL YETTER
ROBERT D. WOODS
YETTER COLEMAN LLP
811 Main Street, Suite 4100
Houston, TX 77002

DANIEL M. MCCLURE
NORTON ROSE
  FULBRIGHT US LLP
1301 McKinney, Suite 5100
Houston, TX 77010

PAUL D. CLEMENT
ERIN E. MURPHY
MATTHEW D. ROWEN[*]
ZACHARY J. LUSTBADER[*]
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

[*] Supervised by principals of the firm who are members of the Virginia bar

*Counsel for Appellants*

March 14, 2024

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,981 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 10th Cir. R. 32(B).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point font.

March 14, 2024

<u>s/Paul D. Clement</u>
Paul D. Clement

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing:

a.      all required privacy redactions have been made;

b.      the hard copies submitted to the clerk are exact copies of the ECF submission;

c.      The digital submission has been scanned for viruses with the most recent version of a commercial virus scanning program, Kaseya Antivirus, and according to the program is free of viruses.

March 14, 2024

<u>s/Paul D. Clement</u>
Paul D. Clement

**CERTIFICATE OF SERVICE**

I hereby certify that on March 14, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the CM/ECF system.  I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Paul D. Clement
Paul D. Clement

# ADDENDUM

# TABLE OF CONTENTS

Opinion re Class Certification (Oct. 3, 2019) (Dkt.126) .......................................A1

Order re Class Certification (Oct. 3, 2019) (Dkt.127)...........................................A18

Memorandum Order re Motion to Clarify (Nov. 26, 2019) (Dkt.186).................A20

Opinion re Partial Summary Judgment (Dec. 10, 2019) (Dkt.231).....................A26

Opinion (Aug. 17, 2020) (Dkt.298) .......................................................................A39

Opinion re Motion for a New Trial and to Alter Judgment
(Dec. 9, 2020) (Dkt.349)..........................................................................................A87

Amended Plan of Allocation Order (Oct. 17, 2023) (Dkt.643) .........................A101

Amended Award of Actual Damages (Oct. 19, 2023) (Dkt.645).......................A107

Judgment Order (Oct. 19, 2023) (Dkt.646) ........................................................A109

Order re Motions to Alter or Amend Judgment and for a New Trial
(Nov. 20, 2023) (Dkt.655)......................................................................................A110

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

PERRY CLINE, on behalf of himself
and all others similarly situated,
                    Plaintiff,

v.                                              Civil Action No. 6:17-cv-313-JAG

SUNOCO, INC. (R&M), and,
SUNOCO PARTNERS MARKETING
& TERMINALS, L.P.,
                    Defendants.

## OPINION

Perry Cline owns a royalty interest in one or more oil wells in Oklahoma.  Sunoco, Inc.

(R&M), and Sunoco Partners Marketing & Terminals, L.P. ("Sunoco"), purchase and resell oil

from Cline's wells.  Oklahoma law requires Sunoco to pay proceeds from the oil to Cline.  If

Sunoco pays the proceeds late, it must pay Cline interest on the payment at a rate set forth in

Oklahoma's Production Revenue Standards Act ("PRSA").  *See* Okla. Stat. tit. 52, § 570, *et seq.*

Cline has sued Sunoco for paying his production proceeds late without paying the

required interest.  Cline seeks to maintain a class action on behalf of other owners[1] whom

Sunoco paid late and did not pay interest.

Because Cline meets the requirements for class certification under Federal Rule of Civil

Procedure 23, the Court will grant the motion and certify the class.

---

[1] The PRSA defines an "owner" as a "person or governmental entity with a legal interest in the mineral acreage under a well which entitles that person or entity to oil or gas production or the proceeds or revenues" from that production.  Okla. Stat. tit. 52, § 570.2.  Sunoco's argument distinguishes between owners who have a "royalty interest" in a well, which means an interest in a percentage of the production or the proceeds from the production, and those who have a "working interest," which "entitle[s] the owner . . . to drill for and produce oil and gas." *Id.*

**A1**

## I. BACKGROUND

The PRSA governs the payment of proceeds for oil and gas production from Oklahoma wells. *See* Okla. Stat. tit. 52, § 570, *et seq.* The PRSA requires the first person who buys oil or gas from an interest owner ("first purchaser") or the person holding the proceeds from the sale of the oil and gas ("holder of proceeds") to pay the wells' interest owners their proceeds within specific times. The first purchaser or holder of proceeds must keep the funds "separate and distinct from all other funds." *Id.* § 570.10(A). With some exceptions, the first purchaser or holder of proceeds must pay statutory interest if it does not pay the proceeds on time. The payor must pay 6 percent or 12 percent interest, depending on the cause of the delay in payment.

Sunoco buys crude oil from oil and gas producers, collects and transports the oil, and resells the oil. It contracts with thousands of oil and gas producers in Oklahoma to purchase their oil. Sunoco has paid over 100,000 well owners royalty proceeds for oil and gas production from over 20,000 properties since 2006. It maintains a division order[2] for each property. Sunoco sends division orders to owners and suspends payment until the owner returns a signed and completed division order. If an owner does not want to sign a division order, Sunoco says that it will remove the account from suspension and pay the owner, but that the owner must first tell Sunoco that he or she refuses to sign the division order. When Sunoco pays proceeds late, it often waits until an owner makes a request for interest before investigating the request and paying any necessary interest.

Cline contends that Sunoco has engaged in an ongoing scheme to avoid making the required interest payments.

---

[2] A "division order" documents the division of each owner's interest in the well and the owner's name, address, and tax identification number. Okla. Stat. tit. 52, § 570.11. The division order helps the first purchaser or holder of proceeds pay the proceeds directly to the owner. *Id.*

2

A2

The proposed class comprises owners of wells in Oklahoma who allege that Sunoco paid them oil proceeds late and without the statutory interest.[3]  Specifically, Cline seeks to represent the following class[4]:

> All non-excluded persons or entities who: (1) received Untimely Payments from Defendants (or Defendants' designees) for oil proceeds from Oklahoma wells and (2) who have not already been paid statutory interest on the Untimely Payments. An "Untimely Payment" for purposes of this class definition means payment of proceeds from the sale of oil production from an oil and gas well after the statutory periods identified in O[kla]. S[tat]. tit 52, §570.10(B)(1) (i.e., commencing not later than six (6) months after the date of first sale, and thereafter not later than the last day of the second succeeding month after the end of the month within which such production is sold). Untimely Payments do not include: (a) payments of proceeds to an owner under O[kla]. S[tat]. tit 52, §570.10(B)(3) (minimum pay); (b) prior period adjustments; or (c) pass-through payments.
>
> The persons or entities excluded from the Class are: (1) agencies, departments, or instrumentalities of the United States of America or the State of Oklahoma; (2) publicly traded oil and gas companies and their affiliates; (3) persons or entities that Plaintiff's counsel may be prohibited from representing under Rule 1.7 of the Oklahoma Rules of Professional Conduct; and (4) officers of the court.

(Dk. No. 91, at 30; Dk. No. 114, at 13.)

---

[3] Cline relies on the expert reports of Barbara Ley, a certified public accountant, to establish that Cline can identify the putative class members and calculate damages class-wide with common proof.  For the reasons stated in a separate opinion, the Court will deny Sunoco's motion to exclude Ley's expert report and testimony (Dk. No. 107) and has considered her conclusions to decide the instant motion.

[4] This includes the revised definition proposed in Cline's reply.  The revisions provide a more narrow and manageable definition, and the Court analyzes whether Cline satisfies the Rule 23 requirements accordingly.  The Court will, however, grant Sunoco's motion for leave to file a sur-reply (Dk. No. 119), and it will direct the Clerk to docket the sur-reply.

3

A3

## II. <u>DISCUSSION</u>[5]

Federal Rule of Civil Procedure 23 governs class actions, including class certification. The party seeking certification must first satisfy the requirements of Rule 23(a): (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy. Fed. R. Civ. P. 23(a). In addition to the requirements of Rule 23(a), the proposed class must fall within at least one of the three types of class actions listed in Rule 23(b). Rule 23(b)(3), the relevant type of class action in this case, requires (5) predominance and (6) superiority. Fed. R. Civ. P. 23(b)(3). Although the Tenth Circuit does not require a separate ascertainability analysis, the Court will consider (7) ascertainability as a separate factor. The Court addresses each requirement in turn.

### A. Numerosity

The proposed class representative must demonstrate that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). The plaintiff must present "some evidence of established, ascertainable numbers constituting the class in order to satisfy even the most liberal interpretation of the numerosity requirements. There is, however, no set

---

[5] The party seeking class certification bears the burden of proof. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011); *Soseeah v. Sentry Ins.*, 808 F.3d 800, 808 (10th Cir. 2015). "[A]t the class certification stage a district court must generally accept the substantive, non-conclusory allegations of the complaint as true." *Vallario v. Vandehey*, 554 F.3d 1259, 1265 (10th Cir. 2009). Additionally, "'the trial court [must be] satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.' Frequently, that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim." *Wal-Mart*, 564 U.S. at 350-51 (internal citations omitted) (quoting *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 161 (1982)). "[A] district court 'may not evaluate the *strength* of a cause of action at the class certification stage,' but it must determine, 'without passing judgment on whether plaintiffs will prevail on the merits,' whether a plaintiff has satisfied the provisions of Rule 23." *Vallario v. Vandehey*, 554 F.3d 1259, 1267 (10th Cir. 2009) (quoting *Shook, et al. v. Bd. of Cty. Comm'rs, et al.*, 543 F.3d 597, 612 (10th Cir. 2008)); *see also Amgen Inc., et al. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013) ("Rule 23 grants courts no license to engage in free-ranging merits inquires at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.").

formula to determine if the class is so numerous that it should be so certified." *Rex v. Owens ex rel. State of Okla.*, 585 F.2d 432, 436 (10th Cir. 1978). The Court must consider "the particular circumstances of the case." *Id.*; *see also Gen. Tel. Co. of the Nw. v. EEOC*, 446 U.S. 318, 330 (1980) ("The numerosity requirement requires examination of the specific facts of each case and imposes no absolute limitations.").

Here, the proposed class encompasses thousands of interest owners, which easily satisfies the numerosity requirement under Rule 23(a)(1). *See Rex*, 585 F.2d at 436 (citing certified classes comprising 17 to 358 members).

### B. Commonality

The proposed class meets the commonality requirement because it presents "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "Even a single [common] question" satisfies this requirement. *Wal-Mart*, 564 U.S. at 359. Cline must show that "the class members have suffered the same injury," and that the "common contention . . . is capable of classwide resolution . . . [and] will resolve an issue that is central to the validity of each . . . claim[] in one stroke." *Id.* at 350; *see also Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc.*, 725 F.3d 1213, 1218 (10th Cir. 2013). Furthermore, "every member of the class need not be in a situation identical to that of the named plaintiff," and "[f]actual differences in the claims of the class members should not result in a denial of class certification where common questions of law exist." *Milonas v. Williams*, 691 F.2d 931, 938 (10th Cir. 1982). A common question of law requires the putative class to "share a discrete legal question of some kind." *J.B. ex rel. Hart v. Valdez*, 186 F.3d 1280, 1289 (10th Cir. 1999).

Cline sets forth four questions of law and fact that he argues satisfy the commonality requirement:

(1) whether, under Oklahoma law, Sunoco owed interest to Plaintiff and the Class on any and all Untimely Payments;

(2) whether owners must make a demand prior to being entitled to receive statutory interest;

(3) whether Sunoco's failure to pay interest to Plaintiff and the putative class on any Untimely Payments constitutes a violation of the PRSA; and

(4) whether Sunoco defrauded Plaintiff and the putative class by knowingly withholding statutory interest [as applied to Count II (fraud) of the original petition].

(Dk. No. 91, at 22-23.)   Cline argues that Sunoco's business records and employee testimony will confirm its "uniform policy of not paying statutory interest unless requested by an owner." (*Id.* at 23.)   Cline says that the proposed class will use common evidence of Sunoco's unlawful actions, and that if the Court finds Sunoco had a duty to pay that interest without a request and Sunoco breached that duty, every class member will prevail.

The case presents common questions of law and fact "capable of classwide resolution." *Wal-Mart*, 564 U.S. at 350.   Sunoco relies on "myriad individualized factors" to argue that the "'common' questions at the center of this case . . . cannot be resolved on a class-wide basis through common proof." (Dk. No. 105, at 31, 41.)   Sunoco's challenge to commonality, however, reads more like a challenge to predominance.   While factual differences may exist between the individual class members, these differences do not defeat the commonality prong under Rule 23(a)(2).   Rather than "broadly conflat[ing] a variety of claims to establish commonality via an allegation of 'systematic failures,'" Cline alleges that Sunoco did not pay statutory interest on late payments to the proposed class members based on Sunoco's single, uniform practice. *J.B.*, 186 F.3d at 1289.   Essentially, Cline presents discrete legal questions both about whether Sunoco violated the PRSA pursuant to its policy and about the injuries the proposed class members suffered as a result. *Id.*   If the Court holds Sunoco liable, all the class members prevail.   Cline has satisfied the Rule 23(a)(2) commonality requirement.

## C. Typicality

In this case, "the claims or defenses of [Cline] are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). This requirement "limit[s] the class claims to those fairly encompassed by the named plaintiff's claims." *Gen. Tel. Co. of the Nw.*, 446 U.S. at 330. "[D]iffering fact situations of class members do not defeat typicality under Rule 23(a)(3) so long as the claims of the class representative and class members are based on the same legal or remedial theory." *Adamson v. Bowen*, 855 F.2d 668, 676 (10th Cir. 1988); *see also DG ex rel. Stricklin, et al. v. Devaughn, et al.*, 594 F.3d 1188, 1198-99 (10th Cir. 2010).

To succeed on his PRSA claims, Cline must show that Sunoco (1) owed Cline payments; (2) made the payments to Cline late; and (3) did not pay the interest on the late payments. *See Chieftain Royalty Co. v. Marathon Oil Co.*, No. Civ-17-334-SPS, 2018 WL 2745906, at *2 (E.D. Okla. June 7, 2018). To succeed on his fraud claim, Cline must show that Sunoco made "1) a material misrepresentation, 2) knowingly or recklessly . . . , 3) with intent that it be relied upon, and 4) the party relying on the false statement suffer[ed] damages." *Silver v. Slusher*, 770 P.2d 878, 881 n.8 (Okla. 1988).[6]

Cline plans to rely on facts related to Sunoco's process for paying statutory interest to prove his PRSA claim. Cline also plans to rely on facts related to Sunoco's check stubs to show that Sunoco concealed the interest it owed to him. Those same facts would also prove—or disprove—the PRSA and fraud claims of the absent class members. Sunoco admits to using the same process for remitting most payments during the class period, and Sunoco used the same check stub format across the class.

---

[6] The accounting, disgorgement, and injunctive relief claims "necessarily flow out of the base claims." *Chieftain Royalty Co.*, 2018 WL 2745906, at *4; *see also Hitch Enters., Inc. v. Cimarex Energy Co.*, 859 F. Supp. 2d 1249, 1258 (W.D. Okla. 2012).

Sunoco tries to defeat the typicality prong by arguing that Cline (1) does not have standing to bring claims on behalf of either himself or the class, and (2) has interests adverse to the other putative class members. Sunoco fails on both arguments.

### i. *Standing*

In the midst of briefing this motion, Sunoco filed a motion to dismiss for lack of subject matter jurisdiction, alleging that it paid Cline the amount he seeks in interest. Sunoco thus challenges Cline's standing to bring this action individually or on behalf of the class. The Court will issue a separate opinion and order denying the motion to dismiss and explaining its reasoning. That ruling renders Sunoco's standing argument moot.

### ii. *Adversity*

Sunoco argues that "deep and significant adversity" exists between Cline, a royalty owner, and the working interest owners also included in the class because the class claims "could trigger an obligation on behalf of many of those same working interest owners to indemnify Sunoco." (Dk. No. 105, at 42.) Cline responds that the PRSA only contemplates claims against the entities who paid the proceeds late, not third parties.

To support its argument on adversity, Sunoco relies on *Cherokee Nation of Oklahoma v. United States*, 199 F.R.D. 357 (E.D. Okla. 2001). *Cherokee*, however, differs in important ways from this case. In *Cherokee*, the plaintiffs, "two Indian tribes that operate various Indian Health Services programs pursuant to contracts entered into under the Indian Self–Determination Act," received project support costs from the federal government. *Id.* at 359. They performed their contracts separately, and the contracts did not have standard language or specify a particular "full funding" amount. Every year, the Indian Health Services calculated the full contract amount for each contract according to various government circulars. The plaintiffs sued because they had

8

A8

not received full payment and sought class certification for 329 tribes in 35 states, of which 296 had experienced contract payment shortfalls.

The court declined to certify the class partly because the named plaintiffs were not "typical" of the class. *Id.* at 364. It concluded that each tribe's contract "is individual and specific to it, . . . [and] negotiated separately from the other tribes," resulting in different definitions of "full funding." *Id.* Additionally, the court held that "the plaintiffs' interests are antagonistic to those of the members of the proposed class" because the Indian Health Services had a finite budget. *Id.* at 364-65. The damage payments would come from the Indian Health Services' budget, meaning one plaintiff's claim would decrease the funds available to pay the remaining plaintiffs.

In *Cherokee*, the central, substantive issue related to separately-negotiated contract rights that pulled from a common, finite budget. In contrast, this Court need only decide whether Sunoco violated its statutory obligations under the PRSA.[7] The PRSA clearly states that "a *first purchaser or holder of proceeds* who fails to remit proceeds from the sale of oil or gas production to owners legally entitled thereto within the time limitations . . . of this section shall be liable to such owners for interest . . . on that portion of the proceeds not timely paid." Okla. Stat. tit. 52, § 570.10(E)(1) (emphasis added).

Sunoco has not demonstrated that the putative class members do not have the same statutory rights as Cline, or that the putative class does not have sufficiently similar financial interests in pursuing these claims against Sunoco. The contracts between Sunoco and working interest owners, or between Cline and his lessees, do not affect Sunoco's obligations under the

---

[7] Sunoco says that working interest owners receive 90 percent of all money paid but has not addressed Ley's observation that Sunoco owes the majority of damages in this action to royalty owners.

PRSA. (Dk. No. 105, at 42); *see* 7A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1768 (3d ed. 2019) ("[O]nly a conflict that goes to the very subject matter of the litigation will defeat a party's claim of representative status.").[8]  Further, the class members do not seek to tap a designated and limited fund, but rather simply seek damages (and equitable relief) against Sunoco.

Simply put, this is not a case in which "[t]he court cannot be assured that the plaintiff[], as [the] representative class member[], will aggressively pursue the claims of all proposed class members because of [his] own possible financial interest." *Cherokee*, 199 F.R.D. at 365.

Accordingly, Cline's claims satisfy the typicality requirement under Rule 23(a)(3).  Fed. R. Civ. P. 23(a)(3).

### D. Adequacy

Turning to adequacy, Cline must prove that both the representative parties and class counsel will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a)(4), (g)(4).  "It is axiomatic that a plaintiff cannot maintain a class action when his interests are antagonistic to, or in conflict with, the interests of the persons he would seek to represent." *Albertson's, Inc. v. Amalgamated Sugar Co.*, 503 F.2d 459, 463 (10th Cir. 1974).  The Court must "stringently appl[y]" this requirement. *Id.*

Sunoco repeats its argument regarding Cline's intra-class conflict in an effort to defeat the adequacy prong.  As already explained, Cline has suffered the same injuries and has the same interests and incentives as the putative class to "fairly and adequately" protect the class'

---

[8] *Cf. Pueblo of Zuni v. United States*, 243 F.R.D. 436, 449 (D.N.M. 2007) ("Plaintiff challenges th[e] conclusion [that the plaintiffs' interest are antagonistic for the reasons in *Cherokee Nation*] by noting that IHS has never reimbursed the Judgment Fund.  Whether or not the IHS has ever actually reimbursed the Fund. . . does not vitiate the mandate that reimbursement is required [by statute].")

interests.  Fed. R. Civ. P. 23(a)(4); *cf. Rhea v. Apache Corp.*, No. CIV-14-0433-JH, 2019 WL 1548909, at \*6 (E.D. Okla. Feb. 15, 2019) ("Given the nature of plaintiff's claim, coupled with the evidence of the uniform process being employed by defendant in how it paid royalties, the court concludes the theoretical potential for conflict, without more, is insufficient to disqualify plaintiff as an adequate class representative.").  The Court also finds that class counsel qualifies as experienced in class actions and other complex civil litigation, and Sunoco does not argue otherwise.  Thus, Cline and class counsel meets Rule 23's adequacy requirement.

### E. Predominance

Next, Sunoco's challenge to the predominance requirement fails because "the questions of law or fact common to class members predominate over any questions affecting only individual members."  Fed. R. Civ. P. 23(b)(3).  While similar to the commonality inquiry, "the predominance criterion is far more demanding."  *Amchen Prods., Inc. v. Windsor*, 521 U.S. 591, 624 (1997).  It "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Id.* at 623.  "It is not necessary that all of the elements of the claim entail questions of fact and law that are common to the class, nor that the answers to those common questions be dispositive."  *CGC Holding Co., et al. v. Broad & Cassell, et al.*, 773 F.3d 1076, 1087 (10th Cir. 2014).  Instead, a court must first "*characterize* the issues in the case as common or not, and then *weigh* which issues predominate."  *Naylor Farms, Inc., et al. v. Chaparral Energy, LLC*, 923 F.3d 779, 789 (10th Cir. 2019).

A court "should consider the extent to which material differences in damages determinations will require individualized inquiries."  *Roderick*, 725 F.3d at 1220.  An "individualized monetary claim[]" may not defeat a finding that common questions exist, but "predominance may be destroyed if individualized issues will overwhelm those questions

commons to the class." *Id.* Even so, "there are ways to preserve the class action model in the face of individualized damages." *Id.* (citing *Comcast Corp. v. Behrend*, 569 U.S. 27, 41 n.* (2013) (Ginsburg, J., and Breyer, J., dissenting) ("A class may be divided into subclasses for adjudication of damages. . . . Or, at the outset, a class may be certified for liability purposes only, leaving individual damages calculations to subsequent proceedings.")). As long as "at least one common issue predominates, a plaintiff can satisfy Rule 23(b)(3)—even if there remain individual issues, such as damages, that must be tried separately." *Naylor Farms*, 923 F.3d at 789.

Common questions of law and fact predominate. The Court must evaluate Sunoco's practice for paying interest and determine (1) whether Sunoco owed interest to the class for making late payments, (2) whether Sunoco could wait for owners to make a demand before paying that interest, (3) whether Sunoco's failure to pay the interest or delays in paying interest pursuant to its practice violates the PRSA, and (4) whether Sunoco defrauded the class by knowingly withholding that interest. The claims will rise or fall on common evidence. *See CGC Holding*, 773 F.3d at 1088 (explaining that the predominance analysis requires a court to evaluate the elements of the underlying causes of action). If the Court finds liability, it must fashion an appropriate remedy, guided by the objective criteria set forth in the PRSA.

Sunoco points to a number of individual questions that the Court must consider to decide liability and to calculate damages, but the Court does not find them persuasive. For example, Sunoco's argument that "myriad individualized factors" predominate falls short because the Court adopts Cline's modified class definition and accepts Ley's methodology for identifying the class members and calculating damages. Sunoco may vigorously contest Ley's conclusions, but Ley's model can determine damages on a class-wide basis sufficient for this stage of the

proceedings.[9] The revised definition excludes payments falling into four categories (the six month grace period, minimum suspense payments, pass-through payments, and prior period adjustments). Ley has said that she can exclude those payments from her model. Ley has also explained the method by which she intends to identify marketable title issues using Sunoco's codes, even if Sunoco contends its own coding system is unreliable for these purposes.

Sunoco also challenges Cline's fraud claim as too individualized. Fraud claims do not always warrant class treatment, particularly "if there was material variation in the representation made or in the kinds or degrees of reliance by the persons to whom they were addressed." Fed. R. Civ. P. 23 advisory committee notes to 1966 amendment. Courts will certify fraud claims, though, when the law of one state applies to the majority of the claims and the check stubs sent to royalty owners "presented . . . a 'standardized, written representation.'" *Rhea*, 2019 WL 1548909, at *9. Cline intends to establish fraud through the check stubs Sunoco issued uniformly to the putative class members. Cline has adequately refuted Sunoco's challenge to the fraud claim and established that the fraud claim "is 'susceptible to general and classwide proof." *Naylor Farms, Inc., et al. v. Chaparral Energy, LLC*, No. Civ-11-0634-HE, 2017 WL 187542, at *8 (W.D. Okla. Jan. 17, 2017) (quoting *CGC Holding*, 773 F.3d at 1089).

Sunoco points to various other individual questions as well, including questions regarding contracts between Sunoco and various well owners, the marketability of title, indemnification agreements, waivers, potential third-party litigation, Sunoco's proposed defenses, and equitable remedies. Notwithstanding those individual inquiries, the class is "sufficiently cohesive to

---

[9] The Court can later divide the class into subclasses to determine damages, or amend or alter its class certification order, if necessary. *See Naylor Farms*, 923 F.3d at 798 ("[T]he district court correctly noted that if necessary, it can later divide the class into subclasses for purposes of determining damages."); Fed. R. Civ. P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgment.").

warrant adjudication by representation." *Amchen*, 521 U.S. at 623. Moreover, many of these challenges to class certification are overexaggerated and largely incredible.

Finally, Sunoco asks the Court to apply the five-year statute of limitations and limit the class period to claims arising after July, 2012.[10] *See* Okla. Stat. tit. 52, § 570.14(D). Cline has not adequately rebutted Sunoco's statute of limitations argument. "Oklahoma follows the discovery rule allowing limitations in tort cases to be tolled until the injured party knows or, in the exercise of reasonable diligence, should have known of the injury." *Resolution Tr. Corp. v. Grant, et al.*, 901 P.2d 807, 813. To toll the statute of limitations, the Court would need to perform individual inquiries into the reasonable diligence of each class member that would defeat the predominance requirement under Rule 23(b)(3). Because Cline has not adequately rebutted that conclusion and has not defined the class period, the Court will limit the class claims to those arising on or after July 7, 2012.

Accordingly, Cline meets the predominance requirement, but the Court limits the class to claims arising on or after July 7, 2012.

### F. Superiority

Cline must also show "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). To evaluate this requirement, a court should consider

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> (D) the likely difficulties in managing a class action.

---

[10] Notably, Cline's class definition does not specify a time period.

Fed. R. Civ. P. 23(b)(3)(A)-(D); *see also Amchem*, 521 U.S. at 615-16 (describing the factors as "nonexhaustive"). "It is enough that class treatment is superior because it will 'achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" *CGC Holding*, 773 F.3d at 1096 (quoting *Amchem*, 521 U.S. at 615).

A class action is superior in this case. This case involves proceeds from Oklahoma wells paid pursuant to the requirements of an Oklahoma statute, and it centers on issues that the Court can resolve class wide. The parties have engaged in extensive discovery and have been litigating the case for over two years. No other litigation is currently pending, and the Court does not foresee any difficulty in managing this case as a class action. Sunoco speculates that the attorneys' fee award will be unduly burdensome but presents no evidence to support that claim. Sunoco also argues that some interest owners "are capable of representing their own interests and resolving any claims they have directly with Sunoco." (Dk. No. 105, at 40.) Sunoco's emphasis on the class members' options to recoup money owed ignores the putative class' interest in a uniform judgment about whether Sunoco's business practice violates the PRSA. Litigating the claims together serves the interests of economy, efficiency, and uniformity of decisions, so Cline meets the superiority requirement.

### E. Ascertainability

Although the Tenth Circuit does not enumerate ascertainability as a separate factor in the class certification analysis, class actions must present "some evidence of established, ascertainable numbers constituting the class in order to satisfy even the most liberal interpretation of the numerosity requirement." *Rex*, 585 F.2d at 436; *Shook, et al. v. El Paso County, et al.*, 386 F.3d 963, 972 (10th Cir. 2004) ("[T]he lack of identifiability is a factor that

may defeat Rule 23(b)(3) class certification."). The plaintiff does not need to identify every potential class member at the outset of the litigation, but "the class description [must be] sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." 7A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1760 (3d ed. 2019); *see also Carrera v. Bayer Corp.*, 727 F.3d 300, 306-07 (3d Cir. 2013).

To determine ascertainability, courts within the Tenth Circuit require "first, that the class be defined with reference to objective criteria; and second, a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition." *Braver v. Northstar Alarm Servs. LLC., et al.*, 329 F.R.D. 320, 334 (W.D. Okla. 2018). Cline's class definition aligns with the exceptions outlined in the PRSA, establishing that "the class [can] be defined with reference to objective criteria." *Id.* Ley's proposed model provides a reliable and administratively feasible mechanism for determining class membership. *Id.* The Court can therefore ascertain the proposed class.

Curiously, Sunoco simultaneously touts the interest owners' sophistication and understanding of the PRSA with regard to some factors, and argues that the class members, Sunoco, and this Court cannot reasonably determine who fits into exceptions to a class definition that tracks the language of the statute. Sunoco cannot have it both ways. Ley's model uses Sunoco's business records to specifically identify class members, assuring the Court that, even if the sophisticated interest owners cannot figure out whether they fall within the class, Ley's model can. Moreover, Sunoco's own conduct belies its argument, since, when required to do so, Sunoco itself determines whether putative owners should receive interest, and in what amount.

16

**A16**

Accordingly, Cline has demonstrated that the proposed class definition will not present an ascertainability problem.

### III.  CONCLUSION

Because Cline meets the requirements for class certification, the Court will grant the motion.  The Court declines to hold a hearing because it will not aid in the decisional process.

Let the Clerk send a copy of this Opinion to all counsel of record.

Date:  3 October 2019
Richmond, VA

/s/
John A. Gibney, Jr.
United States District Judge

17

**A17**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

PERRY CLINE, on behalf of himself
and all others similarly situated,
                    Plaintiff,

v.                                                    Civil Action No. 6:17-cv-313-JAG

SUNOCO, INC. (R&M), and,
SUNOCO PARTNERS MARKETING
& TERMINALS, L.P.,
                    Defendants.

**ORDER**

    This matter comes before the Court on the plaintiff's motion to certify the class (Dk. No.

91) and the defendants' motion for leave to file a sur-reply (Dk. No. 119).  For the reasons stated

in the accompanying Opinion, the Court GRANTS the motion to certify and CERTIFIES the

following class:

> All non-excluded persons or entities who: (1) received Untimely Payments from
> Defendants (or Defendants' designees) for oil proceeds from Oklahoma wells on
> or after July 7, 2012, and (2) who have not already been paid statutory interest on
> the Untimely Payments. An "Untimely Payment" for purposes of this class
> definition means payment of proceeds from the sale of oil production from an oil
> and gas well after the statutory periods identified in OKLA. STAT. tit 52,
> §570.10(B)(1) (i.e., commencing not later than six (6) months after the date of
> first sale, and thereafter not later than the last day of the second succeeding month
> after the end of the month within which such production is sold). Untimely
> Payments do not include: (a) payments of proceeds to an owner under OKLA.
> STAT. tit 52, §570.10(B)(3) (minimum pay); (b) prior period adjustments; or (c)
> pass-through payments.
>
> The persons or entities excluded from the Class are: (1) agencies, departments, or
> instrumentalities of the United States of America or the State of Oklahoma; (2)
> publicly traded oil and gas companies and their affiliates; (3) persons or entities
> that Plaintiff's counsel may be prohibited from representing under Rule 1.7 of the
> Oklahoma Rules of Professional Conduct; and (4) officers of the court.

**A18**

Further, the Court GRANTS the defendants' motion to file a sur-reply (Dk. No. 119) and

DIRECTS the Clerk to docket the sur-reply (Dk. No. 119-1).

It is so ORDERED.

Let the Clerk send a copy of this Order to all counsel of record.

Date: 3 October 2019
Richmond, VA

/s/
John A. Gibney, Jr.
United States District Judge

**A19**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

PERRY CLINE, on behalf of himself
and all others similarly situated,
                    Plaintiff,

v.                                                    Civil Action No. 6:17-cv-313-JAG

SUNOCO, INC. (R&M), and,
SUNOCO PARTNERS MARKETING
& TERMINALS, L.P.,
                    Defendants.

## MEMORANDUM ORDER

This matter comes before the Court on the defendants' motion to "clarify" the class

definition.[1]  (Dk. No. 172.)  The Court held a telephone hearing on the motion on November 25,

2019.

Sunoco asks the Court to change the composition of the class to exclude recipients of

payments made to state unclaimed property funds.[2]  Sunoco inaccurately calls these payments

"escheat payments," implying that the state takes title to the money.  Under typical unclaimed

property laws, however, a state simply holds money for owners who, for various reasons, do not

themselves take possession of the funds.  *See, e.g.*, Okla. Stat. tit. 60, §§ 661, 663-64.

Sunoco wants to cut those people out of the class.  This argument ignores the owners'

right to the funds in question.  This right exists, whether the owners take possession of the funds

themselves or a state holds the money for them.  The Court, therefore, denies the motion to

"clarify" the class definition.

---

[1] In this Order, the Court will refer to the defendants, Sunoco, Inc. (R&M), and Sunoco Partners
Marketing & Terminals, L.P., simply as "Sunoco".

[2] Specifically, Sunoco seeks to exclude "persons [who] did not receive any payments because the
proceeds potentially owed to them were instead paid to the 50 states in compliance with various
unclaimed property (escheat) statutes."  (Dk. No. 172, at 7.)

**A20**

In the alternative, Sunoco asks the Court to decertify the class. Sunoco has litigated this issue vigorously throughout this litigation. In previous unsuccessful efforts to derail the class action after certification, Sunoco has not only asked this Court to stay the case but even has tried to get the Tenth Circuit Court of Appeals to intervene. A month before the trial, the Court will not change the road map for the case.

For the reasons stated in this Order, the Court DENIES the motion.

## I. **BACKGROUND**

This case arises under Oklahoma's Production Revenue Standards Act ("PRSA"). Okla. Stat. tit. 52, § 570, et seq. The PRSA requires entities that take oil and gas to pay the owners in a timely fashion. If the purchaser pays late, interest accrues for the owner.

According to the plaintiffs, Sunoco frequently makes late payments, but does not pay interest until the owner requests it. The plaintiffs say Sunoco does not do this by accident, but rather pursuant to a business practice. The plaintiffs' expert says Sunoco has withheld over $70 million in interest owed to others.

Sometimes Sunoco cannot find the owner of the oil and gas. In these cases, it makes payment for the oil or gas to the unclaimed property agency of the state of the owner's last known residence.[3] Sunoco does not pay interest on the unclaimed funds when it sends those funds to the states. Well over half of Sunoco's late payments go to unclaimed property funds. According to the plaintiffs, the interest on these payments would amount to over $40 million— more than half the amount claimed by the plaintiffs in this case.

---

[3] Sunoco identifies unclaimed funds by various methods, "such as checks and other correspondence being returned as undeliverable or being in certain specific categories of suspense for various reasons for several years without anyone claiming the funds or making an inquiry." (Dk. No. 172, at 8.) If Sunoco cannot identify the owner, it pays the funds to Texas, Sunoco's home state.

On October 3, 2019, the Court certified the following class:

All non-excluded persons or entities who: (1) received Untimely Payments from Defendants (or Defendants' designees) for oil proceeds from Oklahoma wells on or after July 7, 2012, and (2) who have not already been paid statutory interest on the Untimely Payments. An "Untimely Payment" for purposes of this class definition means payment of proceeds from the sale of oil production from an oil and gas well after the statutory periods identified in OKLA. STAT. tit 52, §570.10(B)(1) (i.e., commencing not later than six (6) months after the date of first sale, and thereafter not later than the last day of the second succeeding month after the end of the month within which such production is sold). Untimely Payments do not include: (a) payments of proceeds to an owner under OKLA. STAT. tit 52, §570.10(B)(3) (minimum pay); (b) prior period adjustments; or (c) pass-through payments.

The persons or entities excluded from the Class are: (1) agencies, departments, or instrumentalities of the United States of America or the State of Oklahoma; (2) publicly traded oil and gas companies and their affiliates; (3) persons or entities that Plaintiff's counsel may be prohibited from representing under Rule 1.7 of the Oklahoma Rules of Professional Conduct; and (4) officers of the court.

(Dk. No. 127, at 1.)  Now, less than a month before trial, Sunoco asks the Court to "clarify" the class definition.  This "clarification" amounts to little more than an attempt to lop over fifty percent off Sunoco's potential liability in this case.[4]

## II. DISCUSSION

When a court certifies a class action, it "must define the class and the class claims, issues, or defenses." Fed. R. Civ. P. 23(c)(1)(B).  A court may alter or amend the order granting or denying class certification at any time before final judgment. Fed. R. Civ. P. 23(c)(1)(C). Courts have broad discretion to modify class definitions, *cf. Davoll v. Webb*, 194 F.3d 1116, 1146 (10th Cir. 1999), and the class definition "is subject to refinement," *Vickers v. Gen. Motors*

---

[4] Sunoco says the plaintiffs have overstated the amount due.  Sunoco claims that the plaintiffs can recover only $48 million, of which $30 million arises from payments to unclaimed property funds.  The Court, of course, cannot compute damages at this time.  But under either side's view, Sunoco's proposed "clarification" would reduce its exposure by well over half.

3

**A22**

*Corp.*, 204 F.R.D. 476, 478 (D. Kan. 2001); *see also Lavigne v. First Cmty. Bancshares, Inc.*, No. 1:15-cv-00934-WJ/LF, 2018 WL 2694457, at *9 (D.N.M. June 5, 2018).

Sunoco offers three reasons for the Court to drop from the class the owners who received payments though unclaimed property statutes. First, Sunoco says that these owners have not "received" payments, and therefore do not fall under the class definition. As Sunoco explained in oral argument, it contends that the states alone have received the money and, essentially, own it. This argument ignores how unclaimed property statutes work. Whether those laws define the state as a trustee or a custodian of the money, the statutes all say that the state has received the assets on behalf of the citizen, and that the owner can get the money at any time. *See, e.g.*, Okla. Stat. tit. 60, §§ 661, 663-64, 674-75; Tex. Prop. Code Ann. §§ 74.304, 74.501. Sunoco admitted this during oral argument on this motion. Payment to the state differs little from payment to an agent of the owner, or to a trustee on behalf of the owner. Sunoco does not—and cannot—claim that an owner claiming through a trustee or agent does not have a right to interest on a late payment. Moreover, Sunoco's argument essentially amounts to a contention that it can perpetually keep the interest on these payments, regardless how late they are paid. This contradicts the purpose of the PRSA, which Oklahoma adopted to prevent exactly this kind of windfall.

Second, Sunoco argues that calculating the amount due on payments to unclaimed property funds is really hard to do.[5] Sunoco says that under state laws, property becomes unclaimed at various times, and that it cannot pay money into the unclaimed property funds until the statute has lain unclaimed for a period of time. This, Sunoco says, raises an insuperable

---

[5] This position echoes Sunoco's argument throughout the case—that it is not easy to calculate who should receive interest at all, and therefore that it is acceptable not to pay the interest until someone has the gumption to request it.

4

calamity: on the one hand, the PRSA says Sunoco must pay for the oil within a few months of taking it, but on the other hand the unclaimed property statutes do not allow Sunoco to make the payment for years after the payment becomes due. Nevertheless, at some point the payments become late. Deciding when this occurs presents a legal issue the Court will resolve at trial. The existence of a contested legal issue, however, does not require the Court to reframe the case on the eve of trial.

Finally, Sunoco says that the issues with unclaimed property make this case inappropriate for treatment as a class action. Although "every member of the class need not be in a situation identical to that of the named plaintiff," *Milonas v. Williams*, 691 F.2d 931, 938 (10th Cir. 1982), Rule 23's requirements do have their limits. *See, e.g., Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147 (1982); *Cole v. ASARCO, Inc.*, 256 F.R.D. 690 (N.D. Okla. 2009); *Cherokee Nation of Okla. v. United States*, 199 F.R.D. 357 (E.D. Okla. 2001). In this case, common questions of law and fact underlie the payments Sunoco has made directly to interest owners, such as Cline, and indirectly to owners through unclaimed fund statutes. The class encompasses all owners Sunoco paid late without including the required interest.

Including these payments will not cause individual questions to predominate or create any superiority or manageability problems. Sunoco admits that a party to whom money is owed can claim those funds at any time pursuant to the claim procedure of each state. Moreover, the party may make that claim regardless of how the state's laws define the relationship between the state and the interest owner.[6] As noted above, at trial the Court will decide when interest begins accruing for unclaimed funds. That decision will not require extensive individual inquiries or unmanageable analyses of various state laws.

---

[6] For example, some states may hold the funds in a trust for the benefit of the interest owner, while others consider it a custodial relationship.

Simply put, the unclaimed property payments fall into the category of payees that Cline represents, and they do not defeat class certification. Thus, the Court will include these payments in the class definition. *Cf. Shook v. Bd. of Cty. Comm'rs of Cty. of El Paso*, 543 F.3d 597, 603 (10th Cir. 2008) (recognizing that class certification decisions may involve questions with "no single right answer . . . , but a range of possible outcomes sustainable on the law and facts").

### III. **CONCLUSION**

For the foregoing reasons, the Court DENIES the motion and clarifies that it considers escheat payments, as defined by Sunoco, as part of the class definition. The Court declines to decertify the class.

It is so ORDERED.

Let the Clerk send a copy of this Order to all counsel of record.

Date: 26 November 2019
Richmond, VA

/s/
John A. Gibney, Jr.
United States District Judge

6

**A25**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

PERRY CLINE, on behalf of himself
and all others similarly situated,
                                    Plaintiff,

v.                                          Civil Action No. 6:17-cv-313-JAG

SUNOCO, INC. (R&M), and,
SUNOCO PARTNERS MARKETING
& TERMINALS, L.P.,
                    Defendants.

## **OPINION**

    Perry Cline represents class members who own interests in oil wells in Oklahoma.  The defendants, Sunoco, Inc. (R&M), and Sunoco Partners Marketing & Terminals, L.P. ("Sunoco"), purchase and sell oil from the wells.  Sunoco pays the class members proceeds when it sells the oil.  Oklahoma's Production Revenue Standards Act ("PRSA") governs when Sunoco must pay those proceeds and imposes statutory interest for paying the proceeds late.  *See* Okla. Stat. tit. 52, § 570, *et seq.*  Cline has sued Sunoco for failing to pay the statutory interest on late payments it made on oil proceeds.

    Cline has moved for partial summary judgment on two issues: (1) whether Sunoco violates the PRSA by not paying statutory interest on late royalty payments until an owner demands that interest; and (2) whether the PRSA requires Sunoco to pay the statutory interest at the same time it makes the late payments.  Because the Court concludes that Sunoco must pay the statutory interest without a demand and at the same time it makes the late payment, the Court will grant Cline's motion for partial summary judgment.

**A26**

# I. <u>BACKGROUND</u>

Sunoco buys oil from numerous wells in Oklahoma and distributes proceeds from the oil to well owners. The class members own interests in those wells. The PRSA dictates when Sunoco must pay the proceeds, and it requires Sunoco to pay statutory interest to interest owners when it pays the proceeds late.[1]

Sunoco often waits until an interest owner requests the statutory interest before it pays that interest. When it receives a request, Sunoco investigates the payment and pays the interest if it determines that it owes interest under the PRSA. Sunoco, however, says that it sometimes pays interest owners the required statutory interest without a request.

In July, 2017, Cline sued Sunoco in Oklahoma state court. Cline alleges that Sunoco's practice of paying interest on late proceed payments violates the PRSA, and that Sunoco has committed fraud by hiding the fact that Sunoco owes interest to the class members. Sunoco removed the action to this Court in August, 2017.

Cline moved to certify the class and name him as class representative in June, 2019. In his motion, Cline explained that this action raises common questions of law and fact, including:

> (1) whether, under Oklahoma law, Sunoco owed interest to Plaintiff and the Class on any and all Untimely Payments;
> (2) whether owners must make a demand prior to being entitled to receive statutory interest;
> (3) whether Sunoco's failure to pay interest to Plaintiff and the putative class on any Untimely Payments constitutes a violation of the PRSA; and
> (4) whether Sunoco defrauded Plaintiff and the putative class by knowingly withholding statutory interest.

---

[1] Sunoco is considered a "first purchaser or holder of proceeds" under the PRSA. *See* Okla. Stat. tit. 52, § 570.10.

2

(Dk. No. 91, at 22-23.)  On October 3, 2019, the Court certified a class of interest owners to whom Sunoco paid proceeds late but did not pay the statutory interest.[2]  The Court approved the manner and form of class notice in November, 2019.  The class opt-out period expired on December 9, 2019.

In October, 2019, Cline moved for partial summary judgment on whether Sunoco violates the PRSA by waiting to pay statutory interest until an owner requests it, and whether the PRSA requires Sunoco to pay the statutory interest with the late payments.  Sunoco moved to strike or stay briefing on the motion until after the class notice period expired.  The Court denied the motion to strike or stay and instructed the parties to brief the motion as ordered by the Court.  On December 6, 2019, the Court held a hearing on the motion for partial summary judgment.  Because the opt-out period has expired, the Court finds it appropriate to issue a ruling on the merits of this action.

_____

[2] Specifically, the class includes:

> All non-excluded persons or entities who: (1) received Untimely Payments from Defendants (or Defendants' designees) for oil proceeds from Oklahoma wells on or after July 7, 2012, and (2) who have not already been paid statutory interest on the Untimely Payments. An "Untimely Payment" for purposes of this class definition means payment of proceeds from the sale of oil production from an oil and gas well after the statutory periods identified in OKLA. STAT. tit 52, §570.10(B)(1) (i.e., commencing not later than six (6) months after the date of first sale, and thereafter not later than the last day of the second succeeding month after the end of the month within which such production is sold). Untimely Payments do not include: (a) payments of proceeds to an owner under OKLA. STAT. tit 52, §570.10(B)(3) (minimum pay); (b) prior period adjustments; or (c) pass-through payments.

> The persons or entities excluded from the Class are: (1) agencies, departments, or instrumentalities of the United States of America or the State of Oklahoma; (2) publicly traded oil and gas companies and their affiliates; (3) persons or entities that Plaintiff's counsel may be prohibited from representing under Rule 1.7 of the Oklahoma Rules of Professional Conduct; and (4) officers of the court.

(Dk. No. 127, at 1.)

## II. <u>DISCUSSION</u>[3]

### A. Disputes of Facts

To succeed on the motion for partial summary judgment, Cline must first establish that Sunoco omits interest on late payments and waits for a demand from an owner before paying that interest. The parties disagree about whether Sunoco's actions constitute a uniform "policy" or a frequent "practice," and Sunoco insists that it sometimes pays interest with the late payment and without the request of the interest owner. Those arguments miss the point. Sunoco cannot seriously dispute that it waits to pay statutory interest until it receives a request from the interest owner; indeed, it has admitted that it does. (*See, e.g.*, Dk. No. 103-2; Dk. No. 105, at 17-18.) The record establishes that Sunoco engages in this conduct. (*See* Dk. No. 142-1, 7:13-8:19; Dk. No. 142-2, 6:6-8:10; Dk. No. 142-3, 7:2-9:10; Dk. No. 142-5, 7:8-15; Dk. No. 160-1, 6:12-7:19.) Thus, no genuine dispute of material fact exists about Sunoco's actions with regard to the interest payments.

### B. Questions of Law

Cline asks the Court to decide two legal questions that lie at the center of this litigation.[4] First, he asks for a ruling that Sunoco's "uniform policy of not paying statutory interest until an

---

[3] Rule 56 of the Federal Rules of Civil Procedure directs courts to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In deciding a summary judgment motion, the court must draw all reasonable inferences in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Nevertheless, if the non-moving party fails to sufficiently establish the existence of an essential element to its claim on which it bears the ultimate burden of proof, the court should enter summary judgment against that party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

[4] Sunoco argues that Cline's motion requests an impermissible advisory opinion about a nonmaterial issue. Of course, the Court may not render advisory opinions, but it can decide "concrete legal issues, presented in actual cases." *United Pub. Workers of Am. (C.I.O) v. Mitchell*, 330 U.S. 75, 89 (1947). Moreover, "[i]t is emphatically the province and duty of the judicial department to say what the law is. Those who apply the rule to particular cases, must of

4

owner makes a demand" violates the PRSA. (Dk. No. 142, at 9.) Second, he asks the Court to

decide whether the PRSA "expressly require[s] *payment* of interest at the time proceeds are paid

late." (Dk. No. 142, at 11.) Because any demand requirement depends on when Sunoco must

pay interest, the Court first considers when the PRSA requires Sunoco to pay interest on late

payments.

### *1. Timing of Interest Payments*

In relevant part, § 570.10(D) of the PRSA provides:

1. . . . [W]here proceeds from the sale of oil or gas production or some portion of
such proceeds are not paid prior to the end of the applicable time periods provided
in this section, that portion not timely paid shall earn interest at the rate of twelve
percent (12%) per annum to be compounded annually, calculated from the end of
the month in which such production is sold until the day paid.

2. a. Where such proceeds are not paid because the title thereto is not marketable,
such proceeds shall earn interest at the rate of (i) six percent (6%) per annum to be
compounded annually for time periods prior to November 1, 2018, and (ii) the
prime interest rate as reported in the Wall Street Journal for time periods on or
after November 1, 2018, calculated from the end of the month in which such
production was sold until such time as the title to such interest becomes
marketable or the holder has received an acceptable affidavit of death and heirship
in conformity with Section 67 of Title 16 of the Oklahoma Statutes, or as set forth
in subparagraph b of this paragraph.

§ 570.10(D). The PRSA also requires that, with some enumerated exceptions,

a first purchaser or holder of proceeds who fails to remit proceeds from the sale of
oil or gas production to owners legally entitled thereto within the time limitations
set forth in [§ 570.10(B)] shall be liable to such owners for interest as provided in
[§ 570.10(D)] on that portion of the proceeds not timely paid. When two or more

---

necessity expound and interpret that rule." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177
(1803). The complaint alleges that Sunoco had to pay statutory interest with the late payments
and failed to do so, thereby violating the PRSA. (*See* Compl. ¶¶ 6-7, 32-38, 41-50). Thus, the
Court must decide when Sunoco was required to actually pay that interest to the class members,
so this ruling does not constitute an advisory opinion. To the extent that Sunoco argues that the
motion is overbroad, the Court has already limited the class definition to payments that fall
outside the exclusions listed in § 570.10. The Court's ruling, therefore, only applies to those
payments that fit within the class definition; it offers no opinion on whether Sunoco has violated
the PRSA with regard to payments outside the class definition.

5

A30

persons fail to remit within such time limitations, liability for such interest shall
be shared by those persons holding the proceeds in proportion to the time each
person held such proceeds.

§ 570.10(E).

Cline argues that the PRSA requires Sunoco to pay interest at the time it makes the late

payment based on the language of the statute, the legislative intent of the interest provision, and a

relevant Oklahoma state court decision.

Sunoco contends that it is liable for interest when it makes late payments, but that the

PRSA does not require it to pay that interest at the same time it makes the late payments.

Sunoco distinguishes § 570.10(D) from PRSA provisions that require individuals to "pay" or

"remit" proceeds to the person entitled to them.[5]  *See, e.g.*, § 570.10(B)(1)-(3).  Sunoco argues

that § 570.10(D) only requires proceeds to "earn interest" and that Sunoco "shall be liable" for

the interest unless an exception provides otherwise.  Because the PRSA does not expressly set

forth a payment schedule or require "first purchasers or holders of proceeds" to pay interest

absent a claim for that interest, Sunoco contends that the Court cannot "rewrite" the PRSA to

require interest payments automatically with the late payment.

The Court turns to relevant Oklahoma law and principles of statutory interpretation to

answer this question.

### a. The Pummill Decision

Courts sitting in diversity jurisdiction "apply state law with the objective of obtaining the

result that would be reached in state court." *Butt v. Bank of Am., N.A.*, 477 F.3d 1171, 1179

(10th Cir. 2007).  A decision by the highest court of the state binds federal courts when

---

[5] Sunoco also points to the actions of non-parties to convince the Court that the statute does not
require Sunoco to pay interest with the late payment.  But Sunoco's actions, not the actions of
others, are the subject of this litigation, and the Court must consider the conduct and legal
questions currently before it.

interpreting state law. *West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 236 (1940).  Similarly, the decisions of lower state courts provide persuasive guidance to federal courts in diversity cases. *Id.* at 237-38.

One Oklahoma state court case directly addressed when a "first purchaser or holder of proceeds" must make interest payments under the PRSA.  In *Pummill. v. Hancock Exploration LLC*, an Oklahoma trial court considered whether the defendants' "old" policy of waiting to pay statutory interest until an owner demanded it and its "new" policy to include the statutory interest on late payments when the defendants were at fault for the late payment violated § 570.10(D). No. CV-2011-82, 2012 WL 13098574, at *1 (Okla. Dist. Ct. Grady Cty. July 16, 2012) (Order on Issue IV).  On summary judgment, the Court held that both policies violated § 570.10(D). The court reasoned that "[t]he plain language of this statute imposes an obligation to include interest on late payments regardless of whether the royalty owners make demand for such interest." *Id.* at *2.  "Compliance with the statute is not optional," and the defendants "ha[d] the statutory obligation to pay such interest without prior written or oral demand by royalty owners." *Id.*  Thus, the court granted summary judgment on the interest payment issue ("Issue IV") in favor of the plaintiffs.  The court also granted summary judgment on three other issues ("Issues I through III") unrelated to the timing of interest payments.

The defendants appealed the trial court's orders.  *See Pummill v. Hancock Expl. LLC*, No. 111,096 (Okla. Civ. App. June 27, 2014).  The Oklahoma Court of Civil Appeals affirmed the trial court's decision on all four issues, explaining that "the findings of fact and conclusions of law of the trial court adequately explain the decision." *Id.* at 5.

The Oklahoma Supreme Court vacated the decision of the Civil Court of Appeals. *Pummill. v. Hancock Expl. LLC*, 341 P.3d 69 (Okla. 2014).  The court noted that the interest

7

A32

payment issue "was not contested." *Id.* at 69.  It also concluded that "facts which could affect

the resolution of the district court Issues I through III need to be addressed before the fact-

finder." *Id.*  The court, therefore, affirmed in part and reversed in part the trial court's decision

and remanded the case to decide the specific fact issues.  *Id.*.  On remand, the courts did not

make any further rulings on the interest payment issue.  *See* Order Denying Certiorari, *Pummill*

*v. Hancock Expl. LLC,* No. 114,703 (Okla. May 21, 2018);  *Pummill*, 419 P.3d 1268; *Pummill v.*

*Hancock Expl. LLC*, No. CV-2011-82 (Okla. Dist. Ct. Grady Cty. Jan. 15, 2016).

Cline and Sunoco dispute whether the Oklahoma Supreme Court's 2014 *Pummill*

decision binds this Court in light of the procedural history of the case and the fact that the parties

did not contest the interest payment issue.  Cline thinks it does, and Sunoco thinks it does not.

The Court agrees with Cline.  The Oklahoma Supreme Court reversed in part and affirmed in

part the decision of the Court of Civil Appeals and remanded the case to the trial court.  *Pummill*,

341 P.3d at 69.  The court explained that Issues I through III "need[ed] to be addressed before

the fact-finder." *Id.*  That only left one issue that it could have affirmed—Issue IV.  *See also*

*Pummill v. Hancock Expl. LLC*, 419 P.3d 1268, 1272 (Okla. Civ. App. 2018) ("[The Oklahoma

Supreme Court] . . . vacated [the Court of Civil Appeals'] opinion, affirmed the trial court's

judgment as to statutory interest, reversed its judgment as to the three other issues, and

remanded.").  Although Sunoco vigorously argues that the parties did not contest Issue IV and

the Oklahoma Supreme Court did not rule on the trial court's interest payment decision, it has

not explained what else the Oklahoma Supreme Court could have "affirmed" in its ruling.

Even if the Court did not agree that the Oklahoma Supreme Court adopted the trial

court's ruling on Issue IV, the *Pummill* decision reflects how an Oklahoma state court would

view the issue directly before this Court. *Pummill* also falls in line with the Court's own interpretation of § 570.10(D).

### b. Plain Language of the PRSA

"Legislative intent controls statutory interpretation." *Krug v. Helmerich & Payne, Inc.*, 362 P.3d 205, 210 (Okla. 2015). Courts ascertain intent "from the whole act based on its general purpose and objective." *Id.* at 210-11. Courts must consider relevant portions together "whenever possible to give full force and effect to each." *Id.* at 211. Courts will look to the language of the statute and "presume that the Legislature intends what it expresses." *Id.* It will give terms "their plain and ordinary meaning" unless "a contrary intention plainly appears." *Id.*

The plain language of § 570.10 requires Sunoco to pay interest at the same time it makes a late payment. In § 570.10, the Oklahoma Legislature ("the Legislature") set forth a deadline for Sunoco to pay proceeds to interest owners. Sunoco argues that the statute does not require automatic payment of interest with the late payment because the Legislature did not also specify a deadline for paying the interest. Sunoco, therefore, believes it can withhold interest until an owner either asks for that interest or sues them for it.

That interpretation runs counter to the PRSA's plain language. The omission of the terms "remit" or "pay" from § 570.10(D) does not preclude a requirement that a "first purchaser or holder of proceeds" pay interest with the late payments. Indeed, requiring automatic payment of statutory interest gives full force and effect to the remaining provisions of § 570.10, which set forth a timeframe to pay proceeds and a consequence for paying the proceeds late. *See Krug*, 362 P.3d at 211. Moreover, Sunoco's interpretation would require the Court to read into the statute a grace period between when it makes a late payment and when it pays the interest. The plain language of § 570.10 does not support such an interpretation.

Sunoco, therefore, must pay interest at the same time it makes the late payment. *See Pummill*, 2012 WL 13098574, at *2 ("The plain language of this statute imposes an obligation to include interest on late payments.").

### c. History and Purpose of the PRSA

At most, the omission of the terms "remit" or "pay" from § 570.10(D) raises an ambiguity appropriate for judicial resolution. To resolve a doubt about the meaning of a statute, courts should refer to the statute's history. *Lekan v. P&L Fire Prot. Co.*, 609 P.2d 1289, 1292 (Okla. 1980). "[W]here a statute is ambiguous or its meaning uncertain it is to be given a reasonable construction, one that will avoid absurd consequences if this can be done without violating legislative intent." *TRW/Reda Pump v. Brewington*, 829 P.2d 15, 20 (Okla. 1992). Courts will not assume the legislature "to have done a vain and useless act in the promulgation of a statute, nor will an inept or incorrect choice of words be applied or construed in a manner to defeat the real or obvious purpose of a legislative enactment." *Id.* (citation omitted); *see also Purcell v. Santa Fe Minerals, Inc.*, 961 P.2d 188, 193 (Okla. 1998).

Thus, the Court must consider the purpose of § 570.10(D). The Legislature enacted the statutory interest provision "to ensure that those entitled to royalty payments would receive proceeds in a timely fashion." *Hull v. Sun Ref. & Mktg. Co.*, 789 P.2d 1272, 1279 (Okla. 1989). Indeed,

> [t]he Legislature in clear and unambiguous terms required timely payment when revenue was derived from or attributable to any production of natural gas. The obvious overriding purpose of the Act is to ensure that royalty owners are timely paid their share of the proceeds. The Legislature has followed a path of strengthening mineral owners['] rights since the Act's inception. Prejudgment interest is accruable in the event such payment is not timely made.

*Krug*, 362 P.3d at 214.

The 12 percent interest rate imposed by the statute preceding § 570.10 initially acted as a penalty, while the 6 percent interest rate compensated the owner for the use of his money until he established marketable title.[6]  *See Fleet v. Sanguine, Ltd.*, 854 P.2d 892, 899-900 (Okla. 1999), *superseded by statute as recognized in Purcell.*, 961 P.2d at 193; *In re Tulsa Energy*, 111 F.3d 88, 91 (10th Cir. 1997).  The Legislature, however, removed the language describing the 12 percent interest rate as a "penalty."  *See Purcell*, 961 P.2d at 193.  Nevertheless, courts have continued to acknowledge that "[t]he 12% prejudgment interest acts to compel compliance with the statute's requirement that proceeds be paid to those entitled thereto."  *Okland Oil Co. v. Conoco Inc.*, 144 F.3d 1308, 1320 (10th Cir. 1998).

Sunoco tries to circumvent an unavoidable (and unfavorable) reading of the PRSA by asking this Court to ignore well-founded principles of statutory interpretation and prior relevant case law.  Indeed, Sunoco's theory runs counter to the statute's overarching legislative intent.  *See Krug*, 362 P.3d at 214; *Hull*, 789 P.2d at 1279.  The Legislature enacted § 570.10's predecessor statute in 1980 because "first purchasers and holders of proceeds" wrongfully withheld production proceeds and used those proceeds for their own benefit.  Attorney General's Opinion No. 2015-6, 2015 WL 5193536, at *1, 4 (Okla. A.G. Sept. 1, 2015).[7]  The PRSA meant to "strengthen[] mineral owners['] rights" and to ensure that "first purchasers and holders of proceeds" paid production proceeds on time.  *Krug*, 362 P.3d at 214.

---

[6] For time periods on or after November 1, 2018, the PRSA now requires proceeds withheld due to unmarketable title to "earn interest at . . . 'the prime interest rate as reported in the Wall Street Journal.'"  § 570.10(D)(2)(a).

[7] Oklahoma courts consider Attorney General opinions persuasive authority "when a court is determining legislative intent."  *Quinlan v. Koch Oil Co.*, 25 F.3d 936, 941 (10th Cir. 1994); *see also Nat'l Cowboy Hall of Fame & W. Heritage Ctr. v. State* ex rel. *Okla. Human Rights Comm'n*, 579 P.2d 1276, 1279 (Okla. 1978).

Section 570.10(D), therefore, provides an important incentive for Sunoco to pay interest owners on time. Sunoco does not dispute that it owes interest on late payments, nor could it. But Sunoco's interpretation would allow Sunoco to delay paying the statutory interest indefinitely. Reading the provision to allow Sunoco to withhold the interest from the late payment would, therefore, undermine the very purpose of that provision, rendering it meaningless. Such an interpretation would also mean that the Legislature undertook "a vain and useless act in the promulgation of a statute . . . [that would] defeat the real or obvious purpose of [the] legislative enactment." *TRW/Reda Pump*, 829 P.2d at 20. Resolving the ambiguity by requiring Sunoco to pay the interest at the same time as the late payment, therefore, avoids "absurd consequences . . . without violating legislative intent." *Id.*

### 2. *Demand Requirement*

Cline next asks the Court to decide whether Sunoco may wait until an owner makes a demand for statutory interest before paying that interest.[8] The PRSA does not require interest owners to demand payment to receive royalty proceeds. *See* § 570.10; *cf. Hull*, 789 P.2d at 1279; *Quinlan*, 25 F.3d at 939-40. Because the Court concludes that § 570.10(D) requires a "first purchaser or holder of proceeds" to pay the interest with the late payment, the interest owner need not demand the interest either. *See Pummill*, 2012 WL 13098574, at *2 ("The plain language of this statute imposes an obligation to include interest on late payments *regardless of whether the royalty owners make demand for such interest.*" (emphasis added)). Accordingly, Sunoco may not require interest owners to demand interest payments before paying that interest.

---

[8] Cline describes this as a "uniform policy." (Dk. No. 142, at 9.) Sunoco contends that it sometimes pays interest without a demand. The Court considers this distinction immaterial because Sunoco has consistently admitted that it often waits until an owner makes a demand for interest before paying that interest. Thus, the Court considers whether Sunoco's actions violate the PRSA, regardless of whether Sunoco considers it a "policy."

A37

## III. **CONCLUSION**

The PRSA requires Sunoco to pay interest on late payments at the same time it makes those payments, and Sunoco cannot require an interest owner to make a demand before paying that interest.  Thus, the Court will grant Cline's motion for partial summary judgment.

The Court will enter an appropriate Order.

Let the Clerk send a copy of this Opinion to all counsel of record.

Date: 10 December 2019
Richmond, VA

/s/
John A. Gibney, Jr.
United States District Judge

13

**A38**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

PERRY CLINE, on behalf of himself
and all others similarly situated,
                          Plaintiff,

v.                                          Civil Action No. 6:17-cv-313-JAG

SUNOCO, INC. (R&M), et al.,
                          Defendants.

## OPINION

Sunoco owes millions of dollars in interest on late payments for crude oil. Oklahoma law requires a first purchaser of crude oil—such as Sunoco—to pay promptly for the oil. If the purchaser pays late, it must pay interest to the owner of the well that produced the oil. This case involves Sunoco's failure to pay that interest.

Long ago, Sunoco decided not to pay interest on late payments. Recognizing that the law mandated interest, Sunoco has adopted a policy only to pay if the well owner requests an interest payment. Since most well owners do not know they can get the payment, few request their interest, and Sunoco keeps the money. It amounts to millions of dollars each year.

Sunoco's indifference to its obligation extends far beyond not paying what it should. Sunoco has never even bothered to figure out how much interest it owes to owners. It keeps scant records of why it made late payments. Instead, Sunoco simply keeps the money for its own use, knowing two things: that most owners will not request interest, and that eventually the owners' potential claims will die at the hands of the statute of limitations. And when that happens, Sunoco will have irrevocably pocketed the money.

In this case, a farmer named Perry Cline calls Sunoco to task on this practice.

## I. **INTRODUCTION**

Perry Cline, the named plaintiff, represents a class of owners of interests in oil wells in Oklahoma.[1]  The defendants, Sunoco, Inc. (R&M), and Sunoco Partners Marketing & Terminals, L.P. (collectively, "Sunoco"), purchase crude oil from those wells, sell the oil, and pay proceeds to well owners pursuant to Oklahoma's Production Revenue Standards Act ("PRSA").  *See* Okla. Stat. tit. 52, § 570, *et seq.*  The PRSA says that, when Sunoco pays well owners late, it must pay interest on those late payments.

Cline has sued Sunoco under the PRSA for failing to pay the statutory interest on late payments it made on oil proceeds.  He also contends that Sunoco committed fraud by failing to disclose that it owed interest on those payments.

This case requires the Court to resolve several straightforward questions:  Under the PRSA, when Sunoco pays an interest owner late, must Sunoco automatically pay statutory interest owed on the late payment?  If Sunoco did not pay interest at the same time it made the late payment, does interest continue to accrue?  Does Sunoco's failure to disclose that it did not pay interest on a late payment constitute fraud?  And how much does Sunoco owe?

On December 10, 2019, the Court concluded that the PRSA requires Sunoco to make statutory interest payments automatically with the late payment.  The Court held a bench trial on the remaining issues from December 16-19, 2019.  The Court heard closing arguments on June 17, 2020.[2]  The Court now issues this Opinion to set forth its findings of fact and conclusions of law resolving the remaining questions in this case.  *See* Fed. R. Civ. P. 52(a)(1).

---

[1] Cline serves as the named representative of a class certified by the Court on October 3, 2019.  The Court uses the terms "the class" and "Cline" interchangeably.

[2] The Court delayed ruling on the case until the parties received the trial transcript and had a chance to brief the case.  Unfortunately, by the time the parties filed briefs, Coronavirus 2019

2

## II. **PROCEDURAL HISTORY**

On July 7, 2017, Cline filed this case in Oklahoma state court on behalf of himself and all others similarly situated. Cline asserts claims for a violation of the PRSA (Count One) and fraud (Count Two). He seeks compensatory and punitive damages, and various forms of equitable relief.

Almost immediately after Cline filed suit, Sunoco removed the case to the U.S. District Court for the Eastern District of Oklahoma (Dk. No. 2) and filed its answer (Dk. No. 23). The case moved along slowly, and, finally, on June 14, 2019, Cline moved to certify the class, appoint a class representative, and appoint class counsel. (Dk. No. 91.)

On July 18, 2019, the Court reassigned this case to the undersigned. (Dk. No. 97.) Given the length of time the case had gone on, the Court set the case for trial on December 16, 2019, set a discovery cutoff of October 18, 2019, and set other pretrial deadlines. (Dk. No. 102.)

On October 3, 2019, the Court certified the following class:

> All non-excluded persons or entities who: (1) received Untimely Payments from Defendants (or Defendants' designees) for oil proceeds from Oklahoma wells on or after July 7, 2012, and (2) who have not already been paid statutory interest on the Untimely Payments. An "Untimely Payment" for purposes of this class definition means payment of proceeds from the sale of oil production from an oil and gas well after the statutory periods identified in Okla. Stat. tit 52, § 570.10(B)(1) (i.e., commencing not later than six (6) months after the date of first sale, and thereafter not later than the last day of the second succeeding month after the end of the month within which such production is sold). Untimely Payments do not include: (a) payments of proceeds to an owner under Okla. Stat. tit 52, § 570.10(B)(3) (minimum pay); (b) prior period adjustments; or (c) pass-through payments.

> The persons or entitles excluded from the Class are: (1) agencies, departments, or instrumentalities of the United States of America or the State of Oklahoma; (2) publicly traded oil and gas companies and their affiliates; (3) persons or entities that Plaintiff's counsel may be prohibited from representing under Rule 1.7 of the Oklahoma Rules of Professional Conduct; and (4) officers of the court.

---

(COVID-19) had struck, and the judge could not immediately return to Oklahoma to hear oral argument.

(Dk. No. 127, at 1.)

When it became clear that the case would move forward, Sunoco adopted a number of tactics to derail the litigation. First, after the Court set the case for trial, Sunoco moved to dismiss it as moot. Sunoco had finagled its mootness argument by sending Cline an unrequested check for the amount of interest it owed him, and then, nearly two years later, claimed that the tendered check deprived him of standing. This attempt to pick him off as a plaintiff failed. (Dk. Nos. 122-23)

Second, on October 8, 2019, Sunoco moved to stay this case pending its appeal of the Court's class certification decision to the Tenth Circuit Court of Appeals, pursuant to Federal Rule of Civil Procedure 23(f). The Court denied the stay. (Dk. Nos. 131, 149-50.) On November 13, 2019, the Tenth Circuit denied Sunoco's request to appeal the Court's class certification ruling. (Dk. No. 170.)

Third, after the Court certified the class (and long after the Court set a trial date and discovery cutoff), Sunoco finally began to look through thousands of files for evidence of what it might owe. This resulted in a massive production of millions of lines of data to the plaintiff—after the plaintiff's expert report was due, and after the discovery cutoff.[3]  Sunoco characterizes its search for data as heroic; in reality, Sunoco ignored its files for years because it never intended to pay much interest, and let this case sit around for three years without getting its evidence together. Notwithstanding its untimely production of millions of pieces of evidence, Sunoco scolded Cline's expert for not including it in her calculations. And Sunoco's own expert, Eric Krause, relied upon the compilation of data to file tardy reports of his own—reports that he supplemented and that

---

[3] Sunoco produced the same data to its own expert, helping to fatally delay his report, as discussed below.

4

**A42**

continued to evolve to fit the defense's needs.  (*See* Dk. Nos. 207, 230, 234.)  Indeed, he even revised his opinion the weekend before the trial in this case.

Fourth, Sunoco filed a motion to "clarify" the class definition, which merely amounted to an argument to cut down the size of the class.  (Dk. No. 172.)  On November 26, 2019, the Court denied this motion.  (Dk. No. 186.)

In December, 2019, the case finally moved toward rulings on the merits.  On December 10, 2019, the Court granted Cline's motion for partial summary judgment.  (Dk. Nos. 231-32.)  The Court concluded that the PRSA requires Sunoco to pay interest at the same time it makes a late payment, and that Sunoco cannot wait for a request from the owner before paying that interest.  (*See* Dk. No. 231.)  The Court held a bench trial in this case from December 16-19, 2019, and heard closing arguments on June 17, 2020.

### III.  THE PRSA

Before reciting the facts, the Court begins by setting forth the relevant provisions of the PRSA.  In this case, Sunoco admits that it frequently makes late payments for oil.  The PRSA sets forth different interest rates on late payments, depending on the cause of the lateness.  A great deal of the evidence at trial dealt with the issue of the correct rate of interest.  The significance of the evidence in the case, therefore, only grows clear when viewed through the prism of the PRSA's requirements.

As noted above, the PRSA imposes duties on the first purchaser who buys oil or gas from an interest owner or the person holding the proceeds from the sale of the oil and gas.  Specifically, the first purchaser must pay owners their proceeds within six months from the date of first sale and within two months after the month of subsequent sales.  Okla. Stat. tit. 52, § 570.10(B)(1).  This

requirement has several exceptions, including one that allows less frequent payments for small royalties of less than $100. *See, e.g.*, *id.* §570.10(B)(3).

The Oklahoma Legislature adopted the prompt payment rule because of abusive practices by the oil industry, which frequently withheld payments from owners for a long time. *See Krug v. Helmerich & Payne, Inc.*, 362 P.3d 205, 214 (Okla. 2015). To compensate owners for delayed payment, and to provide an incentive to pay properly, the statute requires the oil industry to pay interest on late payments. When "proceeds from the sale of oil or gas production . . . are not paid prior to the end of the applicable time periods provided in" the PRSA, those proceeds "shall earn interest." Okla. Stat. tit. 52 §570.10(D)(1)-(2). "Except as otherwise provided in paragraph 2 of this subsection [regarding late payments due to marketable title]," a 12 percent interest rate applies to late payments "until the day paid." *Id.* § 570.10(D)(1). When a first purchaser or holder of proceeds does not pay proceeds due to an issue with marketable title,[4] a 6 percent interest rate applies to periods before November 1, 2018, and "the prime interest rate as reported in the Wall Street Journal" applies to periods on or after November 1, 2018.[5] *Id.* § 570.10(D)(2)(a). The interest compounds annually. One of the big fights in this case revolves around whether Sunoco owes 12 percent or 6 percent interest.

---

[4] "Marketability of title shall be determined in accordance with the title examination standards of the Oklahoma Bar Association." § 570.10(D)(2)(a). The title examination standards define "marketable title" as "one free from apparent defects, grave doubts and litigious uncertainty, and consists of both legal and equitable title fairly deducible of record." (Defs.' Ex. 26, at 12.)

[5] The lower interest rate also applies until "the holder has received an acceptable affidavit of death and heirship in conformity with Section 67 of Title 16 of the Oklahoma Statutes," or until the proceeds are interpled, as set forth in § 570.10(D)(2)(b). *See* § 570.10(D)(2)(a). The Court will refer to the lower interest rate as the 6 percent interest rate throughout this Opinion. This rate only applies until title to the interest becomes marketable. *Id.*

The PRSA also bears on Cline's argument that Sunoco committed fraud by withholding information from well owners.  The statute says that, when a first purchaser or holder of proceeds makes a payment to an owner, it must provide the owner with the following information:

1.   Lease or well identification;
2.   Month and year of sales included in the payment;
3.   Total barrels or MCF attributed to such payment;
4.   Price per barrel or MCF, including British Thermal Unit adjustment of gas sold;
5.   Total amount attributed to such payment of severance and other production taxes, with the exception of windfall profit tax;
6.   Net value of total sales attributed to such payment after taxes are deducted;
7.   Owner's interest, expressed as a decimal, in production from the property;
8.   Owner's share of the total value of sales attributed to such payment prior to any deductions;
9.   Owner's share of the sales value attributed to such payment less owner's share of the production and severance taxes; and
10.  A specific listing of the amount and purpose of any other deductions from the proceeds attributed to such payment due to the owner upon request by the owner.

Okla. Stat. tit. 52, § 570.12(A).

## IV.  <u>FACTS</u>

### A.  *The Parties*

#### 1.  *Sunoco*

Sunoco, Inc. (R&M) (now Sunoco (R&M), LLC) is a limited liability company that is a wholly owned subsidiary of ETP Holdco Corporation ("ETP").  Sunoco Partners Marketing & Terminals, L.P., is a limited partnership with no corporate parents.  Sunoco has a net value over $30 billion.

Sunoco buys crude oil from oil producers and sells the oil.  (Trial Tr. vol. 1, 168:11-20.) Sunoco is a first purchaser under the PRSA.  (*Id.* 77:7-10, 85:21 to 86:8.)  As a first purchaser, Sunoco is a "holder" of the oil proceeds owed to owners until Sunoco pays the oil proceeds directly

to owners or to states as "unclaimed" property on behalf of unlocated owners. (*Id.* 77:7-13, 86:3-8, 131:8-24.)

Sunoco is not itself an oil and gas producer and does not have leases with individual landowners. (*Id.* 112:18 to 113:1, 177:7-9.) Rather, "operators" typically extract the oil from the ground and, pursuant to contracts, convey it to Sunoco.[6] Sunoco then pays owners their proceeds directly. (*Id.* 86:3-8, 191:2-14.) Sunoco has paid thousands of owners across the United States. (*Id.* 178:3-5.) In many cases, Sunoco has agreed to pay these owners pursuant to a contract with the operator.[7] (*See, e.g.*, Defs.' Ex. 29, at 3 ¶ 6.) Sunoco often relies on information provided by a well operator to pay owners their proceeds. (*See, e.g.*, Trial Tr. vol. 1, 178:6 to 181:11.) That information is not always correct. (*Id.* 171:6-14, 178:6 to 181:11.)

---

[6] Oil production has a cast of varied characters. When someone (such as Cline) owns land that may have oil on it, an exploration and production ("E&P") company leases the land to drill for and extract the oil. (Trial Tr. vol. 1, 174:22 to 175:8.) The E&P company agrees to split the proceeds from the sale of that oil with the landowner if the company can extract it. (*Id.* 175:10-13.) Usually, the landowner gets at least a one-eighth royalty and bears no costs or risk associated with drilling the well or cleaning and closing a dry hole. (*Id.* 175:14-20.) The E&P company partners with other industry players, known as working interest owners, to drill the well, and they split the remaining interest. (*Id.* 175:21-24.) One of the working interest owners is deemed the "operator." (*Id.* 175:25 to 176:2.) The operator "frequently ha[s] either a majority interest, or [it is] elected because [it is] knowledgeable and the other working interest owners respect [it]." (*Id.* 176:3-7.) The working interest owner with the largest share of the interest performs and coordinates the work, with the remaining companies sharing in the cost and risk. (*Id.* 176:8-13.) After the working interest owners extract the oil, companies such as Sunoco will enter into contracts with the operators to transport and market the oil. (*Id.* 176:24 to 177:6.) The landowner's interest may fracture over time, such as when a landowner dies or sells the interest to another individual or entity. (*Id.* 177:13 to 178:10.) Thus, it is not unusual for Sunoco to pay anywhere from tens to thousands of interest owners for oil produced from a well. (*Id.* 172:19-25.)

[7] The contracts sometimes include an indemnity agreement under which the producer or operator agrees to indemnify Sunoco for costs associated with late payments to owners. (*See* Trial Tr. vol. 1, 125:22 to 127:4.)

## 2. *Cline and the Class*

Cline lives in Oklahoma and owns royalty interests in three oil wells.  (Dk. No. 175.)  He works as a farmer and has no training in the oil and gas industry. (Trial Tr. vol. 2, 428:2-16.)  During the class period, Sunoco paid Cline royalty proceeds on all three wells; on occasion, Sunoco paid the royalties late.  (Dk. No. 175.)  Cline did not ask Sunoco to pay him interest on the late payments.  (Trial Tr. vol. 1, 257:1-4.)  At all relevant times, Sunoco had Cline's correct contact and interest information.  (*See id.* 99:8-15, 103:21 to 110:4; Pl.'s Exs. 459-60, 463.)

Cline represents a class of individuals and entities who own royalty interests in wells from which Sunoco purchased crude oil and paid proceeds late without paying interest on the proceeds.  (*See* Dk. No. 127, at 1.)

## B.  Sunoco's Conduct

### 1.  *Late Payments*

Sunoco generally pays proceeds to owners on time.  (Trial Tr. vol. 1, 77:25 to 78:2, 222:8-14.)  On approximately one percent of its payments, however, Sunoco pays owners the proceeds late as defined by the PRSA.  (*Id.* 77:14-24, 78:3-5, 91:12-20, 222:8-14.)  Because Sunoco deals with thousands of owners, making many payments to each owner, over the years this small percentage amounts to millions of late payments.

The reasons for the late payments vary.  Sometimes, the payments are just not on time.  Other times, Sunoco has an internal reason why they are late.  For example, Sunoco may suspend payment on an account if the owner has not returned a division order.[8]  (*Id.* 103:6-20.)  If Sunoco

---

[8] Sunoco uses division orders to confirm ownership and ensure accuracy of the payments. (Trial Tr. vol. 1, 186:19 to 187:11.)  Oklahoma law says that an oil company cannot withhold payments because the owner has not signed a division order.  Whether Sunoco's practices with regard to division orders violate the PRSA is not before the Court.

does not have current or accurate information either from the owner or from the producer to pay the owner, sometimes it cannot remit the funds, or it may receive a returned check.[9]  (*Id.* 186:21 to 187:11, 221:1 to 222:1, 281:4-8.)  If Sunoco does not know the identity of the interest owner, it does not remit payment to anyone and instead pays those proceeds to Texas as unclaimed funds.[10]  (Trial Tr. vol. 3, 577:7-24, 578:23 to 580:8.)

When Sunoco pays owners late, it does not automatically pay statutory interest.  (Trial Tr. vol. 1, 78:6-13, 116:3-11; Pl.'s Ex. 43.)  As noted above, Sunoco only pays statutory interest when specifically requested by an owner.  (Trial Tr. vol. 1, 78:10-13, 82:20-23; Holland Dep. 55:18 to 56:16; *see, e.g.*, Pl.'s Ex. 38.)  Sunoco does not get many requests for interest each year.  (*See, e.g.*, Trial Tr. vol. 1, 83:21-24; Holland. Dep. 33:5-15; Pl.'s Ex. 62.)

Sunoco takes a haphazard approach to its obligations arising from late payments.  In fact, Sunoco has not even tried to identify every instance of a late payment in Oklahoma.  (Trial Tr. vol. 1, 79:6-7; Holland Dep. 102:5-19.)  For its millions of late payments, it says it cannot determine the amount of interest due.  This inability, however, does not arise from a lack of information. Rather, it arises from Sunoco's unwillingness to make the effort, at the time of the late payment, to determine the cause of the lateness and the amount of interest due.  On the rare occasions when Sunoco receives a request for interest, it usually has the information it needs to calculate the amount of interest due on the late payment.  (*See, e.g.*, Trial Tr. vol. 1, 99:8-15; Holland Dep. 34:8-24.)  Sunoco employees simply look at the files for each payment to determine the reason the payment was late and whether Sunoco owes that owner 6 percent interest or 12 percent interest.

---

[9] When Sunoco gets bad owner information from a producer or operator, it generally does not tell the producer or operator.  (*See* Pl.'s Ex. 339.)

[10] Sunoco calls payments for which it has no owner information "undivided payments."

**A48**

(Trial. Tr. vol. 1, 94:1 to 95:3, 223:17 to 224:7.)  One employee handles calculating interest after other employees research the request.  (*Id.* 94:1-21.)  Sunoco uses a computer program into which a Sunoco employee manually inputs information to calculate the interest.  (*Id.* 94:1 to 95:3; Holland Dep. 19:8 to 21:19; *see* Defs.' Exs. 261-79.)  When Sunoco finally gets around to paying interest, it pays the interest due only through the date Sunoco paid the proceeds to the owner. (Holland Dep. 123:7 to 124:18.)

Although Sunoco knows that it owes interest on late payments under the PRSA, it takes the position that the statute does not set forth a due date; in other words, the debt never becomes due.  Sunoco takes this position based on industry practice and the advice of counsel.  (*See, e.g.*, Trial Tr. vol. 1, 84:15-24.)

After Cline filed this lawsuit, Sunoco investigated Cline's claim for interest.  (*Id.* 98:21 to 99:17; Pl.'s Ex. 4.)  Sunoco had not paid Cline because Cline had not signed a division order and had not otherwise responded to Sunoco's communications with him.  (*Id.* 99:21 to 100:7.)  On December 19, 2017, Sunoco sent Cline a check for $1,886.54 in unpaid interest.  (Dk. No. 175; Pl.'s Exs. 4, 24.)  Sunoco applied a 12 percent interest rate compounded through the date it had paid Cline his late proceeds.  (Trial Tr. vol. 1, 99:16-20; Pl.'s Exs. 4, 24.)  When Cline did not cash the check, Sunoco sent Cline a letter asking Cline to respond and explaining that failure to respond would lead Sunoco to deem the funds as unclaimed, which could have resulted in the money going to Oklahoma's unclaimed property agency.  (Trial Tr. vol. 1, 110:9 to 111:21; Pl.'s Ex. 476.)  To date, Cline has not cashed Sunoco's check.  (Trial Tr. vol. 2, 445:10-19.)

As a result of this litigation, Sunoco has decided to stop paying proceeds and interest in Oklahoma.  (Trial Tr. vol. 1, 74:10 to 75:19.)

### 2.   *The Amount of Interest Due Because of Late Payments*

Sunoco owes millions of dollars in interest on late payments.  To prove the precise amount due, Cline relied on the expert testimony of Barbara Ley, a certified public accountant who has extensive experience with accounting in the oil and gas industry.  (*See, e.g.*, Trial Tr. vol. 3, 493:4 to 510:15.)  Ley testified credibly, and described a thorough and defensible method of calculating the amount due from Sunoco.  Ley received information from Sunoco to create a database of individual owner information and to determine whether each payment was late based on that data.  (*Id.* 510:17 to 588:12.)  Sunoco's data identifies the date proceeds were sold, the date Sunoco paid proceeds to an owner, and the amount of the proceeds.  (Trial Tr. vol. 1, 89:3-15.)  To the extent she could, Ley checked the sale date against public records.  (Trial Tr. vol. 3, 519:4 to 520:17.)  She also reviewed depositions and other documents produced in the case, and was present in the courtroom during the majority of the trial.  (*Id.* 505:1-24).  Sunoco agrees that Ley's data reliably reflects the sale date, payment date, and amount of proceeds.  (Id. 90:8-20.)

Ley removed some late payments from her database because they fell outside the class certification definition.  She did this based on Sunoco's accounting data, Sunoco's suspense codes,[11] and discussions with class counsel and Sunoco's experts.  (*Id.* 561:9 to 570:4, 587:14 to 588:12.)  Further, Ley excluded payments made to unclaimed property funds[12] when Sunoco issued a check to the interest owner on time.  (*Id.* 580:21 to 582:7.)  Thus, she did not include payments to unclaimed funds if Sunoco previously sent a timely check to the owner that went

---

[11] Suspense codes are Sunoco's administrative notes about delayed payments.  In relying on Sunoco's suspense codes, Ley bent over backwards to give Sunoco the benefit of the doubt.  As discussed below, even Sunoco's own experts say that the suspense codes do not give reliable information about the reasons for late payments.

[12] Unclaimed property payments are discussed below.

uncashed.   (*Id.* 580:21 to 582:13.)   She also excluded statutory interest payments Sunoco previously made during the class period for the types of payments at issue in this case.  (*Id.* 574:15 to 575:5.)  All told, Ley only considered liability for interest on late payments falling within the class definition.  (*Id.* 589:5-17.)

Ley determined that Sunoco made 1,596,945 late payments to approximately 53,000 class members.  (*Id.* 554:8-12, 568:21 to 569:1; Pl.'s Ex. 454.)  As of December 16, 2019, Sunoco owed $74,763,113.00 in late interest payments, based on a 12 percent interest rate compounded annually.[13]  (Trial Tr. vol. 3, 571:23 to 572:5.)

### C. *Evidence Related to Sunoco's Defenses*

#### 1. *Unclaimed Property Funds*[14]

Sunoco says that it should not have to pay interest on proceeds it pays to unclaimed property funds.  Each state has created by statute a government agency that collects money held

---

[13] Because the actual damages in this case include amounts that will continue to compound until the Court enters judgment, the Court must explain its reference point for damages.  At trial, Cline presented a damages figure of $74,763,113.00 based on Ley's calculations.  (Trial Tr. vol. 3, 571:23 to 572:5.)  That figure represented the statutory interest due on the late payments through December 16, 2019, less interest Sunoco already paid and any opt-outs received during the class notification process as of the first day of trial.  (*Id.* 572:9 to 576:25.)  For ease, the Court will base its damages award off the $74,763,113.00 discussed during trial.  Thus, the interest owed in this case is $74,763,113.00 plus any additional interest due from December 17, 2019, to the date of this Opinion.  Further, for the reasons set forth below, the Court will apply a 12 percent interest rate to all the late payments.

After trial, however, the class administrator submitted information about additional opt-out requests and withdrawals of previously submitted opt-out requests.  Although the Court will award damages based on the figure presented at trial, the Court will require counsel to submit updated calculations before it enters the final judgment order.  Nevertheless, the Court believes it is appropriate to issue this Opinion and Order because the exclusion requests do not affect the merits of this case.  Further, Sunoco had adequate notice of the additional exclusion requests well before closing arguments in June, 2020.  Issuing this decision will stop interest from compounding and will enable counsel to provide a final damages calculation.

[14] The parties sometimes refer to these payments as "escheat" payments.

by businesses for people who cannot be found.  The agency holds the money on behalf of the true owners.

When Sunoco cannot identify or locate an owner, it eventually sends the owner's proceeds to the unclaimed property fund of the state of the owner's last known residence.  (*See, e.g.*, *id.* 131:8 to 132:21.)  For example, if someone stops cashing his or her checks and does not respond to the notice Sunoco sends, Sunoco sends the proceeds to the unclaimed agency of the owner's state.  It makes this payment after it holds the funds for a certain number of years set by state unclaimed property law.  (*Id.* 265:10 to 270:2)  If Sunoco does not know the address of the owner or the payment is an undivided payment, it pays unclaimed proceeds to Texas, Sunoco's home state.  (*Id.* 262:10-20.)  When Sunoco sends unclaimed proceeds to a state, it does not send any interest owed on those proceeds.  (*Id.* 132:22-25.)

Sunoco does not conduct an extensive search to locate unidentified or unlocated owners.  (*Id.* 137:6 to 138:8; Lanscelin Dep. 67:24 to 69:8, 70:23 to 71:02.)  Rather, if Sunoco has an address for an owner who has stopped cashing checks, it will send a division order twice to the address on file, a stale check notice, a letter notifying the owner that it may send the funds to the state as unclaimed, and a due diligence notice.  (Trial Tr. vol. 1, 135:16 to 137:5, 156:8-22.)  Sometimes people will respond to Sunoco's notices, at which point Sunoco verifies the owner's identity or ownership.  (*Id.* 271:4 to 272:3.)[15]

---

[15] Cline  offered evidence designed to show that Sunoco did not make a bona fide effort to find people before sending their proceeds to unclaimed property funds. For instance, Sunoco claimed not to know where well owner Paul Walker lived, even though he had lived at the same place for decades.  Fred Buxton, an oil producer, said that his company took many steps more than Sunoco does to find correct addresses for owners.  And Sunoco threatened to send one of Cline's interest checks to unclaimed property, even though it was in litigation with Cline, knew his address, and had frequent contact with his lawyers.  While interesting, and indicative of a lackadaisical attitude by Sunoco, this evidence does not figure in the Court's analysis.

## 2.  *Unmarketable Title*

Under the PRSA, a purchaser owes only 6 percent interest if a delay in payment occurs because  the owner does not have marketable title to the oil sold.  Sunoco tried to show that many of its late payments could have stemmed from the owner's unmarketable title.

To establish unmarketability, Sunoco relied on its "suspense" codes.  When Sunoco puts a payment in suspense, it does not send the money to the owner.  Someone at the company makes a file entry reflecting one of fifty codes.  The codes are shorthand for reasons to withhold payments. As an example, Sunoco might not make a payment if the IRS had asserted a lien over the proceeds; an employee at Sunoco would then make an entry for the code relating to IRS liens.  The validity of suspense codes to establish marketability was a central issue at trial.

Sunoco called Kraettli Epperson as an expert on marketable title.  Epperson testified about the title opinion process and opined that the title examination standards do not presume marketability, but that "you have to look at the record, you have to determine in essence whether it is clear that somebody owns it."  (Trial Tr. vol. 4, 707:9-16.)  Thus, a title examiner must review a variety of records to determine whether title is marketable.  (*Id.* 708:20 to 710:11.)

Epperson did not examine any titles, and could not testify that any of the owners did not have marketable title.  He did talk about the suspense codes, and opined that some of them might mean that the owner did not have unmarketable title.  Ultimately, however, the suspense codes were, at best, "a crude surrogate" for marketability.  (*Id.* 715:5.)  They do not give a determination that title is marketable or unmarketable.  (*Id*. 718:9-14.)  As defense counsel observed at trial, Sunoco's employees prepared the codes to justify failure to make payments.  The codes are simply an administrative tool, not an indication of marketability.  (*Id.* 629:15-18.)

Epperson did not conduct a title search on property of any of the 53,000 owners to whom Sunoco made late payments. He offered no opinion on the state of any titles at issue in this case.

### D. Fraud

Cline offered evidence to support his claim that Sunoco had committed fraud on owners to whom it owed interest. Essentially, Cline showed that Sunoco did not tell owners either that it owed them interest on late payments, or that it would give them interest payments if they requested it.

Sunoco did, however, provide check stubs with royalty checks. Although they generally do not mention interest, Sunoco's check stubs do contain the information required by § 570.12. (See, e.g., Defs.' Ex. 8; see also Closing Arg. Tr. 195:21 to 196:6.) The check stubs, however, do not indicate: (1) that Sunoco owes the owner interest and has withheld that interest; (2) how to calculate the interest Sunoco is withholding based on the data provided; or (3) that Sunoco will pay the interest if the owner requests it. (Trial Tr. vol. 3, 589:19 to 592:2; Pl.'s Ex. 520.) On the occasions when Sunoco pays interest, it notes the payment on the check stub with an "interest payment" code. (Trial Tr. vol. 3, 514:16-20; see Pl.'s Ex. 24; Defs.' Ex. 45.)

### E. Eric Krause

Sunoco called Eric Krause to rebut Ley's testimony regarding liability and damages. For the reasons set forth below, the Court will strike Krause's testimony.

### V. <u>ANALYSIS</u>

### A. Preliminary Matters

Before turning to the merits of the case, the Court must address two preliminary matters raised by the parties at trial and in their briefs.

16

**A54**

*1. Class Certification*

Sunoco continues to challenge the Court's decision to certify the class.  (*See, e.g.*, Dk. No. 274, at 58-60; Dk. No. 275, at 155-65.)  The Court has had multiple opportunities to consider the propriety of class certification.  (*See* Dk. Nos. 126, 149, 186.)  For the reasons set forth in its October 3, 2019 Opinion (Dk. No. 126), the Court continues to conclude that class certification is proper in this case.  The evidence and trial testimony do not change the Court's conclusions. Nevertheless, the Court will briefly address some of Sunoco's arguments.

First, although this case requires a degree of individualized inquiry, "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3).  The Court has resolved most of the issues in this case by interpreting provisions of the PRSA and applying that interpretation to the class as a whole.  (*See, e.g.*, Dk. No. 231.)  The trial testimony established that Sunoco followed a practice of not paying interest until it received a request from an owner.  (*See, e.g.*, Trial Tr. vol. 1, 78:6-13, 82:20-23; Holland Dep. 102:5-19.) Ley created a methodology through which she could calculate class-wide damages based on that conduct.  (Trial Tr. vol. 3, 491:21 to 594:25; Trial Tr. vol. 4, 605:10 to 683:7.)  Further, her computer calculations identify the precise damages for each late payment for each owner of each well.

Moreover, the trial confirmed that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  For the reasons set forth below, Cline will prevail on his breach of statutory interest claim on behalf of the class, which comprises approximately 53,000 class members and more than 1.5 million late payments.  Cline has done this through a trial that lasted approximately one week.  That outcome represents a fair and efficient way of resolving the claims without requiring individual actions.

In essence, Sunoco wants to force all 53,000 victims of its scheme to file independent claims, just as it has tried to compel them to make individual requests for interests. No doubt, Sunoco hopes that the owners will abandon their claims, most of which are small, rather than incur the cost and effort to take on a behemoth. Class actions exist precisely for claims such as those presented here.

Second, to the extent that Sunoco complains that it could not possibly have presented all of its defenses at trial, Sunoco had the opportunity to at least try to do so. Instead, Sunoco did not object to finishing the trial on December 19, 2019—a day before trial was scheduled to end. (Trial Tr. vol. 4, 602:16 to 603:6.) Nor did it request any additional time to try this case. It did not even begin to analyze its own data until the eve of trial.

Sunoco continues to insist that its defenses are too individualized to present in a class action. At trial, Sunoco presented a light sampling of these defenses but failed to establish that such defenses would have overwhelmed the trial.[16] Unsurprisingly, Sunoco conflates doing what is impossible with doing what is hard. No doubt, figuring out what Sunoco owes to interest owners is difficult when it has failed to comply with the PRSA for years. Had Sunoco done its homework in the years before this suit, it would have known how much interest it owes, and could have presented a compilation or summary. *See* Fed. R. Evid. 1006. Sunoco's own evidence shows that it has the ability to determine what Sunoco owes interest owners; it just does not do so until asked. Thus, Sunoco's arguments fall far short.

The Court declines to decertify the class.

---

[16] Additionally, many of the defenses did not actually rebut Cline's claims or carry Sunoco's burden.

18

A56

## 2. *Motion to Strike Krause*

On December 5, 2019, Cline moved to strike the testimony and opinions of Krause, Sunoco's expert witness on damages. (Dk. No. 207.) Cline argues that Sunoco disclosed Krause's opinions late in violation of the Court's pretrial order and the Federal Rules of Civil Procedure. At trial, the Court took the motion and related objections under advisement. For the following reasons, the Court will grant the motion and sustain Cline's objections.

### a. *Background*[17]

The parties began discovery in 2017. Sunoco disclosed Krause as an expert in March, 2019. Cline contends that Krause asked Sunoco for its suspense history data in 2018. Sunoco claims that it did not refuse to produce the historical suspense data. Rather, it asserts "that the data did not exist in [usable], accessible form in Sunoco's accounting system, and it was only through a massive effort appropriately undertaken after the Court certified the class on October 3 that Sunoco was able to come up with it at all." (Dk. No. 230, at 6.) It took Sunoco several weeks to compile the data in a usable format. This argument ignores the question of why Sunoco waited until after class certification to begin to think about its exposure to damages in this case.

The Court reassigned the case to the undersigned district judge on July 18, 2019. On August 5, 2019, the Court set the discovery deadline as October 18, 2019. (Dk. No. 102, at 1.) For expert disclosures, the Court set the following deadlines: initial disclosures for the party with burden of proof on an issue were due October 25, 2019; the opposing party's disclosures were due on November 1, 2019; and rebuttal expert disclosures were due on November 8, 2019. (*Id.* at 2.)

---

[17] Because Cline filed this motion before trial, the Court summarizes the relevant facts as set forth in the parties' briefs.

Sunoco served Krause's initial expert report on November 1, 2019.  In the report, Krause explained that Sunoco provided him with the data he needed to render certain opinions on October 31, 2019, and reserved the right to supplement his opinions "once [he was] able to complete a refined study" of the data.  (Dk. No. 207-5 ¶ 49.)  Based on his preliminary review of the data, however, he could not link millions of dollars of damages in Ley's model to any suspense codes. (*Id.* ¶ 49 n.38.)  He also opined that, even with the data, he could not determine the reason for the untimely payments. (*Id.*)

On November 8, 2019, Ley served her rebuttal expert report.  She objected to Krause's use of the suspense code information but nevertheless asserted that, if Sunoco met its burden of showing unmarketable title, she could incorporate those conclusions into her model.  (*See* Dk. No. 230-7 ¶¶ 5-9.)  She also reserved the right to supplement her report because she understood Krause's work to be ongoing.  (*Id.* ¶ 11.)

Less than three weeks before trial, Krause's expert report was not done, and his opinions were not complete.  Two weeks before trial, Krause served a supplemental report "[d]ue to the complex nature of the data and because [he] received the data one day prior to [his] report being due."  (Dk. No. 207-3 ¶ 5.)  He explained that he "did not have sufficient time by November 1 to perform a quantification of the effects to any damages resulting from a full analysis and evaluation of this data."  (*Id.*)  Nevertheless, "[i]t remain[ed] [his] opinion after a full review of the suspense history data" that Ley could not use that information to fully understand the reason for an untimely payment and whether a 6 percent or 12 percent interest rate would apply.  (*Id.*)  The report also responded to the Court's ruling on the motion to clarify.  (*Id.* ¶ 29.)  Krause's analysis reduced the damages amount by approximately $3.5 million.  (*Id.* ¶ 15.)  Krause further opined that his

damages figures would change based on work performed between completing the report and trial. (*See id.* ¶ 14.)

On December 3, 2019, Sunoco sent Cline a corrected version of Krause's supplemental report. Sunoco served the materials supporting the report on December 4, 2019. Cline deposed Krause on December 5, 2019, and filed the motion to strike later that day. Sunoco contends that the "additional work [Krause] intends to do is a summary, for illustrative purposes only, of his already-disclosed opinions." (Dk. No. 230, at 14.)

At trial, Krause testified about a number of topics, including issues related to unclaimed funds and the feasibility of using the suspense codes to determine marketable title. (Trial Tr. vol. 4, 814:13 to 912:24; Trial Tr. vol. 5, 920:21 to 947:17.) He also considered evidence from the Oklahoma Corporation Commission using information he downloaded from the Internet on December 15, 2019. (Trial Tr. vol. 4, 854:19 to 858:7.) Further, Krause testified to his own calculation of damages—a number significantly lower than Ley's calculations. (*See, e.g.*, *id.* 885:15 to 888:22, 896:17 to 901:3.) Cline objected to much of the testimony, including a continuing objection to the admissibility of Krause's testimony for the reasons set forth in the motion to strike. (*See id.* 822:21 to 823:23, 839:23 to 840:13, 855:23 to 858:7, 870:11 to 872:5, 872:15 to 873:2, 875:11 to 876:4, 890:2-3, 890:18 to 891:5.)

*b. Legal Standard*

When a party discloses the identity of its expert witness, the party must provide a written report prepared and signed by the expert that contains "a complete statement of all opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B)(i). Parties must make these disclosures by the dates ordered by the court. *See* Fed. R. Civ. P. 26(a)(2)(D).

A party has a duty to supplement its disclosures "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing."  Fed. R. Civ. P. 26(e)(1)(A).  For expert reports, the duty to supplement applies to information both included in the report and given in a deposition.  *See* Fed. R. Civ. P. 26(e)(2).  The disclosures, however, "must be [made] by the time the party's pretrial disclosures under Rule 26(a)(3) are due."  *Id.*

Expert reports "are necessary to allow the opposing party a reasonable opportunity to prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses."  *Rodgers v. Beechcraft Corp.*, 759 F. App'x 646, 656 (10th Cir. 2018) (alterations and quotations omitted).  A party who fails to disclose or supplement information may not use that information or witness "to supply evidence" at a trial "unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).

"Substantial justification requires justification . . . that could satisfy a reasonable person that parties could differ as to whether the party was required to comply with the disclosure request. The proponent's position must have a reasonable basis in law and fact."  *Nguyen v. IBP, Inc.*, 162 F.R.D. 675, 680 (D. Kan. 1995).  A failure to disclose is harmless "when there is no prejudice to the party entitled to the disclosure."  *Id.*  The late-disclosing party bears the burden of establishing that the failure was substantially justified or harmless.  *See id.*

A court need not make "explicit findings" about whether the failure was substantially justified or harmless.  *Rodgers*, 759 F. App'x at 657.  Rather, it must consider the following factors: (1) the prejudice or surprise to the party against whom the testimony is offered, (2) the ability of the party to cure the prejudice, (3) the extent to which introducing the testimony would disrupt the

trial, and (4) the moving party's bad faith or willfulness. *See id.* The late-disclosing party's conduct does not need to satisfy all factors to justify exclusion. *See, e.g.*, *SFF-TIR, LLC v. Stephenson*, No. CIV 14-0369, 2020 WL 2922190, at *14 (N.D. Okla. June 3, 2020).

### c. Application

Here, Sunoco's disclosures were both late and incomplete. Sunoco assumed that Cline had the burden of proof regarding marketability of title. For the reasons set forth below, Sunoco bore that burden. Thus, Sunoco should have disclosed Krause's opinions regarding marketable title on October 25, 2019. (See Dk. No. 102.) Even if Sunoco did not have the burden of proof, the final version of his report was over a month late. In any event, Krause's disclosures gave Cline at best a high-level overview of Krause's opinions regarding marketable title and the reliability of Ley's methodology, but his opinions were essentially a moving target until trial. Thus, Cline did not have "a complete statement of all opinions [Krause] [would] express and the basis and reasons for" the opinions until trial. Fed. R. Civ. P. 26(a)(2)(B)(i).

Moreover, Sunoco had no reasonable justification to delay the production of its historical suspense data and the disclosure of Krause's opinions; it simply hoped that the case would not proceed to trial. *See* Fed. R. Civ. P. 37(c)(1). The Court cannot overstate the prejudice that Cline suffered and the incurable nature of that prejudice. *See Rodgers*, 759 F. App'x at 657. Sunoco lauds itself for transforming its suspense code data into a usable format within a few weeks of the Court's class certification decision. But discovery had been going on for nearly two years. To the extent that the reassignment of this case to the undersigned district judge changed the trial timeline, the parties knew a month and a half before discovery closed that this case would proceed to trial in December, 2019. Instead of trying to complete discovery within the required timeline, Sunoco

23

**A61**

waited to begin these efforts until the Court certified the class and rejected Sunoco's last-ditch effort to pick off the named plaintiff and moot this case.

When Sunoco finally produced key evidence, it did so after Ley's first report was due. Then, Sunoco blamed Ley for creating an allegedly unreliable model in large part because she tried to discern marketable title from Sunoco's late-produced data. Sunoco, however, created an untenable situation for Cline—either scramble through "a big new slug of data" produced after discovery closed or risk failing to meet his burden regarding liability at trial. (Trial Tr. vol. 4, 622:4-5.) Cline, of course, chose the former option. Ultimately, Ley created a well-reasoned and thorough model that she testified about at trial.

Krause continued to work with the data well past the discovery and expert deadlines, leaving Cline to guess about Krause's opinions—the exact scenario that Rule 26 and the Court's pretrial order meant to avoid. Krause's late disclosures significantly limited the amount of time Cline's attorneys had to prepare for Krause's cross-examination and required Cline to take a deposition on the eve of trial. Any argument that Cline knew the contours of Krause's opinions ignores the fact that Sunoco's conduct still limited class counsel's ability to fully prepare for trial and required them to expend resources completing depositions well past the discovery deadline. Much of this case now centers on the damages Sunoco owes. Any change to the damages calculations bears on central questions in this case. Regardless of whether Sunoco acted willfully or in bad faith, Sunoco's conduct justifies exclusion of Krause's testimony and opinions.

On a final note, even if the Court denied the motion, Krause's opinions would not tip this case in Sunoco's favor. Most of the evidence presented through Krause's testimony rests on faulty assumptions—that Cline bore the burden to prove marketable title and that Ley created an unreliable model. For the reasons set forth below, Sunoco, not Cline, bears the burden of proving

**A62**

unmarketable title, and Ley created a reliable model that satisfies Cline's burden. Moreover, Krause's testimony mostly echoes what Sunoco's other witnesses have said all along—that Sunoco's suspense codes are not reliable, and that it is too unfair to hold Sunoco liable for violating the PRSA because it would be really hard for Sunoco to straighten it all out now. These defenses do not carry the day.

For the foregoing reasons, the Court will grant the motion to strike and will sustain Cline's objections to Krause's testimony.

### B.  Count One: Breach of Statutory Obligation to Pay Interest

#### 1.  Liability

Cline has met his burden of proving liability by a preponderance of the evidence for the entire class.

For the reasons set forth in the Court's December 10, 2019 Opinion, "[t]he PRSA requires Sunoco to pay interest on late payments at the same time it makes those payments, and Sunoco cannot require an interest owner to make a demand for payment before paying that interest." (Dk. No. 231, at 13.)  Sunoco's representative at trial, Eric Koelling, acknowledged that Sunoco sometimes pays proceeds late and does not automatically remit interest with the late proceeds. (Trial Tr. vol. 1, 77:19 to 78:9.)  Koelling also acknowledged that Sunoco generally only pays interest when owners ask for it.  (*Id.* 78:10-13.)  Koelling further agreed that Sunoco had already sent every class member a check for proceeds and that "there is no issue about whether those people have a right to be paid their principal proceeds."  (*Id.* 159:3-12.)

Ignoring the evidence at trial, Sunoco says that the Court must consider the file of every single class member—that it must conduct thousands of mini-trials.  As the Court described above, however, Ley conducted a thorough and individual assessment of more than 1.5 million late

payments.  (*See* Trial Tr. vol. 3, 510:17 to 588:12; Pl.'s Ex. 454.)  She determined the date payment was due, and the date it was made.  She calculated interest.  She identified payments that fell outside of the class and excluded those payments from her calculations.  (Trial Tr. vol. 3, 561:9 to 570:4, 580:21 to 582:13, 587:14 to 588:12.)  This methodology proves liability by a preponderance of the evidence.

Nevertheless, Sunoco attacks Ley's method as unreliable, mainly arguing that she cannot accurately determine marketable title issues.  As discussed below, Sunoco, not Cline, bears the burden of proving that it withheld payments due to title issues.  Thus, Sunoco's argument that its data is unreliable merely faults Ley for being unable to meet Sunoco's burden regarding the applicable interest rate.  (*See, e.g.*, Trial Tr. vol. 4, 618:8 to 634:11, 710:12 to 744:22.)[18]

Sunoco also says that Ley cannot identify payments that fall outside the class definition.  Again, Sunoco fails to sufficiently challenge Ley's methodology.  Sunoco primarily relies on Krause to establish that Ley's conclusions are unreliable or incorrect.  Because the Court has struck his testimony, Sunoco cannot rely on his opinions.  Even so, Krause did not identify any payments Ley categorized as late because they were paid outside of the six-month and two-month time frames.  (Trial Tr. vol. 5, 937:3 to 938:8, 943:3-10.)  Krause did find a few small errors in Ley's

---

[18] Sunoco's focus on this point also underscores a separate flaw in its argument.  The PRSA requires that interest accrue at 6 percent "until such time as the title to such interest becomes marketable."  § 570.10(D)(2)(a).  When title is not marketable, Sunoco "is not [ ] required to pay until the other party has cleared up his title."  *In re Tulsa Energy, Inc.*, 111 F.3d 88, 90 (10th Cir. 1997).  Interest, however, still accrues, albeit at 6 percent.  At most, the defendant's argument would reduce the amount of interest it owes, a defense on which it has the burden of proof.  This litigation only focuses on interest owed on payments Sunoco already made.  Thus, when Sunoco paid an owner the proceeds, Sunoco essentially determined that it was liable for that payment in some capacity.

To the extent that Sunoco argues that it sometimes paid owners as a "business decision," it has provided little concrete evidence to rebut Ley's methodology and conclusions regarding class-wide liability.  (Trial Tr. vol. 1, 158:3-14.)

methodology, and relied on them to conclude that the entire model was unreliable.  (*See* Trial Tr. vol. 3, 565:20 to 566:21; Trial Tr. vol. 4, 860:13 to 861:24; Trial Tr. vol. 5, 945:8-20.)  The Court cannot resolve this case based on a hypothetical challenge.  Thus, even if the Court considered Krause's opinions, a few examples of small errors in a document spanning millions of lines of data does not undermine the credibility of Ley's testimony or methodology.

Next, relying on *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011), Sunoco tries to characterize this litigation as a "trial by spreadsheet."  In *Dukes*, the Supreme Court determined that a class certified under Rule 23(b)(2) could not seek individualized money damages for violations of Title VII of the Civil Rights Act of 1964.  The Supreme Court distinguished the class certified under Rule 23(b)(2) from one certified under Rule 23(b)(3), which "allows class certification in a much wider set of circumstances but with greater procedural protections."  *Id.* at 362.  The Court disagreed with the approach to determining liability, in which "[a] sample set of the class members would be selected, as to whom liability for sex discrimination and the backpay owing as a result would be determined in depositions supervised by a [special] master."  *Id.* at 367.  Under this approach, the special master would determine "[t]he percentage of claims . . . to be valid . . . and then . . . appl[y] [that percentage] to the entire remaining class."  *Id.*  Each class member would receive an average back pay award.

Here, the Court certified this class under Rule 23(b)(3), thereby affording the class greater protections than enjoyed by the class in *Dukes*.  Further, the class members will not receive an average damages award based on representative claims.  As explained above, Ley has examined each payment and determined liability for each class member.  Essentially, Sunoco saw a spreadsheet and cried foul.  But for the above reasons, Sunoco has not endured a "trial by spreadsheet."

Finally, Sunoco argues that Cline failed to prove that Sunoco alone caused the harm. Under the PRSA, "[w]here royalty proceeds are paid incorrectly as a result of an error or omission, the party whose error or omission caused the incorrect royalty payments shall be liable for the additional royalty proceeds on such production and all resulting costs or damages ***incurred by the party making the incorrect payment***."[19] § 570.10(C)(4) (emphasis added). Under that provision's plain language, the party causing the error or omission must pay Sunoco for costs associated with the incorrect payment. That provision, however, does not change Sunoco's obligations to pay owners on time when it undertakes the responsibility to do so. (*See* Trial Tr. vol. 1, 85:21 to 86:8.)[20]

Here, Sunoco was a first purchaser that paid owners late during the class period. Thus, Sunoco owes interest on those late payments. Accordingly, Cline has established liability under Count One.

### 2. *Default Interest Rate*

Next, the parties dispute whether the 12 percent interest rate or the 6 percent interest rate applies by default, and which party bears the burden of proving that the non-default rate applies.

"Legislative intent controls statutory interpretation." *Krug*, 362 P.3d at 210. "The obvious overriding purpose of the [PRSA] is to ensure that royalty owners are timely paid their share of the proceeds. The [Oklahoma] Legislature has followed a path of strengthening mineral owners[']

---

[19] The Court assumes for the purposes of this argument that the PRSA considers a late payment an "incorrect payment."

[20] For the same reasons, the Court rejects Sunoco's arguments regarding liability issues related to indemnity agreements. Whether Sunoco can later recover from another party for its liability in this lawsuit is not before the Court.

rights since the [PRSA's] inception." *Id.* at 214. Against that background, the Court reaches the unremarkable conclusion that the PRSA sets forth a 12 percent default interest rate.

Under the PRSA,

> **[e]xcept as otherwise provided in paragraph 2 of this subsection**, where proceeds from the sale of oil or gas production or some portion of such proceeds are not paid prior to the end of the applicable time periods provided in this section, **that portion not timely paid shall earn interest at the rate of twelve percent (12%) per annum** to be compounded annually"

§ 570.10(D)(1) (emphasis added). The "paragraph 2" referred to in that provision describes when a 6 percent interest rate applies for unmarketable title. Thus, the statute defines the 6 percent interest rate as an exception, not a rule. *See Roberts Ranch Co. v. Exxon Corp.*, 43 F. Supp. 2d 1252, 1275 (W.D. Okla. 1997) ("[T]he only exception to the twelve percent interest provision is where the proceeds are not paid because the title to the royalties is not marketable, in which case the unpaid royalties bear interest at the annual rate of six percent (6%).") The only question that remains, therefore, is who bears the burden of proving which interest rate applies in this case?

Sunoco argues that *Tulsa Energy* should inform the Court's analysis. 111 F.3d 88. In *Tulsa Energy*, the Tenth Circuit considered whether the parties could waive the interest provision in a division order. In its analysis, the Tenth Circuit explained that "[i]t is the interest owner's responsibility to establish marketable title so that he can receive proceeds." *Id.* at 90. The court then concluded that parties may waive the 6 percent interest rate because that rate "merely compensates the party entitled to payment for the use of his money until he can establish marketable title." *Id.* at 91 (quotations omitted).

Here, the Court has limited the class definition to those whom Sunoco has paid proceeds but failed to pay interest. (*See* Dk. No. 127, at 1.) Thus, whether the class members bore the

burden of proving marketable title to receive the proceeds in the first place makes no difference. Sunoco has already remitted payments to the class in some fashion. Now, it must pay the interest.

Instead, the Court considers *Quinlan v. Koch Oil Co.*, 25 F.3d 936 (10th Cir. 1994), instructive. In *Quinlan*, the Tenth Circuit rejected the argument that the plaintiff "was not entitled to twelve percent interest because he was not legally entitled to the proceeds as he failed to show either marketable title or sign a division order." *Id.* at 939 (quotations omitted). Because no question as to marketability of title existed with regard to the plaintiff's oil interest, the Tenth Circuit explained that the PRSA "did not require [the plaintiff] to make an affirmative showing of marketable title at that time in order to be deemed 'legally entitled to the proceeds.'" *Id.* at 939-40. Further, the Tenth Circuit declined to impose a burden on the interest owner to prove marketable title for every royalty payment.

Unmarketability is, in essence, an affirmative defense. In making its argument, Sunoco agrees it owes some interest under the statute, but says that those payments falls into an exception to the general rule. The burden of proving an affirmative defense rests with the defendant. *Meacham v. Knolls Atomic Power Lab.*, 554 U.S. 84, 92 (2008); *NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393, 400 (1983); *Roberts v. Barreras*, 484 F.3d 1236, 1241 (10th Cir. 2007) ("[T]he burden of proving all affirmative defenses rests on the defendant."). The burden is not only to put the defense in issue, but also to ultimately prove it. *See Roberts*, 484 F.3d at 1241.

Sunoco's entire argument rests on its suspense codes. But its own witness called them a "crude surrogate" for issues of marketability. (*See* Trial Tr. vol. 4, 715:5.) Sunoco did not identify a single case in which an owner did not have marketable title. In fact, Sunoco has already paid owners their proceeds and has not raised any legitimate questions about marketability. Thus,

applying *Quinlan*'s holding more broadly, the Court concludes that the PRSA imposes the burden on Sunoco—not Cline—to prove that it withheld the payments at issue due to unmarketable title.[21]

In sum, the PRSA requires first purchasers and holders of proceeds, such as Sunoco, to pay 12 percent interest on late payments by default.  The first purchaser and holder of proceeds bears the burden of proving that it withheld payment due to unmarketable title such that it only owes 6 percent interest on the late payment.  Accordingly, Sunoco bore the burden of establishing that a 6 percent interest rate applied to any of the late payments at issue in this case.

### 3.  *Unclaimed Funds*

The parties dispute whether (and when) Sunoco is liable for interest on unclaimed funds. Sunoco contends that it does not owe interest on these funds when it pays the funds to the state. (*See, e.g.*, Trial Tr. vol. 1, 139:9-15.)

### a.  *Standing*

The class members entitled to unclaimed funds have standing to seek damages.  To have standing, a plaintiff must prove (1) that he suffered an injury in fact that is "concrete and particularized and . . . actual or imminent, not conjectural or hypothetical;" (2) that the injury is "fairly traceable to the challenged action of the defendant;" and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by the relief requested."  *Tandy v. City of Wichita*, 380 F.3d 1277, 1283 (10th Cir. 2004); *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).

---

[21] Sunoco has vigorously argued that its own records are too unreliable to explain why it made a late payment.  If the Court interpreted the PRSA to impose on the owners the burden to prove why Sunoco withheld payment, the Court would effectively allow Sunoco to hide behind a mess of its own making, claiming innocence.  Moreover, Sunoco, not the owner, is in the best position to know the reasons Sunoco made a late payment.  Thus, placing the burden on the owner to prove why Sunoco made a late payment would undermine the purpose of the PRSA.

Cline has proven that all class members suffered an injury, including those entitled to unclaimed funds. For most payments to unclaimed property funds, Sunoco knew the identity of the owner. Even where Cline has not provided the precise identities for some class members, Ley's methodology identified late payments—payments Sunoco determined it owed to someone— on which Sunoco did not pay interest. Moreover, Sunoco admitted that it does not pay interest when it sends proceeds to a state. (Trial Tr. vol. 1, 132:22-25.) As the Court explained on November 26, 2019, "the owners' right to the funds in question . . . exists, whether the owners take possession of the funds themselves or a state holds the money for them." (Dk. No. 186, at 1.) Once the state receives the money on behalf of the individual, the owner can claim the money. *See, e.g.*, Okla. Stat. tit. 60, §§ 661, 663-64, 674-75; Tex. Prop. Code Ann. §§ 74.304, 74.501. Paying the state amounts to paying the owner or an agent or trustee on behalf of the owner. Thus, each class member has suffered an injury because Sunoco has withheld interest it owes to the owner.

Sunoco creatively argues that those entitled to unclaimed funds do not have a concrete injury because the owners have not asked for the proceeds, and therefore, are not aggrieved by a lack of interest. (*See* Dk. No. 274, at 22.) This argument implies that an owner suffers no injury if the owner never realizes that Sunoco owes the owner proceeds. No matter how one looks at it, Sunoco has kept someone else's money, a classic example of a concrete injury. The failure to pay interest on late proceed payments—regardless of whether Sunoco has identified or located the owner—"affect[s] the [owner] in a personal and individual way," creating an injury that "actually exist[s]." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016), *as revised* (May 24, 2016).

Essentially, the owners of unclaimed funds suffer an injury at the moment Sunoco fails to pay interest on the late payment. Requesting the proceeds or interest, therefore, cannot be a

precondition to suffering an injury for Sunoco's violation of the PRSA for failing to pay interest on late payments without a request.

Next, Sunoco argues that it has not caused the unidentified class members' injuries because those class members have not claimed their proceeds.  (Dk. No. 274, at 23.)  This argument is a thinly veiled effort to shift the blame to those who had a right to the money in the first place.  The PRSA requires Sunoco to pay interest on proceeds, which Sunoco did not pay.  Thus, Sunoco caused the class members' injuries.  *See Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1156 (10th Cir. 2005) ("Article III . . . require[s] proof of a substantial likelihood that the defendant's conduct caused plaintiff's injury in fact.").

Finally, Sunoco argues that Cline has not established redressability because "a judgment awarding interest to the owners of unclaimed proceeds likely would be of no practical benefit to them."  (Dk. No. 274, at 23.)  As with the injury analysis, Sunoco asks the Court to relieve it of its legal obligations because a royalty interest owner has not yet claimed the funds.  This argument "misconstrue[s] the nature of [the] redressability inquiry."  *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 286 (2008).  The Court must consider "whether the *injury* that a plaintiff alleges is likely to be redressed through the litigation."  *Id.* at 287.  The Court's judgment must "redress[ ] the plaintiff's injury . . . directly or indirectly."  *Nova Health Sys.*, 416 F.3d at 1159. "[T]he requirement of redressability ensures that the injury can likely be ameliorated by a favorable decision."  *S. Utah Wilderness All. v. Office of Surface Mining Reclamation & Enf't*, 620 F.3d 1227, 1233 (10th Cir. 2010).

Here, the class members' injuries occurred when Sunoco made a late payment without the required interest.  An award of damages will compensate the unidentified or unlocated owners for the interest owed on those late payments.  Once the relevant state receives the damages award on

33

A71

behalf of the owner, the owner may claim that interest at any time.  At a minimum, this provides

indirect relief for the injury.  *See Nova Health Sys.*, 416 F.3d at 1159.  Thus, a damages award will

redress the injury that each class member suffered as a result of Sunoco's violations of the PRSA,

regardless of whether the owner is identified.[22]  Accordingly, owners entitled to unclaimed funds

have standing.

### b.  PRSA Language

The Court has already concluded that paying the state unclaimed property fund amounts to

paying the owner or a trustee on behalf of the owner.  (Dk. No. 186.)  If Sunoco could hold

proceeds without interest until it sends the proceeds to unclaimed funds, that would "contradict[ ]

the purpose of the PRSA, which Oklahoma adopted to prevent exactly this kind of windfall."  (*Id.*

at 4.)

Indeed, the Court's analysis regarding the interest owed on unclaimed funds begins and

ends with the language of the PRSA.  Section 570.10 provides,

> ***Except as otherwise provided in this section***:
>
> 1. Proceeds from the sale of oil or gas production from an oil or gas well ***shall be paid to persons legally entitled thereto***:
>
> a. commencing not later than six (6) months after the date of first sale, and
>
> b. thereafter not later than the last day of the second succeeding month after the end of the month within which such production is sold.

§ 570.10(B)(1) (emphasis added).  The PRSA, therefore, sets forth the precise timeframes by

which Sunoco must pay proceeds.  The PRSA further excepts certain payments from its timing

---

[22] Because the injuries to the unidentified or unlocated owners of unclaimed funds have already occurred, their claims are ripe for adjudication.  *See Texas v. United States*, 523 U.S. 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." (quotations omitted)).

requirements.  *See, e.g.*, § 570.10(B)(3).  Those exceptions do not include unclaimed funds.  *See World Pub'g Co. v. Miller*, 32 P.3d 829, 833 (Okla. 2001) ("Th[e] [Oklahoma Supreme] Court does not read exceptions into a statute not made by the Legislature.").  The PRSA's timing requirements, therefore, apply to unclaimed funds.

Moreover, because interest accrues "until the date paid," interest accrues until the proceeds—including interest on late payments—are paid to the relevant state.[23]  *See, e.g.*, Okla. Stat. tit. 60, §§ 661, 663-64, 674-75; Tex. Prop. Code Ann. §§ 74.304, 74.501; *see also Cockerell Oil Props., Ltd v. Unit Petroleum Co.*, No. CIV-16-135, 2020 WL 2110904, at *2 (E.D. Okla. May 4, 2020) ("The term as used in the PRSA is, therefore, found to be unambiguous and providing for the annual accrual of interest on the accumulated interest on any unpaid proceeds not paid timely under the provisions of that statute.").

Accordingly, Sunoco must pay interest on unclaimed funds from the date the interest payment is late under the PRSA through the date it remits those funds as unclaimed property to the relevant state.[24]

---

[23] Sunoco lodges a bevy of challenges related to unclaimed funds, including that unclaimed funds involve numerous individual questions and that the unclaimed funds statutes of each state conflict with the PRSA and implicate constitutional concerns.  The Court rejects those arguments.  Sunoco has previously sent payments to unclaimed funds, so it can identify the state to which the payment is due.  (*See, e.g.*, 131:8 to 139:25.)  Sunoco has also summarized the period of time that must elapse before a state considers property abandoned.  (Dk. No. 275, at 98-99.)  Further, the PRSA requires Sunoco to pay proceeds on time and creates a consequence for not doing so; the unclaimed funds statutes set timelines for remitting the funds *only if Sunoco's efforts to locate owners do not work*.  Thus, despite the deadline in the unclaimed funds statutes, Sunoco remains free to try to locate and identify the owners.  Sunoco, therefore, has failed to show that (1) individual questions predominate in this regard; (2) the various states' unclaimed funds statutes conflict with the PRSA's interest payment requirements or otherwise control in this case; or (3) any purported conflicts between the PRSA timing requirements and the unclaimed funds statutes raise due process concerns.

[24] The Court rejects Sunoco's argument that it should be excused from complying with the PRSA because it relied on industry custom and could not possibly determine the applicable interest

*4. Compound Interest*

Sunoco argues that once it makes the late payment to the interest owner, statutory interest stops accruing.  Cline contends that Sunoco owes compound interest until Sunoco pays the statutory interest.  Sunoco refers to this as "interest on interest," in an attempt to make it sound like something exotic or unusual.  In fact, compound interest is a common feature in investments and means simply that interest becomes part of the principal and therefore earns interest.  *See* Kate Ashford, *What is Compound Interest?*, Forbes (Aug. 12, 2020, 1:18 p.m.), https://www.forbes.com/advisor/investing/compound-interest/.

Under the PRSA,

> where proceeds from the sale of oil or gas production or some portion of such proceeds are not paid prior to the end of the applicable time periods provided in this section, that portion not timely paid shall earn interest at the rate of twelve percent (12%) per annum to be compounded annually, calculated from the end of the month in which such production is sold until the day paid.

§ 570.10(D)(1).  Essentially, Sunoco interprets "until the day paid" to mean "until the day Sunoco paid the proceeds."  Thus, Sunoco argues that it does not owe compound interest.

---

rate at the same time it makes a late payment.  Moreover, Sunoco's repeated proclamations that it simply misinterpreted the law falls short.  If Sunoco could escape liability because it misinterpreted the statute or because it believed its actions were legal because everyone else was doing it, that would undermine the remedy enacted by the Oklahoma Legislature to address the precise conduct that Sunoco has engaged in.  *Cf. Creekmore v. Pomeroy IT Sols., Inc.*, No. 10-cv-0091, 2010 WL 3702543, at *2 (N.D. Okla. Sept. 16, 2010) ("Permitting a defendant to plead ignorance of the requirements of the Testing Act would have virtually eliminated the civil remedy created by the Testing Act, and would have reserved a civil remedy only for the most extreme violations." (quotations omitted)).  Further, Sunoco presented testimony that shows that compliance may have been difficult, but it failed to establish that compliance was impossible.  Indeed, Sunoco could calculate interest when someone requested interest.  (*See, e.g.*, Trial Tr. vol. 1, 90:8-20, 99:8-15; Holland Dep. 34:8-24.)  To the extent that Sunoco argues that the PRSA is void for vagueness, the fact that Sunoco misunderstood the PRSA's requirements does not make the PRSA "so vague and indefinite as really to be no rule or standard at all."  *A.B. Small Co. v. Am. Sugar Ref. Co.*, 267 U.S. 233, 239 (1925).

The Court recently resolved this question in a different case, concluding that the plain language of the PRSA "provides for compounding of interest until the full amount—the proceeds due *and the accrued interest*—are paid in accordance with the terms of the statute," *Cockerell Oil Props.*, 2020 WL 2110904, at *1-2 (emphasis added). The Court finds *Cockerell Oil* persuasive and adopts the reasoning set forth therein. *Id.* Further, Ley's model adequately compounds interest on the payments at issue in this case. (*See, e.g.*, Trial Tr. vol. 3, 526:23 to 527:25.) Accordingly, the PRSA requires Sunoco to pay interest on interest, and Ley's model adequately calculates compound interest for the payments at issue in this case.

### C. Count Two: Fraud

Cline has not proven fraud. Oklahoma recognizes two types of fraud—actual and constructive. "To be actionable, both actual fraud and constructive fraud require detrimental reliance by the person complaining." *Howell v. Texaco Inc.*, 112 P.3d 1154, 1161 (Okla. 2004). "Fraud is never presumed, but must be proven by clear and convincing evidence."[25] *Tice v. Tice*, 672 P.2d 1168, 1171 (Okla. 1983).

As explained above, the PRSA sets forth the information Sunoco must include when it remits payment. *See* § 570.12. "The PRSA . . . give[s] the royalty owners a right to be accurately informed of the facts and place[s] a legal duty on the [first purchasers and holders of proceeds] to accurately inform the plaintiffs of the facts on which the royalty payments are based." *Howell*, 112 P.3d at 1161. The plain language of the PRSA creates a legal duty for Sunoco to provide the information set forth in § 570.12. *See id.*

---

[25] "[C]lear and convincing evidence is the measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegation sought to be established." *In re C.D.P.F.*, 243 P.3d 21, 23 (Okla. 2010).

Cline does not argue that Sunoco failed to comply with the PRSA's explicit requirements under § 570.12. (Closing Arg. Tr. 196:2-6); *cf. Howell*, 112 P.3d at 1161 ("The respondents failed to include any statements or evidentiary materials in their motions for partial summary judgment showing that they complied with the PRSA."). *Compare* § 570.12, *with* (Pl.'s Ex. 520). Rather, Cline contends the class relied on Sunoco's "material misrepresentations and omissions to their detriment" because "[t]hey cashed the checks they received from Sunoco believing that Sunoco paid them all the monies they were owed." (Dk. No. 272, at 43.)

The Court doubts that an additional duty exists for Sunoco to inform interest owners that it withheld interest from a late payment. *See Wylie v. Chesser*, 173 P.3d 64, 71 (Okla. 2007) ("If a statute is plain and unambiguous and its meaning clear and no occasion exists for the application of rules of construction a statute will be accorded the meaning expressed by the language used."). In any event, Cline has failed to establish class-wide detrimental reliance based on Sunoco's check stubs. For instance, owners entitled to interest on unclaimed funds did not cash—and likely, did not see—the checks. Thus, Cline has not shown that those class members have relied on the information contained on the check stubs. *See Buford White Lumber Co. Profit Sharing & Sav. Plan & Tr. v. Octagon Props., Ltd.*, 740 F. Supp. 1553, 1570 (W.D. Okla. 1989) ("The alleged misrepresentations need not be the sole inducement which causes a party to take action, but they must be that *without which the party would not have acted*." (emphasis added)). Moreover, the information on the check stubs allowed an owner to determine whether she had received interest and, if so, in what amount. Accordingly, Cline has not proven class-wide detrimental reliance by clear and convincing evidence sufficient to prove fraud.

### D. Relief[26]

#### 1. Actual Damages[27]

##### a. Damages Award

For the reasons set forth above, Cline has established class-wide liability, and Sunoco must pay compound interest. Further, the Court has concluded that the PRSA applies a 12 percent interest rate to unpaid proceeds by default, and that Sunoco bears the burden of proving when a 6 percent interest rate applies. Unfortunately for Sunoco, it has failed to meet its burden of proving that 6 percent interest applies to any of the late payments.

Sunoco repeatedly emphasized that its own data cannot reliably establish why a payment was late. (See, e.g., Trial Tr. vol. 1, 222:2-7, 223:17-25.) Epperson opined that the codes were "simply a crude surrogate" for identifying payments made due to unmarketable title. (Trial Tr. vol. 4, 715:5.) He also agreed that none "of [Sunoco's] codes provide a definitively accurate determination of marketability or unmarketability without doing a more elaborate search of Sunoco's records and potentially even public records." (Id. 718:9-14.) Further, at trial, Koelling explained that the ability to locate an interest owner does not mean that the owner has marketable title. (Trial Tr. vol 1, 133:23-25.) Under that reasoning, the inverse is also true—being unable to

---

[26] Based on the post-trial briefs and closing arguments, Cline no longer seeks equitable relief if the Court awards actual and punitive damages. (See, e.g., Dk. No. 272, at 53.) Because the Court will award those damages, it will not award an accounting, disgorgement, or an injunction.

[27] Sunoco argues that "Cline . . . concedes that the actual class damages claimed at trial ($74,763,113) should be reduced $8,033,00.60 for the 'undivided' category of unclaimed funds paid to the states and by $5,790,028 based on the Krause identification of payments associated with Epperson's 'unmarketable' suspense codes." (Dk. No. 279, at 28.) Cline, however, only agrees to reduce the damages award by those amounts if the Court concludes that Sunoco met its burden of proving unmarketable title at trial. (See Closing Arg. Tr. 16:23 to 17:2; see also Dk. No. 272, at 20.) Accordingly, the Court will consider whether Sunoco has met its burden of proving marketable title as to those two figures.

locate an interest owner does not mean that that owner has unmarketable title. Indeed, Sunoco has not proffered—nor could the Court find—any authority holding that a company's inability to locate or identify an owner makes the title to that owner's interest unmarketable per se.

In sum, Sunoco has failed to establish by a preponderance of the evidence that Sunoco withheld any of the late payments at issue due to unmarketable title. Accordingly, 12 percent interest applies to all late payments in this case.[28]

### b. *Fluid Damages*

Relying primarily on *Eisen v. Carlisle & Jacquelin*,[29] Sunoco contends that the presence of unidentified class members deprives Sunoco of its due process rights, making a damages award unconstitutional. (Dk. No. 274, at 49-50.) As noted above, Cline has offered evidence that questions whether many of these individuals truly cannot be located. In any event, Sunoco has misplaced its reliance on *Eisen*.

---

[28] The Court construes Sunoco's argument that the class did not mitigate its damages because owners failed to provide Sunoco with updated contact information as a challenge to the Court's class certification decision. To the extent that Sunoco also raises this argument as a challenge to liability and damages, that argument ignores that the PRSA requires Sunoco to pay interest regardless of the reason for the late payment. *See* § 570.10(D). For that same reason, the argument that a class member has waived interest by preventing payment also fails. Further, the Court rejects Sunoco's argument that some class members may have waived interest by contract. First, Sunoco did not prove by a preponderance of the evidence that the class members were parties to contracts waiving the interest requirement. Second, as explained above, the Court concludes that a 12 percent interest rate applies to all late payments in this case. In *Tulsa Energy*, the Tenth Circuit held that parties cannot waive the 12 percent interest rate for public policy reasons. 111 F.3d at 90. Although Sunoco argues that the Oklahoma Supreme Court later concluded that PRSA claims are contractual, *see Purcell v. Santa Fe Minerals*, 961 P.2d 188, 193 (Okla. 1998)— implying that a party can now waive that interest—neither the Oklahoma Supreme Court nor the Tenth Circuit have cast doubt on the holding in *Tulsa Energy*. Thus, pursuant to *Tulsa Energy*, the parties cannot waive the 12 percent interest rate requirement.

[29] 479 F.2d 1005 (2d Cir. 1973), *vacated on other grounds*, 417 U.S. 156 (1974).

*Eisen* involved a six-million-member class of individuals throughout the world who bought or sold odd lots on the New York Stock Exchange from 1962 through 1966. Millions of unidentified class members would receive notice by publication through extensive efforts. After several appeals, the district judge substituted individual claimants for "the class as a whole." *Eisen*, 479 F.2d at 1010. Under the district court's plan, after the defendants distributed the damages award to the court, counsel would continue to publish notices soliciting claims. Importantly, the U.S. Court of Appeals for the Second Circuit suspected that few individuals would ever be identified or file claims, and the court could not discern how the district court expected to disburse the remainder of the "huge residue." *Id.* at 1010-11. The Court further noted that "the expenses of giving the notices required by . . . Rule 23 and the general costs of administration of the action would exceed the amount due to the few members of the class who filed claims and the individual members of the class would get nothing." *Id.* at 1018.

This case does not present the same manageability problems at issue in *Eisen*. The Court has not substituted individual claimants with the class as a whole. Nor has Ley's methodology simply aggregated damages into one lump payment without considering Sunoco's liability to every class member. Rather, Ley has calculated individual damages through a standard methodology, and Sunoco has had the opportunity to rebut those calculations. *See McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 232 (2d Cir. 2008), *abrogated on other grounds by Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639 (2008) (explaining the right to raise individual defenses against the class members "does not mean that defendants are constitutionally entitled to compel a parade of individual plaintiffs to establish damages" (quotations omitted)). Moreover, this action is far from "hopelessly unmanageable" due to the unidentified class members. *Eisen*, 479 F.2d at 1010. To

41

**A79**

the extent that Cline cannot identify the owner owed the funds, Cline need only send that member's portion of the damages to the same place Sunoco remitted the underlying unclaimed funds.

Accordingly, recovery in this case does not "mask the prevalence of individual issues [such that] it is an impermissible affront to defendants' due process rights." *McLaughlin*, 522 F.3d at 232.

### 2. *Punitive Damages*[30]

Cline must clear two hurdles to receive punitive damages: first, Cline must show that Sunoco's conduct meets the standard set forth in the Energy Litigation Reform Act ("ELRA"), Okla. Stat. tit. 52, § 903; and second, Cline must show that Sunoco's conduct meets the requirements set forth in Oklahoma's punitive damages statute, Okla. Stat. tit. 23, § 9.1.

### a. ELRA

Under the ELRA, the PRSA "provide[s] the exclusive remedy to a person entitled to proceeds from production for failure of a holder to pay the proceeds within the time periods required for payment." § 903. A plaintiff may recover punitive damages, however, if the Court determines

> upon clear and convincing evidence that the holder who failed to pay such proceeds did so with the actual, knowing[,] and willful intent: (a) to deceive the person to whom the proceeds were due, or (b) to deprive proceeds from the person the holder knows, or is aware, is legally entitled thereto.

*Id.* Cline, therefore, must first show that Sunoco's conduct overcomes the ELRA's bar to punitive damages.

---

[30] In its motion to dismiss, Sunoco argued that Cline waived his claim to punitive damages by failing to include those damages in his initial disclosures. (Dk. No. 117, at 3, 11-12.) Sunoco never moved to strike that request.

As an initial matter, Sunoco argues that the ELRA only applies to claims for "proceeds," not "interest." But "it is the failure to timely pay 'proceeds' that leads to the recovery of 'interest.'" *Cockerell Oil Props., Ltd v. Unit Petroleum Co.*, No. CIV-16-135, 2020 WL 974875, at *6 (E.D. Okla. Feb. 28, 2020), *modified on other grounds on reconsideration*, 2020 WL 2110904. Thus, the ELRA does not bar Cline's claim in that respect.

Next, the Court concludes that Sunoco acted with "the actual, knowing[,] and willful intent: . . . to deprive proceeds from the person the holder knows, or is aware, is legally entitled thereto." § 903. Sunoco says that it had a good faith belief that it did not have to pay interest automatically based in large part on industry practice. (*See* Dk. No. 274, at 46.)

As thousands of mothers have told their children, the fact that everyone does something does not make it right. Here, an industry (apparently supported by its lawyers) decided that it owes interest that it never has to pay. This myopic group-think does not excuse keeping millions of dollars of other people's money.

At trial, Koelling confirmed that Sunoco knew that it owed interest to royalty owners for the late payments. (Trial Tr. vol. 1, 82:20 to 85:19.) Sunoco also admitted that it generally waited for owners to ask for that interest rather than pay the interest automatically. (*Id.* 78:6-9, 82:20 to 83:23.) Further, Cline introduced other evidence, such as emails, that established that Sunoco is aware of its legal obligation to pay interest and its intent to keep the interest absent a request, thereby depriving owners of the interest Sunoco owed them. (*See, e.g.*, Pl.'s Ex. 38.)

Thus, Cline proved by clear and convincing evidence that Sunoco knew it owed interest payments and intentionally withheld that interest until—and unless—the owner finally asked for the interest. Accordingly, the ELRA allows punitive damages in this case.

*b. Oklahoma's Punitive Damages Statute*[31]

Cline seeks an award of punitive damages equal to twice the class' actual damages, or in the alternative, to the amount of the class' actual damages.

When the factfinder finds by clear and convincing evidence that the defendant acted with *reckless disregard* for the rights of others, the Court may award punitive damages equal to the amount of actual damages awarded. Okla. Stat. tit. 23, § 9.1(B). Reckless disregard requires the plaintiff to prove that the defendant "was either aware, or did not care, that there was a substantial and unnecessary risk that [its] conduct would cause serious injury to others." *Beavers v. Victorian*, 38 F. Supp. 3d 1260, 1273-74 (W.D. Okla. 2014) (quoting Okla. Unif. Civil Jury Instr. 5.6).

When the factfinder finds by clear and convincing evidence that the defendant acted intentionally with *malice* towards others, the Court may award twice the amount of actual damages. *Id.* § 9.1(C). Malice "requires that the action complained of be actuated by ill will or hatred and may be inferred from a willful action in reckless or wanton disregard for the rights of another." *Chavez v. Sears, Roebuck & Co.*, 525 F.2d 827, 830 (10th Cir. 1975).[32]

---

[31] Sunoco argues that Cline cannot recover for punitive damages pursuant to Oklahoma's punitive damages statute because the punitive damages statute only applies to actions "for the breach of an obligation not arising from contract." § 9.1(A). Sunoco says that PRSA claims are contractual in nature. The cases Sunoco relies on considered PRSA claims as contractual for the purposes of determining (1) the statute of limitations, *Purcell*, 961 P.2d at 193, and (2) whether a party owed owners interest on a settlement payment, *see Krug*, 362 P.3d at 210-13 (concluding that the PRSA was inapplicable to that case). Neither case considered whether punitive damages are available for the type of claim at issue here, and the ELRA specifically contemplates an award of punitive damages if the defendant's conduct meets its threshold requirements. *See* § 903. "Clearly, an exception exists under the [ELRA] for the availability of a punitive damage claim, should [the plaintiff] make the appropriate showing," *Cockerell Oil Props.*, 2020 WL 974875, at *6. Accordingly, § 9.1 does not bar recovery for punitive damages.

[32] *See Hamilton v. Amwar Petroleum Co.*, 769 P.2d 146, 149 (Okla. 1989) ("Showings necessary for a punitive damage award require a higher standard of culpability, i.e., fraud[,] oppression[,] or malice which is accompanied with some evil intent or recklessly wanton conduct as is deemed its equivalent in the law.").

To determine the amount of punitive damages to award, the Court must consider:

1. The seriousness of the hazard to the public arising from the defendant's misconduct;
2. The profitability of the misconduct to the defendant;
3. The duration of the misconduct and any concealment of it;
4. The degree of the defendant's awareness of the hazard and of its excessiveness;
5. The attitude and conduct of the defendant upon discovery of the misconduct or hazard;
6. In the case of a defendant which is a corporation or other entity, the number and level of employees involved in causing or concealing the misconduct; and
7. The financial condition of the defendant.

§ 9.1(A).

*Seriousness and profitability of the misconduct.* The public has suffered an enormous loss in this case. Sunoco urges the Court to consider that it pays almost all proceeds either early or on time. But as of December 16, 2019, Sunoco had withheld more than $74 million on more than 1.5 million late payments. (Trial Tr. vol. 3, 554:2-12, 572:5; Pl.'s Ex. 454.) Moreover, Sunoco withheld payments from over 50,000 class members. (Trial Tr. vol. 3, 568:21 to 569:1.) Despite that large number of class members and late payments, Sunoco does not get many requests for interest each year. (*See, e.g.*, Trial Tr. vol. 1, 83:21-24; Holland. Dep. 33:5-15; Pl.'s Ex. 62.) Thus, Sunoco has enjoyed an enormous benefit by paying owners late and then withholding interest on those late payments—particularly significant in light of the purpose of § 570.10(D). *See Krug*, 362 P.3d at 214.

*Duration of the misconduct, concealment, and awareness.* Sunoco has withheld interest until an owner asks for it for the entire class period. (*See, e.g.*, Trial Tr. vol. 1, 78:10-13, 82:20-23; Pl.'s Ex. 43.) For the reasons set forth above, the Court concludes that Sunoco did not actively conceal that it failed to pay interest to interest owners. But Sunoco knew that it owed interest on late proceeds and failed to make any effort to identify the late payments and pay the interest owed.

(Trial Tr. vol. 1, 79:4-20.)  Instead, Sunoco generally waited for a demand for payment before paying interest.  (Trial Tr. vol. 1, 84:15 to 85:19, 116:3-6; Pl.'s Ex. 339.)

*Attitude and conduct of Sunoco after discovery.*  Outside of litigation, Sunoco still has not tried to calculate the interest it owes on late payments or identify every late payment it has made in Oklahoma.  (Trial Tr. vol. 1, 79:4-20.)  Further, when this Court ruled that interest was due at the same time as the late payment, Sunoco decided to "get out of the business" of paying royalty proceeds altogether.  (*Id.* 74:10-17.)

*Number and level of employees involved.*  Sunoco did not formally train its employees on the PRSA requirements; they all received on-the-job training.  (*Id.* 97:19 to 98:12; Holland Dep. 67:1-11.)  Company-wide, Sunoco generally does not pay interest unless someone asks for it.  (Trial Tr. vol. 1, 82:20-23.)  In limited or "unusual" circumstances, Sunoco will pay interest without a request.  (*Id.* 83:8-11.)

*Financial Condition.*  Sunoco's parent company is worth approximately $30 billion.[33] (Pl.'s Ex. 440, at 169.)  In Sunoco's view, the unpaid interest "was never a significant dollar amount to [Sunoco].  It was never something where [Sunoco was] going to make a fortune not paying the interest."  (Trial Tr. vol. 1, 121:9-11.)

Sunoco's conduct probably reflects malice required for a punitive damages award of double the amount of compensatory damages under § 9.1(C).  Malice here is demonstrated by a willful action in reckless and wanton disregard of the rights of others—specifically keeping other people's money.  Nevertheless, the Court is reluctant to impose $150 million dollars in punitive damages.  Generally, Sunoco does a good job of paying proceeds to owners on time, at a better

---

[33] During discovery, Sunoco told Cline to look at the net worth of ETP to determine Sunoco's net worth.  (Trial Tr. vol. 5, 948:25 to 951:6.)

**A84**

rate than the petroleum industry as a whole.  While it bungled its system for paying interest on late payments, an award of double the amount of compensatory damages goes a bit too far.

Sunoco's conduct, however, certainly amounts to a reckless disregard of the class members' rights.  *See* § 9.1(B).  Sunoco knew that it owed interest on late payments, but it made no effort to identify those payments to determine the interest it owed—much less pay that interest. (Trial Tr. vol. 1, 79:4-20.)  Absent this litigation, Sunoco would have deprived the class members of millions of dollars of interest indefinitely.  Thus, Sunoco acted with a reckless disregard to a risk of serious harm to the class that supports an award of punitive damages.  *See* § 9.1(B).

Furthermore, this award advances "the primary purpose of punitive damages"—punishing the wrongdoer and deterring similar conduct in the future.  *Thiry v. Armstrong World Indus.*, 661 P.2d 515, 517 (Okla. 1983).  Sunoco has had these business practices in place for decades yet is only being held accountable for late payments made on or after July 7, 2012.  Nevertheless, although Sunoco may have assumed that "people didn't care that much about" more than seventy million dollars in withheld interest payments (Trial Tr. vol. 1, 93:14-19), this punitive damages award will adequately punish Sunoco for failing to comply with § 570.10(D) during the class period.  Further, such an award will deter Sunoco—and companies like it—from adopting "[p]erverse and absurd statutory interpretations . . . in the name of literalism" that perpetuate the abuse that the PRSA was designed to correct.  *Twisdale v. Snow*, 325 F. 3d 950, 953 (7th Cir. 2003).

Thus, pursuant to § 9.1(B), the Court will award punitive damages of $75 million dollars, an amount approximately equal to the class' actual damages.[34]

---

[34] At this time, the plaintiff has proved damages of just under $75 million.  With interest added until the date of this Opinion, the Court expects the actual damages amount will exceed $75 million.

47

**A85**

## VI. **CONCLUSION**

For the foregoing reasons, the Court will grant the motion to strike Krause as an expert and will sustain Cline's objections to Krause's testimony at trial. The Court will enter judgment against Sunoco as to Count One and will award the class: (1) actual damages in the amount of the interest owed on the late payments identified by Ley, amounting to $74,763,113.00 as of December 16, 2019, plus any additional interest that has accrued on each payment at a rate of 12 percent, compounding annually, from December 17, 2019, to the date of this Opinion and Order, subject to modification based on the updated exclusion requests[35]; and (2) punitive damages in the amount of $75,000,000. The Court will not enter judgment against Sunoco as to Count Two and will not award any equitable relief. The Court will overrule the remaining objections to the exhibits, witnesses, depositions, and other evidence.

The Court will issue an appropriate Order.

Let the Clerk send a copy of this Opinion to all counsel of record.

Date: 17 August 2020
Richmond, VA

/s/
John A. Gibney, Jr.
United States District Judge

---

[35] As explained earlier, the Court will withhold entering judgment pursuant to Federal Rule of Civil Procedure 58 until counsel provides the updated damages calculations to the Court. This Opinion and Order, however, will serve as the judgment for the purposes of calculating the final interest due.

**A86**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

PERRY CLINE, on behalf of himself
and all others similarly situated,
          Plaintiff,

v.                             Civil Action No. 6:17-cv-313-JAG

SUNOCO, INC. (R&M), et al.,
          Defendants.

## OPINION

     Oklahoma's Production Revenue Standards Act ("PRSA") requires a first purchaser of

crude oil—such as Sunoco, Inc. (R&M), and Sunoco Partners Marketing & Terminals, L.P.

(collectively, "Sunoco")—to pay promptly for the oil.[1]  *See* Okla. Stat. tit. 52, §§ 570.1–.15.  If the

purchaser pays late, it must pay interest to the owner of the well that produced the oil.  This case

involves Sunoco's failure to pay that interest to Perry Cline and the class he represents.[2]

     In August 2020, the Court found for Cline and awarded him damages.  Sunoco, however,

does not concede.  In September 2020, Sunoco moved for a new trial and to alter the judgment.

For the reasons stated below, the Court will deny both motions.

## I. BACKGROUND[3]

     Perry Cline represents a class of owners of interests in oil wells in Oklahoma.  Cline sued

Sunoco under the PRSA for failing to pay the statutory interest on late payments it made on oil

---

[1] Oklahoma law calls these payments "proceeds."  Okla. Stat. tit. 52, § 570.2(8).

[2] Cline serves as the named representative of a class certified by the Court on October 3,
2019.  (ECF Nos. 126, 127.)  The Court uses the terms "the class" and "Cline" interchangeably.

[3] The Court detailed the background and procedural history of this case in its August 17,
2020 Opinion.  (*See* ECF No. 298, at 2–5.)

proceeds.

On December 10, 2019, the Court concluded that the PRSA requires Sunoco to make statutory interest payments automatically with late payments.  (ECF Nos. 231, 232.)  The Court held a bench trial on the remaining issues from December 16–19, 2019, and heard closing arguments on June 17, 2020.

On August 17, 2020, the Court announced that Sunoco breached its obligation under the PRSA to pay statutory interest on late payments it made on oil proceeds.  (ECF No. 298.)  Accordingly, the Court entered judgment against the company, (ECF Nos. 299), and, on August 27, 2020, awarded the plaintiffs "damages in the amount of $80,691,486.00 in actual damages and $75,000,000.00 in punitive damages," (ECF No. 308).

On September 24, 2020, Sunoco filed two motions: one for a new trial and one to alter the judgment.  (ECF Nos. 322, 323.)  The Court addresses each motion in turn.

## II. **MOTION FOR A NEW TRIAL**

Sunoco argues that it "did not have a fair trial" and, therefore, the "Court should order a new" one "to prevent an injustice" and avoid violating its Due Process rights.  (ECF No. 322, at 4, 15.)  Sunoco makes this argument in two ways.  First, Sunoco says that the Court unfairly announced its legal conclusion regarding which party bore the burden of proving marketable-title issues *after* trial.  (*Id.* at 9–11, 15–16.)  Second, Sunoco claims that when the Court allocated the burden of proving marketable-title issues to Sunoco, it "erred as a matter of law."  (*Id.* at 16–19.)  Both arguments fail for the reasons detailed below.

2

### A. Post-Trial Announcement of Legal Conclusion

According to Sunoco, "the trial was not fair, and a new trial is required to prevent injustice, because the Court held—for the first time *post*-trial—that Sunoco, *at trial*, bore the burden of proof to show which class members had unmarketable title." (*Id.* at 4–5.)  The Court did, indeed, hold "for the first time *post*-trial" that the burden of proof on marketable-title issues fell to Sunoco. (*See* ECF No. 298, at 30–31.)  But this post-trial announcement of its "conclusion of law" keeps with Federal Rule of Civil Procedure 52(a). (*See id.* at 2.)

Rule 52(a)(1) provides that "[i]n an action tried on the facts without a jury," courts must state "[t]he findings [of fact] and conclusions [of law] . . . on the record after the close of the evidence or . . . in an opinion or a memorandum of decision filed by the court."  In this case, as Rule 52(a)(1) permits, the Court announced its conclusion as to which party bore the burden of proof on marketable-title issues in its August 27, 2020 Opinion.  (ECF No. 298, at 2, 30–31.)

Sunoco claims that the Court's conclusion of law on the marketable-title issue surprised them.  (ECF No. 322, at 15 ("Sunoco had no realistic notice that it would bear the burden of proof on the marketable-title issue at trial . . . .").)  But Sunoco *knew* that the question of which party bore the burden of proof regarding marketable-title issues remained in dispute during the trial.  In fact, both Sunoco and Cline wrote pretrial briefs on the issue.[4]  (ECF Nos. 208, 213.)  And the Court's reference to its initial thoughts on the issue during the December 11, 2019 pretrial conference provided further notice to Sunoco that the issue remained undecided.  (*See* ECF No. 333, at 12.)  The Court, therefore, finds Sunoco's surprise insincere.

---

[4] The Court permitted both parties to file "pretrial bench briefs on material issues expected to arise at trial."  (ECF No. 102 ¶ 13.)

3

The Court also rejects the defendant's claim that the Court deprived it of the opportunity to present evidence about marketable-title issues. (ECF No. 322, at 11.)  Not only did Sunoco never ask for a continuance, but it also did not object to finishing trial a day early. (ECF 298, at 18; ECF No. 333, at 10.)  Sunoco claims that the Court "cut off" its presentation of evidence when it "attempted, at trial, to adduce evidence to demonstrate that individualized evidence was necessary to prove why particular payments for particular class members were late" and "precluded Sunoco from presenting any 'more [examples] like this.'" (ECF No. 322, at 11 (alteration in original) (quoting Trial Tr. vol. 1, 279:21–280:1).)

In making this argument, Sunoco boldly mischaracterizes the record.  During the incident Sunoco cites, the company's lawyers questioned Eric Koelling, Sunoco's representative at trial, about the "circumstances" of "three royalty owners" that Sunoco planned to call as witnesses. (Trial Tr. vol. 1, 254:19–23).  By showing the "circumstances" of these royalty owners, Sunoco intended "to show examples of late payments and what it took to figure out" the reason for the late payment and how much, if anything, Sunoco owed the royalty owner. (*Id.* at 279:18–19.)  Sunoco proceeded to ask Koelling questions about the three royalty owners, discussing the difficulties Sunoco had determining what it owed each royalty owner.  By the time Sunoco reached its questions about the third royalty owner, the Court had a firm grasp on the difficulty Sunoco has determining how much money the company owes and to whom they owe it.  Accordingly, the Court characterized further testimony about the third royalty owner's circumstances as "fairly cumulative." (*Id.* at 279:25.)

Pointing to this exchange for support, Sunoco suggests that the Court would not have permitted its presentation of individualized proof of marketable title for each class member. (ECF No. 322, at 11.)  Considering the context surrounding this exchange and the limited purpose for

4

which Sunoco elicited this testimony, Sunoco's claim rings hollow. The emptiness of Sunoco's claim becomes even clearer upon its confession that it could not have presented individualized proof of marketable title for the class members even if it had tried.

In sum, the Court's post-trial announcement of which party bore the burden on marketable-title issues complied with Federal Rule of Civil Procedure 52, and, therefore, the Court will deny Sunoco's claim that it "did not have a fair trial." (ECF No. 322, at 4.) The Court also rejects Sunoco's claim that this post-trial announcement violated its due process rights because it did not have "an opportunity to present every available defense"—here, the unmarketability of class members' title. (ECF No. 322, at 16 (quoting *Lindsey v. Normet*, 405 U.S. 56, 66 (1972)). The Court did not deny Sunoco the opportunity; Sunoco's records—or lack thereof—denied it the opportunity. Accordingly, the Court finds Sunoco's due process rights remain intact.

## B. Sunoco Bore the Burden of Proof on Marketable-Title Issues

Sunoco claims that "a new trial is required because the Court erred as a matter of law by allocating the burden of proof to Sunoco on the marketable-title issue." (ECF No. 322, at 16.) Sunoco says that *In re Tulsa Energy, Inc.*, 111 F.3d 88 (10th Cir. 1997), compels this conclusion. For the same reasons discussed in its August 17 Opinion, the Court disagrees. In *In re Tulsa Energy, Inc.*, the Tenth Circuit explained that "[i]t is the interest owner's responsibility to establish marketable title so that he can receive *proceeds*." *Id.* at 90 (emphasis added). Here, Sunoco has already paid the class members "proceeds." Sunoco disputes the rate at which it must pay the class members *interest* on those proceeds. *In re Tulsa Energy, Inc.*, therefore, does not compel the conclusion Sunoco says it does.

Sunoco also says the Court erred by allocating "the burden of proof to Sunoco based on [its] analysis of Subsection 'D' of the PRSA." (ECF No. 322, at 18.) Instead, Sunoco points the

5

Court towards Subsection "E," the provision under which the plaintiffs sued and which Sunoco claims "imposes on Plaintiffs the burden of proof" as to which rate of interest applies.[5]  (*Id.* at 19.) Again, the Court disagrees and maintains—for all the same reasons announced in its August 17 Opinion—that the first purchasers or holders of proceeds referred to in § 570.10(E)(1) bear of the burden of proving that the 12 percent default interest rate set by the PRSA does not apply.[6]

### C. The Punitive Damages Award is Constitutional

Sunoco argues that the $75,000,000 punitive damages award in this case "is excessive" under the due process clauses of the Fifth and Fourteenth Amendments to U.S. Constitution.[7] (ECF No. 322, at 20.)  In support of this position, Sunoco says that its "conduct was not reprehensible under the Supreme Court's standards"; that "[t]he ratio of compensatory to punitive damages is unconstitutionally high"; and that "[t]he damages award exceeds any civil or criminal penalties for comparable misconduct." (ECF No. 322, at 23, 25 (emphasis omitted).)  For the

---

[5] The Court refers to Subsection "D" not because the Court does not understand which provision creates the right the class members enforced in this suit, but because Subsection "E" directs its readers to Subsection "D."

[6] Although the Court recognizes the general rule that "plaintiffs bear the risk of failing to prove their claims," *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 56 (2005), the Court declines to place the burden of proving marketable title on royalty owners whose marketable title "[is] not legitimately in question," *Quinlan v. Koch Oil Co.*, 25 F.3d 936, 940 (10th Cir. 1994), and who have gone without interest payments that Sunoco rightfully owes them, § 570.10(E)(1). Doing so would undermine the purpose of the PRSA—"to ensure that those entitled to royalty payments would receive proceeds in a timely fashion." *Hull v. Sun Refin. & Mktg. Co.*, 789 P.2d 1272, 1279 (Okla. 1989); *see H.B. Krug v. Helmerich & Payne, Inc.*, 362 P.3d 205, 210 (Okla. 2015) ("Legislative intent controls statutory interpretation.").

[7] Although Sunoco also claims that the punitive damages award in this case violates the Eighth Amendment's Excessive Fines Clause, the "Excessive Fines Clause does not apply to awards of punitive damages in cases between private parties." *Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 260 (1989).

following reasons, this Court finds the punitive damages award in this case comports with due process.

### 1. *Degree of Reprehensibility*

Regarding the "degree of reprehensibility of the defendant's conduct"—"[p]erhaps the most important indicium" for determining the constitutionality of a punitive damages award—the Court agrees with Sunoco that it caused economic, not physical, harm. *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996). But Sunoco's practice of "paying statutory interest" only after the royalty owner demanded it amounted to an enormous loss for the public. (ECF No. 322, at 22.) Although Sunoco may have "acted on the advice of counsel," and although Sunoco's practice "was consistent with the industry practices," its conduct clearly violated the PRSA and kept millions of dollars that belonged to others. (*Id.*) Essentially, Sunoco took the position that it could keep other people's money indefinitely. Its position was reprehensible. The Court did not err in issuing the punitive damages award.

### 2. *Ratio between Compensatory and Punitive Damages*

As for the ratio between the punitive damages and "the actual harm inflicted on the plaintiff," *Gore*, 517 U.S. at 580, Sunoco suggests that the Court awarded punitive damages twenty-four times greater than "the amount that would fully compensate the plaintiffs for their loss." (ECF No. 322, at 24.) Sunoco reached this conclusion first, by claiming that a market interest rate of 1 percent would "fully compensate the class." (*Id.*) Consequently, the Court's actual damage figure—calculated based on the 12 percent interest rate provided by the PRSA— "is 12 times higher" than the amount "that would fully compensate the class for its actual losses for not receiving interest at the time the proceeds were paid." (*Id.* (emphasis omitted).) Next, Sunoco combines this 12 percent interest with the Court's $75,000,000 punitive damages award,

7

and concludes that "this damage award . . . is 24 times larger than the amount that would fully compensate the plaintiffs for their loss." (*Id.* (emphasis omitted).)

Sunoco appears to misunderstand the nature of "compensatory damages," which Black's Law Dictionary defines as "sufficient in amount to indemnify the injured person for the loss suffered." *Damages*, Black's Law Dictionary (11th ed. 2019). Here, Sunoco owes the class members interest on untimely statutory payments. The PRSA sets the rate of interest on these payments at 12 percent, unless the first purchaser or holder of proceeds can prove that it paid the proceeds late because of unmarketable title, in which case a 6 percent rate applies. Sunoco may object to the PRSA and the interest rates it sets, but the law applies "to all owners," and its rates define the amount of loss suffered by the class members. Okla. Stat. tit. 52, § 570.3. Consequently, the Court's award of $80,691,486 merely indemnifies the class members for the amount of interest Sunoco owes them under the PRSA.

Sunoco also seems to confuse the ratio courts consider when assessing whether a punitive damages award satisfies due process. Courts do not combine the punitive and compensatory damages awards and compare that sum with what the defendant thinks "would fully compensate the class," as Sunoco suggests. (ECF No. 322, at 24.) Indeed, if courts did as Sunoco suggests, they would often compare damages awards against the defendant's desired award of $0. Such a comparison would render every damages award unconstitutional. This the law does not support.

Instead, courts consider "the ratio between punitive and compensatory damages." *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 507 (2008). Here, that ratio is *less than* 1:1, falling well within the bounds of constitutional permissibility. *See Lompe v. Sunridge Partners, LLC*, 818 F.3d

8

1041, 1068 (10th Cir. 2016) (quoting *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003)).[8]

### 3. *Penalties for Comparable Misconduct*

Finally, Sunoco claims that "[t]he damages award exceeds any civil or criminal penalties for comparable misconduct." (ECF No. 322, at 25.)  In support of this, Sunoco cites Oklahoma's 6 percent default legal interest rate.  Okla. Stat. tit. 15, § 266.  The Court calculated both the compensatory and punitive damages awards pursuant to Oklahoma law.  Sunoco's gripe about the PRSA's 12 percent default interest rate, therefore, lies with the Oklahoma legislature, not with this Court.

### C. The Energy Litigation Reform Act Allows Cline's Recovery

In its reply brief, Sunoco raised again its argument that the Energy Litigation Reform Act ("ELRA"), Okla. Stat. tit. 52, § 903, only applies to claims for "proceeds," not "interest," and, therefore, Cline may not recover punitive damages.  (ECF No. 338, at 6–8.)  For all the reasons stated in its August 17 Opinion, the Court disagrees.  (ECF No. 298, at 42–43.)

Sunoco also says that Cline failed to prove, by clear and convincing evidence, that "Sunoco willfully deprived Plaintiffs of proceeds knowing that Plaintiffs were legally entitled thereto—*i.e.*, knowing Plaintiffs had marketable title."  (ECF No. 338, at 7 (emphases omitted).)  Sunoco mischaracterizes Cline's burden under § 903.

---

[8] '[S]ingle-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution.'  This suggests that up to a 9:1 ratio of punitive damages to compensatory damages is likely acceptable in some cases, and that a 10:1 ratio might be permissible because it does not exceed 9:1 to a significant degree.

*Id.* (quoting *Campbell*, 538 U.S. at 425).

9

In order to recover punitive damages under § 903, Cline needed to prove that Sunoco failed to pay interest "with the actual, knowing[,] and willful intent . . . to deprive" the interest from Cline, who Sunoco "knows, or is aware, is legally entitled thereto." For all the reasons stated in its August 17 Opinion, the Court finds that Cline satisfied this burden. (ECF No. 298, at 42–43.) Sunoco attempts to heap onto Cline the additional burden of proving marketable title, contending that the class could not prove their legal entitlement to the interest otherwise. But Sunoco *knew* it owed interest to royalty owners for late payments. (Trial Tr. vol. 1, 82:20–85:19.) And Cline introduced other evidence, such as emails, that established Sunoco's awareness of its legal obligation to pay interest and its intent to keep the interest absent a demand, thereby depriving owners of the interest owed them. (*See, e.g.*, Pl.'s Ex. 38.) Consequently, the Court again finds that Cline satisfied his burden under § 903 and, therefore, the ELRA permits punitive damages in this case.

### III. MOTION TO ALTER OR AMEND THE JUDGMENT

Sunoco asks the Court to eliminate, or at least reduce, the damages awards in this case. First, Sunoco argues that the punitive damages award exceeds what the Constitution permits. The Court disagrees for the same reasons discussed above. Second, Sunoco contends that "[b]ased on all the arguments Sunoco has made to date—including . . . that plaintiffs failed to prove liability on a class-wide basis—the Court should alter or amend the judgment" pursuant to Federal Rule of Civil Procedure 59(e). (ECF No. 323, at 9.) Finding that Cline *did* prove class-wide liability for the reasons outlined below, the Court will decline to alter or amend the judgment.

#### A. The Punitive Damages Award is Constitutional

Sunoco raises arguments identical to those in its briefing in support of its motion for a new trial regarding the punitive damages award. (*Id.* at 4–9; ECF No. 322, at 20–25). For all the

reasons set forth in Section II.C, the Court finds that the punitive damages award in this case comports with due process.

### B. The Class Proved Class-Wide Liability

Sunoco says that "[b]ased on all the arguments Sunoco has made to date," the Court should alter the judgment by lowering the damages awards. (ECF No. 323, at 9.) But Sunoco specifically identifies one argument for the Court to consider: Cline's alleged failure to prove liability on a class-wide basis. (*Id.*) Sunoco argues that Cline failed to prove that all the members of the class "are the true owners 'legally entitled' to interest." (*Id.*)

The Court disagrees, and again finds that Cline met his burden of proving, by a preponderance of the evidence, class-wide liability. The certified class in this case includes only those who "received Untimely Payments from Defendants . . . for oil proceeds" after a certain date, and "who have not already been paid statutory interest on the Untimely Payments." (ECF No. 127.) These limitations—narrowing the class to those who have already received[9] untimely payments for oil proceeds but have not received the statutory interest payments—ensure the legal entitlement of each member of the class to interest payments under the PRSA. (*See* Trial Tr. vol. 1, 159:03–159:12.) Sunoco's contention that its payment of proceeds does not demonstrate legal entitlement defies logic. The Court finds implausible that Sunoco paid people money that it did not owe them, especially considering the company's policy of withholding interest payments from their rightful owners in contravention of clear Oklahoma law. The Court, therefore, finds again, by a preponderance of the evidence, that Cline demonstrated Sunoco's liability to the entire class.

---

[9] Although Sunoco directed the proceeds it owed to some class members to an unclaimed property fund, that does not negate the right of those unidentified or unlocated class members to the proceeds—a right that they could vindicate at any time by collecting the proceeds from their respective state. (ECF No. 298, at 33–43.)

11

Sunoco also contends that because it will remit a portion of the judgment to state unclaimed property funds due to the number of unidentified or unlocated class members, "the judgment will order a 'fluid' recovery that violates Due Process." (ECF No. 323, at 10.)  For all the reasons discussed in its August 17 Opinion, the Court disagrees. (ECF No. 298, at 40–42.)  Because Cline has demonstrated Sunoco's liability to each member of the class and because Sunoco had the opportunity to rebut Cline's assertions, recovery in this case does not "mask the prevalence of individual issues [such that] it is an impermissible affront to defendants' due process rights." *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 232 (2d Cir. 2008), *abrogated on other grounds by Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639 (2008).

The Court also rejects Sunoco's claims that it "would be compelled to pay damages to class members that lack standing to sue, . . . and [that] Sunoco may be improperly bound by a judgment to thousands of unknown persons." (ECF No. 323, at 10.)  First, for the same reasons detailed in its August 17 Opinion, the Court finds that the class members—including those who remain unlocated and unidentified—had standing to seek damages in this case. (ECF No. 298, at 31–34.)  Second, the Court's judgment does not bind Sunoco to *unknown* persons as Sunoco alleges.  The company anticipates difficulty determining "who is a party to the judgment, and against whom it could assert estoppel or res judicata if future lawsuits against Sunoco for PRSA interest are filed." (ECF No. 321, at 20.)  Although the judgment binds Sunoco to unidentified and unlocated persons, a class member's status as unlocated or unidentified does not render them *unknown* to Sunoco.  The Court, therefore, finds that the judgment does *not* bind Sunoco to unknown persons, and it does not place Sunoco at risk for subsequent, duplicative claims.  Indeed, Sunoco itself paid these unidentified or unlocated class members by remitting payment to the relevant state unclaimed property fund.

12

Finally, Sunoco "renews . . . its prior arguments . . . that Sunoco is not liable for, and class members cannot recover for, alleged untimely payments of proceeds to states under their unclaimed property statutes." (ECF No. 323, at 11.)  As the Court confirmed above, owners entitled to unclaimed funds had standing to seek damages in this case. (*See also* ECF No. 298, at 31–34.)  In addition, the PRSA compels the conclusion that Sunoco must timely pay proceeds to "persons legally entitled thereto" unless one of the exceptions provided in § 570.10(B)(3) applies. Because the statute does not list unclaimed funds among its exceptions, the Court finds that the PRSA's timing requirements do, in fact, apply to unclaimed funds. (*See* ECF No. 298, at 34–35.) Accordingly, Sunoco "is . . . liable for, and class members can[] recover for, . . . untimely payments of proceeds" to state unclaimed property funds. (ECF No. 323, at 11.)

## IV. CONCLUSION

For the foregoing reasons, the Court will deny Sunoco's motion for a new trial and its motion to alter or amend the judgment. [10]  (ECF Nos. 322, 323.)

The Court will issue an appropriate Order.

---

[10] On November 25, 2020, Sunoco renewed its motion for a new trial and its motion to alter the judgment. (ECF Nos. 347, 348.)   Challenging the Plan of Allocation, Sunoco argues that because the Court should either order a new trial or alter the judgment, the Court should also vacate or amend the Plan of Allocation.  Sunoco also reasserts that the Plan of Allocation "does not adequately (1) address the method for distributing funds that go unclaimed by class members . . . or (2) allocate, to identified class members, the 10% of the damages awarded to class members whose interests were combined with Sunoco's 'undivided' account." (ECF No. 347, at 3; ECF No. 348, at 3.)
    The Court dismisses both arguments.  Sunoco's first argument fails because the Court will deny Sunoco's motion for a new trial and its motion to alter the judgment.  The Court also finds the Plan of Allocation adequate as it provides for the distribution of funds to state unclaimed property funds if the class member does not claim their funds or remains unidentified or unlocated. Accordingly, the Court will deny Sunoco's renewed motion for a new trial and its motion to alter the judgment. (ECF Nos. 347, 348.)

13

Let the Clerk send a copy of this Order to all counsel of record.

Date: _9 December_ 2020
Richmond, VA

_/s/_

John A. Gibney, Jr.
United States District Judge

14

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **PERRY CLINE, on behalf of** | ) | |
| **himself and all others** | ) | |
| **similarly situated,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:17-cv-313-JAG** |
| | ) | |
| **SUNOCO, INC. (R&M)** | ) | |
| **and SUNOCO PARTNERS** | ) | |
| **MARKETING & TERMINALS, L.P.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

<u>**AMENDED PLAN OF ALLOCATION ORDER**</u>

This matter comes before the Court following the Order and Judgment by the Tenth Circuit

in Case No. 22-7018, which remanded this matter for further proceedings consistent with its

opinion of August 3, 2023. The Court, being fully advised on the issues before it, hereby ORDERS

as follows:

**A. Definitions**

For purposes of this Order:

The term "Judgment Fund" means the sum of all actual and punitive damages awarded in

this matter and allowed after any appeal (or after the expiration of time allowed for filing an appeal,

if no appeal is filed within that time), inclusive of any attorneys' fees, expenses, costs, and pre-

and post-judgment interest as have been or may be awarded to Class Representative and the Class,

and inclusive of any interest earned through such investments as the Court may direct following

Defendants' payment of the judgment.

The term "Judgment Administrator" means the officer appointed by the Court pursuant to this Order to execute the Plan for Distribution and to perform such incidental and additional duties as are set forth in this Order or as the Court may subsequently direct.

The term "Net Class Award" means the Judgment Fund, less any: (i) case contribution award to Class Representative; (ii) attorneys' fees, expenses, and costs awarded from the Judgment Fund to counsel for Class Representative and the Class; (iii) compensation and expenses paid or reimbursed to the Judgment Administrator; and (iv) any additional administrative expenses that may be charged against the Judgment Fund at the Court's direction.

The term "Residual Unclaimed Funds" means the amount of the Net Class Award remaining as a result of uncashed distribution checks, inability to locate Class Members, and/or other such reasons after the Judgment Administrator distributes the Net Class Award to all Class Members using commercially reasonable efforts according to the Final Distribution Order.

**B. The Formula That Will Determine the Division of Damages**

The Tenth Circuit recognized that the original plan of allocation adopted a formula for dividing damages that was intended to assign each class member a ten-digit BA number taken from Sunoco's records. Order and Judgment at 11. Under this formula, the judgment administrator would calculate each class member's damages by multiplying their predetermined percentage of the total judgment by the total judgment itself. *Id.* at 11-12.

There is no dispute that this formula will produce individual damage figures for *most* class members because *most* of the BA numbers correspond to an individual class member. *Id.* at 12. But two of the BA numbers do not represent individual accounts held by a single class member, but instead, represent two undivided accounts that Sunoco deposited proceeds into whenever it did not know a mineral-interest owner's name or address. Order at 12.

Finding that these undivided accounts prevented the original plan of allocation from achieving finality, the Tenth Circuit remanded and instructed this Court to include instructions for how the judgment administrator is to divide damages among the class members associated with those two BA numbers (0009134057 & 0007005424).

This Amended Plan of Allocation cures the Tenth Circuit's concern, *see* Order at 13 n.6, by now including instructions for the two undivided accounts.

 *1.* *Division of Damages for BA Numbers that Correspond to Individual Class Members*

The formula that will determine the division of damages for BA numbers that correspond to individual class members is the same formula set forth in the Oklahoma Production Revenue Standards Act ("PRSA") for calculating 12% compound interest as applied by Barbara Ley at trial to calculate the damages for Class Members. That information is contained in PX454. That formula has been applied and set forth on a percentage basis in Exhibit 1 to the Declaration of Barbara Ley (Class Representative's damages expert) [Dkt. No. 317-1].

The methodology Ms. Ley used to prepare the proposed allocation was derived from, and consistent with, the methodology that this Court previously approved in support of Plaintiff's *Motion to Certify Class* [Dkt. No. 91] and admitted into evidence at the trial in this matter in order to determine the total amount of actual damages.[1]

---

[1] Ms. Ley's methodology here is also consistent with the methodology that has been approved by this Court in the following cases: *Reirdon v. XTO Energy*, Final Plan of Allocation Order, Dkt. No. 141 (E.D. Okla. June 12, 2018); *Reirdon v. Cimarex*, Final Plan of Allocation Order, Dkt. No. 114 (E.D. Okla. April 25, 2019); *Chieftain v. Marathon Oil Co.*, Final Plan of Allocation Order, Dkt. No. 127 (E.D. Okla.. June 11, 2019); *Chieftain v. Newfield Exploration Mid-Continent Inc.*, Final Plan of Allocation Order, Dkt. No. 75 (June 4, 2020); *DASA Investments, Inc. v. EnerVest Operating, et al.*, Final Plan of Allocation Order, Dkt. No. 124 (E.D. Okla. June 25, 2020); and *McClintock v. Continuum Producer Services*, LLC, Case No. 6:17-CV-259-JAG, Initial Plan of Allocation Order, Dkt. No. 64 (E.D. Okla. June 4, 2020).

Ms. Ley calculated the amount of damages owed to each individual Class Member, and then summed those figures to determine the amount of damages owed to the Class. Ms. Ley then updated those amounts, at the Court's direction, to reflect the time that had elapsed and the interest that had accrued since her original calculation. Ms. Ley then divided the updated damage figure for each Class Member by the total amount of damages awarded to the Class, and thereby determined each Class Member's proportional share of the Judgment. The result of this formulaic approach is a list containing Class Members' fractional share of the total amount of damages.

For Class Members other than those in the undivided accounts, the Judgment Administrator is directed to multiply the fractional share for each Class Member expressed in Ms. Ley's Declaration by the Net Class Award in order to arrive at the exact dollar amount that each Class Member shall be paid.

2. *Division of Damages for The Two Undivided Accounts with BA Numbers 0009134057 & 0007005424*

For the undivided accounts, PX454 contains the information related to each separate late principal payment made to a Class Member and labeled as "undivided," along with the formula and amount to calculate the damages owed for each payment. The Judgment Administrator is directed to calculate the fractional share for each such payment based on Ms. Ley's calculations and formula using the information in PX454, then apply the resulting percentage to the Net Class Award to arrive at the exact dollar amount owed for each payment and assign that amount to the Class Member, if possible. If the Judgment Administrator is unable to obtain further ownership information related to any particular payment, then the Judgment Administrator shall pay the same amount to the appropriate unclaimed property fund with a schedule identifying all information related to the original payment from PX454 so that the unclaimed property fund can correlate the damages to the original late principal payment. That schedule is attached hereto as Exhibit 1.

## C. Procedures for Distribution

The Court already appointed JND Legal Administration to serve as Judgment Administrator in this matter. At such time as the Court directs, the Judgment Administrator, in consultation with Class Counsel, shall be responsible for applying the mathematical principles established in the Plan for Distribution to ascertain the precise amounts of the Net Class Award allocable to each Class Member and each separate late payment included in the undivided accounts. The result of the Judgment Administrator's calculations shall be submitted to the Court for approval as the Final Plan for Distribution.

Upon approval, the Court will enter a Final Distribution Order establishing the allocation for purposes of disbursements to Class Members.

The Judgment Administrator will also be responsible for distributing the Net Class Award pursuant to such further orders as the Court shall issue.

The Judgment Administrator shall report to the Court from time to time to advise the Court of its progress in discharging its responsibilities under this Order, on such occasions and at such intervals as the Judgment Administrator may deem appropriate or as the Court may direct. The Judgment Administrator is authorized to make reasonable expenditures to secure the resources and assistance reasonably necessary to the performance of its duties, including obtaining support from experts such as Barbara Ley and landmen. Such expenses, and the compensation of the Judgment Administrator at its usual and customary hourly rates, will be paid and reimbursed from the Judgment Fund periodically, as incurred.

The Judgment Administrator shall not commence the performance of its duties under this Order until such time as the case is remanded to this Court from any appeal (or until after the expiration of the time allowed for filing such appeal, if no appeal is filed within that time).

**D. Procedures and Principles for the Distribution of any Unclaimed Funds**

Any Residual Unclaimed funds will be sent to the appropriate state accounts for unclaimed property. After the Judgment Administrator has used commercially reasonable efforts to complete the distribution process outlined in the Final Distribution Order, Class Counsel shall file a motion stating the amount of any Residual Unclaimed Funds. The Court will then order the Residual Unclaimed Funds to be remitted to the unclaimed property funds as indicated.

It is so ORDERED.

Let the Clerk send a copy of this Order to all counsel of record.

Date: 17 October 2023
Richmond, VA

/s/
John A. Gibney, Jr.
Senior United States District Judge

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

PERRY CLINE, on behalf of    )
himself and all others       )
similarly situated,           )
                             )
          **Plaintiff,**       )
                             )
              **v.**         )     **Case No. 6:17-cv-313-JAG**
                             )
SUNOCO, INC. (R&M)       )
and SUNOCO PARTNERS    )
MARKETING & TERMINALS, L.P.,   )
                             )
       **Defendants.**      )

## AMENDED AWARD OF ACTUAL DAMAGES

       This matter comes before the Court following a bench trial and numerous appeals that resulted in a determination that the judgment was not yet final. The Court held a trial in this case on December 16-19, 2019, and heard closing arguments on June 17, 2020. On August 17, 2020, the Court entered its Opinion and Order in this matter. (ECF Nos. 298-299.) The Court entered a Judgment Order on August 27, 2020, to update the actual damages based on the interest statute, awarding damages in the amount of $80,691,486.00 in actual damages and $75,000,000.00 in punitive damages. (ECF No. 308.)

       On August 3, 2023, the Tenth Circuit Court of Appeals ruled that the judgment in this case is not yet final and remanded the case for further proceedings. In accordance with its reasoning for the August 27, 2020 order and its October 17, 2023 order (ECF No. 642), the Court now updates the actual damages based on the interest statute and awards an additional $23,181,516.50 in actual damages for interest that accrued after the Court's August 27, 2020 order, for a total of $103,873,002.50 in actual damages.

It is so ORDERED.

Let the Clerk send a copy of this Order to all counsel of record.

Date: 19 October 2023

Richmond, VA

/s/

John A. Gibney, Jr.
Senior United States District Judge

John A. Gibney, Jr.
United States District Judge

2

**A108**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| PERRY CLINE, on behalf of himself and all others similarly situated, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 6:17-cv-313-JAG |
| SUNOCO, INC. (R&M) and SUNOCO PARTNERS MARKETING & TERMINALS, L.P., | ) ) ) ) | |
| Defendants. | ) ) | |

### RULE 58 JUDGMENT ORDER

Under Rule 58, the Court hereby ENTERS JUDGMENT against the Defendants in accordance with the reasoning stated in the Court's August 17, 2020 opinion, (ECF No. 298), and its prior Order (ECF No. 299.) In addition to the actual damages of $80,691,486.00 calculated as of the prior Judgment Order on August 27, 2020 (ECF No. 308), the Court awards an additional $23,181,516.50 in actual damages in accordance with its October 17, 2023 order (ECF No. 642.)

The total amount awarded to Plaintiffs from Defendants, therefore, is $103,873,002.50 in actual damages and $75,000,000.00 in punitive damages.

The Court attaches hereto as Exhibit A an Amended Plan of Allocation Order.

It is so ORDERED.

Let the Clerk send a copy of this Order to all counsel of record.

Date: 19 October 2023
Richmond, VA

/s/
John A. Gibney, Jr.
Senior United States District Judge
John A. Gibney, Jr.
United States District Judge

**A109**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

PERRY CLINE, on behalf of himself
and all others similarly situated,
                    Plaintiff,

v.                                          Civil Action No. 6:17cv313-JAG

SUNOCO, INC. (R&M), and,
SUNOCO PARTNERS MARKETING
& TERMINALS, L.P.,
                    Defendants.

### ORDER

This matter comes before the Court on a motion for a new trial and a motion to alter or amend the judgment filed by the defendants, Sunoco, Inc. (R&M), and Sunoco Partners Marketing & Terminals, L.P. (collectively, "Sunoco"). (ECF Nos. 651, 652.) Sunoco raises no new arguments in its motions. Instead, it rehashes a litany of arguments that this Court carefully considered and rejected throughout the past six years of proceedings. Indeed, Sunoco reiterated many of these arguments in previous post-trial motions, which this Court denied. (ECF No. 349.) Accordingly, and upon due consideration, the Court DENIES the motions. (ECF Nos. 651, 652.)

It is so ORDERED.

Let the Clerk send a copy of this Order to all counsel of record.

Date: 20  November 2023
Richmond, VA

                    /s/
                    John A. Gibney, Jr.
                    Senior United States District Judge

**A110**